UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| VS | : | CR 06-02-T |
| | : | |
| ROBERT A. URCIUOLI, | : | |
| FRANCES P. DRISCOLL, | : | |
| PETER J. SANGERMANO, JR., and | : | |
| ROGER WILLIAMS MEDICAL CENTER | : | |

**DEFENDANT FRANCES P. DRISCOLL'S MOTION TO DISMISS**

Now comes the Defendant, Frances P. Driscoll, and hereby moves that this Honorable Court dismiss the indictment brought against her by the United States Government on or about January 5, 2006. The factual allegations in the indictment, even if taken as true, are legally insufficient to support the charged offenses.

In support of this Motion, Defendant relies upon the attached Memorandum of Law. **This Motion and the Memorandum of Law are being filed in conjunction with Defendant Robert A. Urciuoli's Motion to Dismiss.**

Respectfully submitted
FRANCES P. DRISCOLL
By her Attorney,

KEVIN J. BRISTOW, ESQ. #3984
505 Turks Head Building
Providence, RI 02903
(401) 521-2800; fax (401) 521-2812

**Certification of Service**

I hereby certify that on the 3rd day of April, 2006, I mailed a copy of the within Motion to Assistant United States Attorney Luis Matos, United States Attorneys Office, Fleet Center, 50 Kennedy Plaza, Providence, RI 02903, Michael J. Connolly, Esq., Hinckley, Allen & Snyder LLP, 1500 Fleet Center, Providence, Rhode Island 02903, and James P. Redding, Esq., 170 Westminster Street, Providence, Rhode Island 02903.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
VS. : CR 06-02-02-T
:
ROBERT A. URCIUOLI, :
FRANCES P. DRISCOLL, :
PETER J. SANGERMANO, JR., and :
ROGER WILLIAMS MEDICAL CENTER :

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FRANCES P. DRISCOLL'S MOTION TO DISMISS THE INDICTMENT**

Defendant Frances P. Driscoll ("Mrs. Driscoll") respectfully submits the following Memorandum of Law in support of his Motion to Dismiss the Indictment in this matter. **This memorandum explicitly incorporates Defendant Robert A. Urciuoli's Memorandum of Law in support of his Motion to Dismiss the Indictment and all attachments thereto. The factual references and legal arguments made by co-defendant Urciuoli will not be repeated in this Memorandum of Law.**

**I.**

**FACTUAL DISTINCTIONS**

Although Mrs. Driscoll is relying upon many of the legal and factual arguments advanced by co-defendant Urciuoli, there are several important factual distinctions between her case and that of Mr. Urciuoli. First, Mrs. Driscoll was charged in the first and second counts of the indictment and not counts three through thirty-eight. See Indictment, Par. 107.

Next, Mrs. Driscoll was not the chief executive of the hospital and, as such, she did not have the authority to hire or set the terms of the employment of John Celona ("Celona"). When Mrs. Driscoll was advised that RWMC was contemplating hiring Celona as a consultant, she urged consulting the medical center's legal counsel. Thereafter, she advocated having that legal counsel obtain an opinion from the Rhode Island Ethics Commission on behalf of Celona. As part of this process, Mrs. Driscoll was directed to prepare a "job description" for Celona. The document she prepared disclosed the relationship between Celona and RWMC. See Indictment, Par. 23. Thereafter, Mrs. Driscoll relied upon the advice of legal counsel for RWMC and the opinion sought and obtained from the Rhode Island Ethics Commission regarding the legality of Celona's consulting.

## II.

## PRELIMINARY STATEMENT

Mrs. Driscoll, like her two co-defendants, is charged with willfully causing former State Senator John Celona to deprive the Rhode Island citizenry of their right to Celona's honest services. The heart of the alleged fraud scheme is that Celona had an undisclosed conflict of interest, because he schemed and conspired with all of the defendants to hold himself out as a consultant for the Village at Elmhurst, LLC ("the Village") when actually he worked for Roger Williams Medical Center ("RWMC"). The Government posits that, because Celona's relationship with RWMC was intentionally concealed, Celona's legislative actions involving bills affecting RWMC and its affiliates

defrauded the public of Celona's honest services. Taking all of the allegations in the Indictment as true, the Government's theory is fatally-flawed for several reasons.

First, co-defendant Urciuoli engaged RWMC's legal counsel to seek an advisory opinion from the Rhode Island Ethics Commission regarding Celona's consulting contract with the Village. In requesting the advisory opinion, Urciuoli and RWMC notified the Ethics Commission that the Village was half-owned by RWMC through a subsidiary, and that Celona was being paid to work for the Village *and RWMC affiliates* of the Village. The ensuing Ethics Commission Advisory Opinion prohibited Celona from participating in legislation regarding assisted living facilities, but allowed Celona to participate in legislation regarding hospital regulation, nursing homes, general health care, and other issues. The disclosures to the Ethics Commission were then published on page B-1 of The Providence Journal. The Government simply cannot meet its burden to prove that Urciuoli or Mrs. Driscoll intended to conceal from the public Celona's financial relationship with RWMC when Urciuoli disclosed that relationship to the Ethics Commission and made it headline news.

Second, the Government claims that Rhode Islanders were defrauded of their rights to Celona's honest services because: (i) Urciuoli and Mrs. Driscoll had Celona advocate for more ambulance runs from certain municipalities to Roger Williams Hospital; and (ii) Urciuoli and Mrs. Driscoll advocated RWMC's position to Celona on general health care legislation.[1] The first allegation cannot support an honest services fraud case because it does not involve legislative action, which is required to sustain an honest services fraud charge. As to the second allegation, the Ethics Commission found

---

[1] It must be noted that many of the allegedly conspiratorial communications among Celona, Urciuoli, and others simply involve Celona informing RWMC representatives of the status of health care legislation. See e.g., Indictment ¶¶ 70, 73.

as a matter of law that Celona could participate in general health care legislation that would impact RWMC, despite his financial ties to RWMC. The Ethics Commission cited R.I. Gen. Laws § 36-14-7(b), which allows such participation when the "benefit or detriment accruing to the Senator and/or the Village/[RWMC] affiliates would affect them to no greater extent than any other similarly situated members of a significant and definable group." See Exhibit A.[2][3]

Third, numerous courts have recognized the inherent risk in honest services mail fraud cases of making federal felonies out of state law misdemeanor violations, such as the Rhode Island Ethics Code at issue here. The vagaries inherent in the honest services fraud doctrine, combined with the unique facts here -- including express approval by the Rhode Island Ethics Commission, render this a compelling case for dismissal under the rule of lenity.

Accordingly, none of the allegations can support a legally viable honest services mail fraud theory and the Indictment should be dismissed.

---

[2] The general rule is that a Court may only consider the four corners of the indictment when ruling on a motion to dismiss. United States v. Welsch, 327 F.3d 1081, 1090 (10th Cir. 2003). However, an indictment may be dismissed at the pretrial stage based on evidence beyond the four corners of the indictment when "the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case." See United States v. Brown, 925 F.2d 1301, 1304 (10th Cir. 1991); United States v. Wood, 6 F.3d 692, 695 (10th Cir. 1991); United States v. China Star, Inc., 375 F. Supp. 2d 1291, 1292 (D. N.M. 2005) (following the tenth circuit); see also Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (holding that when ruling on a motion to dismiss, the court may refer to documents, the authenticity of which is not disputed, official public records, documents central to plaintiffs' claim and documents sufficiently referred to in the complaint).

[3] Defendant Urciuoli is filing, contemporaneously with this motion, a motion for leave to exceed the 10 page limitation on Exhibits set forth in the Court's Standing Order. The Government has assented to the relief requested in that motion. If granted, Urciuoli will promptly file and serve an Appendix including all of the Exhibits referenced herein.

## III.

## THE ALLEGATIONS IN THE INDICTMENT[4]

On January 5, 2006, a grand jury returned a thirty-eight (38) count Indictment against Urciuoli, RWMC, Driscoll and Peter J. Sangermano, Jr. ("Sangermano"). As noted, Mrs. Driscoll was charged only in the first two counts of this indictment. Count 1 of the Indictment alleges a conspiracy to deprive the citizens of Rhode Island of Celona's honest services in violation of 18 U.S.C. §§ 371, 1341 and 1346. See Indictment ¶¶ 13-94. The conspiracy is alleged to have two objectives: (1) to pay Celona, under the guise of a consulting agreement with the Village, to influence his official legislative actions to benefit the political and financial interests of RWMC and its affiliates; and (2) to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC. Id. at ¶¶ 15-16. Counts 2 through 38 allege substantive mail fraud violations involving the same alleged scheme. Id. at ¶¶ 95-107.

### A. The Parties

RWMC is a Rhode Island not-for-profit corporation and the parent company of Roger Williams Hospital ("Hospital"). Indictment ¶ 4. It is also the sole shareholder of the following three entities: (1) Roger Williams Realty Corporation ("Roger Williams Realty"), a Rhode Island for-profit corporation that owns and manages real estate for the benefit of RWMC; (2) Elmhurst Extended Care Facilities, Inc. ("Elmhurst"), a Rhode Island for-profit corporation that operates a skilled nursing and intermediate care facility; and (3) Elmhurst Health Associates, a Rhode Island for-profit corporation that operates a

---

[4] For purposes of this motion only, the factual allegations in the Indictment are accepted as true. United States v. J. Tirocchi & Sons, Inc., 187 F. Supp. 778, 778 (D.R.I. 1960).

pharmacy and provides outpatient laboratory services. Id. Urciuoli is the former President and Chief Executive Officer of RWMC. Id. at ¶ 1. Driscoll is the former Senior Vice President, External Affairs, Corporate Communications and Development for RWMC. Id. at ¶ 2.

The Village is an assisted living facility, which, during the period covered by the Indictment, was a joint venture between Roger Williams Realty and SANAT Properties, LLP ("SANAT"). Id. at ¶ 5. Defendant Sangermano is a principal of Village Retirement Communities, LLC, which was a part owner of SANAT. Id. at ¶¶ 3 and 5.

Celona was a Rhode Island State Senator from January 1995 through March 2004. Id. at ¶ 6. From on or about January 4, 2001, through on or about December 11, 2003, Celona was Chairman of the Senate Corporations Committee. Id.

## B. The Rhode Island Code of Ethics

Rhode Island has a part-time, citizen legislature. Representatives and Senators elected to serve in the General Assembly, therefore, typically hold full-time employment in private businesses and in various professions. Thus, it is inevitable that individual legislators will encounter legislation in the course of performing their official duties that may impact their respective businesses or professions, and thus their financial interests, as the General Assembly enacts legislation that over time affects all industries.

In order to set standards of conduct for all public officials and employees, including legislators, the General Assembly enacted the Rhode Island Code of Ethics ("Code of Ethics") in June of 1987. Indictment ¶ 11. The Code of Ethics prohibits, among other things, any person subject to the Code of Ethics from having "any interest, financial or otherwise, direct or indirect," or engaging "in any business, employment,

transaction or professional activity," or incurring "any obligation of any nature, which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities" as prescribed in the laws of the State of Rhode Island. R.I. Gen. Laws. § 36-14-5(a). The Code of Ethics also provides that a public official has a conflict of interest if he "has reason to believe or expect that he…or any business associate, or any business by which the person is employed or which the person represents will derive a direct monetary gain…by reason of his of her official activity." R.I. Gen. Laws. § 36-14-7(a).

The Code of Ethics, however, expressly allows members of the General Assembly to participate in legislation where the legislator or his employer is part of a broad group or industry whose members will be similarly impacted by the legislation. R.I. Gen. Laws § 36-14-7(b). Specifically, the statute permits a legislator to vote on legislation that affects the legislator's financial interests or those of his employer where such interests are affected to no "greater or lesser extent than the interests of all other members of the affected group or profession to which the legislator…or his employer…belongs." Id.

The Code of Ethics governs all elected and appointed state and municipal officials, as well as employees of state and local government, boards, Commissions and agencies. R.I. Gen. Laws § 36-14-3. The Code of Ethics does not apply to individuals outside of public service, such as the individual Defendants in this case. See id. [5]

[5] The knowing and willful violation of the Ethics Code by a public official is a misdemeanor. R.I. Gen. Laws § 36-14-19 ("Any person who knowingly and willfully violates the provisions of this chapter shall, in addition to the civil penalties provided herein, be guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1000) and/or imprisonment for no longer than one year.").

In 1987[6] the Rhode Island Ethics Commission was created to enforce the provisions of the Code of Ethics and investigate violations of it. Indictment ¶ 11. The Ethics Commission has jurisdiction to adjudicate complaints, issue findings, and remove elected officials from office. R.I. Gen. Laws §§ 36-14-12, 36-14-13 and 36-14-14. The Ethics Commission also has the authority to issue advisory opinions relating to the requirements of the Code of Ethics. R.I. Gen. Laws § 36-14-11.

## C. Celona's Consulting Agreement

In or about August 1997, Celona met with Urciuoli and requested employment with RWMC. Indictment ¶ 21. Urciuoli advised Driscoll that he was interested in hiring Celona as a consultant to RWMC. Id. at ¶ 22. Thereafter, Urciuoli, Driscoll and Sangermano drafted a consulting agreement outlining Celona's job duties (the "Consulting Agreement"). Id. at ¶¶ 23-25. Pursuant to the initial draft of the Consulting Agreement, Celona's primary job was "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at Roger Williams Medical Center and its affiliated entities." Id. at ¶ 23. The final, executed Consulting Agreement required Celona to provide various public relations and marketing services to the Village and RWMC's wholly-owned nursing home, Elmhurst, including

---

[6] In 1976, the Rhode Island General Assembly enacted the state's first Code of Ethics and created the Conflict of Interest Commission. That Code governed the activities of state and municipal elected and appointed officials and required all such officials to meet newly imposed financial disclosure requirements. The Conflict of Interest Commission enforced the statute. In November, 1986, Rhode Island voters adopted a constitutional amendment mandating that the General Assembly "establish an independent, non-partisan ethics commission" (R.I. Const. art. III, sec. 8). In 1987, the General Assembly replaced the Conflict of Interest Commission with a 15-member Ethics Commission. In 1992, the Assembly reduced the size of the Ethics Commission to the current nine members.

heightening awareness among seniors of the programs and services provide by those organizations, among other obligations. See Exhibit B. The Consulting Agreement also required Celona to "keep abreast of legislative issues and regulations at the local, state and federal levels that impact or could impact the Village delivery of care with particular emphasis on efforts to regulate or license assisted living facilities." Id.

It was unmistakably clear from the terms of the Consulting Agreement that Celona was obligated to serve the economic interests of RWMC, both as to its wholly-owned nursing home and its half-owned assisted living facility. Indeed, Urciuoli and Driscoll expressly acknowledged that Celona would encounter conflicts of interest between his duties as a Senator and his duties to the Village and the RWMC affiliates in conjunction with requiring Celona to cooperate with *RWMC's counsel* in *RWMC's efforts* to seek an Ethics Commission Advisory Opinion. The Consulting Agreement provided:

> Given your position as a Rhode Island state senator, there will be situations in which your performance hereunder will conflict with your responsibilities as a senator. It is essential to delineate what areas of conflict may develop. Accordingly, counsel to RWMC will assist you with preparing and submitting a request for an advisory opinion from the Rhode Island Ethics Commission. You agree to cooperate fully with such efforts and consent to this agreement being attached to such request.

See Exhibit B. Thus, contrary to the Government's legal theory, in requiring this precautionary measure, Driscoll and Urciuoli not only did not conceal Celona's economic relationship with RWMC, they required scrutiny of it by legal counsel and the Ethics Commission.

## D. RWMC's Letter to the Rhode Island Ethics Commission

As contemplated by the Consulting Agreement, Urciuoli directed legal counsel for RWMC to prepare a letter to the Ethics Commission on Celona's behalf to obtain

guidance on the extent to which Celona could continue to perform his legislative functions. Indictment ¶ 41. On or about April 6, 1998, counsel for RWMC, James R. McGuirk of Edwards & Angell, sent a letter to the Ethics Commission, requesting an advisory opinion regarding the extent to which Celona could continue to propose, debate and vote on health care issues before the General Assembly in light of his consulting duties to the Village and RWMC affiliates. See Exhibit C. The letter attached a copy of the Consulting Agreement. Indictment ¶ 44; see also Exhibit C.

In the letter, Attorney McGuirk painstakingly spelled out the numerous ways in which Celona's consulting relationship was connected to RWMC. First, McGuirk made it clear that, while Celona was engaged by the Village, the "Village is a joint venture between Roger Williams Realty Corporation ("RWRC") and SANAT, LLP." See Exhibit C. McGuirk further explained that "RWRC, Roger Williams Hospital and Elmhurst Extended Care Facility, Inc. are all members of the same group of controlled companies, which have Roger Williams Medical Center as their sole member or holding company." Id. Second, McGuirk explained the nature of two of the businesses of the Roger Williams entities mentioned in the letter, stating, "Roger Williams Hospital is an acute care hospital and Elmhurst Extended Care Facility, Inc. is a 200-bed nursing home with a hospice unit." Id. In providing that information, McGuirk underscored the fact that Celona had financial ties to Roger Williams Hospital and Elmhurst in order to facilitate the Ethics Commission's assessment of Roger Williams-related conflict issues. Third, McGuirk explicitly advised that Celona would be working for the Village and "other *facilities* such as the Elmhurst Extended Care Facility, Inc., …" Id. (emphasis added). Fourth, in highlighting the areas where he believed conflicts were likely to arise,

McGuirk enumerated "health care issues such as elderly affairs, nursing home issues, hospital regulations, hospital reorganizations and health care in general." Id. Here again, McGuirk underscored Celona's financial ties to Roger Williams Hospital and Elmhurst. Lastly, McGuirk pointed out that, in regard to preparing the instant letter, he was being paid by RWMC. Id. ("The undersigned has been engaged by RWMC to seek an advisory opinion ...").

It is difficult to imagine how McGuirk could have been more clear in disclosing the financial ties between Celona and RWMC under the Consulting Agreement, as well as the likely conflicts that would occur in light of those ties.

### E. The Ethics Commission's Response – Advisory Opinion 98-59

In April 1998, the Ethics Commission responded to RWMC's letter with Advisory Opinion 98-59 (the "Advisory Opinion"). See Exhibit A. The Advisory Opinion reflects that the Ethics Commission understood Celona would be working for the Village and other RWMC affiliates, in that it states Celona would be working for the Village "and its related facilities, such as the Elmhurst Extended Care Facility, Inc." Id. Furthermore, the Advisory Opinion expressly acknowledged that Celona's job responsibilities required him to "keep abreast of legislative issues and regulations at local, state and federal levels that potentially could impact delivery of care by the Village *and its related facilities*." Id. (emphasis added). Thus, based on information supplied by McGuirk, acting at the direction of Urciuoli, the Ethics Commission expressly understood that Celona would be monitoring "legislative issues" for Roger Williams affiliates.

The Ethics Commission concluded, among other things, that Celona could not participate in legislation relating to assisted living facilities. Id. The Ethics Commission also ruled that Celona could "fully participate and vote on broad-based legislation involving general health care issues of public interest." Id. The Advisory Opinion stated further that "general legislation relating to elderly affairs, nursing home issues and hospital regulations is likely to impact all corners of the health care industry in the state, as well as many related industries," and that, under R.I. Gen. Law § 36-14-7(b), "any benefit or detriment accruing to the Senator and/or the Village/affiliates would affect them to no greater extent than any other similarly situated members of a significant and definable group." Id.

Furthermore, the Advisory Opinion provided two "illustrative" examples of situations where it permitted public officials to participate in official decision-making even though the decision-making would directly affected their financial interests. Id. First, in Advisory Opinion 96-71, the Ethics Commission determined that a legislator could participate and vote on legislation regulating the sale of insurance by banks even though the legislator requesting the opinion was an insurance agent. Id. Second, in Advisory Opinion 96-24, the Ethics Commission determined that a Newport Zoning Board member could participate in matters affecting the bed and breakfast industry even though the Zoning Board member owned a hotel. Id. In citing these precedents, the Ethics Commission sent the unambiguous message that Celona could "fully participate and vote" on legislation regarding hospitals, nursing homes, and other health care issues even though he had direct financial ties to RWMC and its affiliates, so long as he complied with the Section 6 Notice requirement.

**F. <u>Alleged Overt Acts In Furtherance of the Conspiracy to Defraud</u>**

The Indictment alleges several courses of conduct engaged in by the Defendants and Celona that allegedly furthered the scheme to defraud the citizens of Rhode Island of their right to Celona's honest services. The conduct generally falls into three categories: (i) Celona's efforts to increase ambulance runs from certain municipalities to Roger Williams Hospital; (ii) Celona's efforts to facilitate meetings between RWMC officials and representatives of two health insurers – Blue Cross & Blue Shield of Rhode Island ("Blue Cross") and United Healthcare of New England ("United"): and (iii) the Defendants efforts to cause Celona to take positions on legislation favored by RWMC and/or the Village.

**1. <u>Ambulance Runs</u>**

In early 1998, Urciuoli advised Driscoll and others that rescue runs were a source of revenue for the Hospital because they brought revenue producing patients into the facility, and that Roger Williams Hospital was not getting its "fair share" of rescue runs from certain municipalities. <u>Id.</u> at ¶ 35. To address this issue, Urciuoli sought to have Celona "take care of" the rescue run problem "politically." <u>Id.</u> at ¶ 36. At the direction of Urciuoli and Driscoll, Celona attempted to persuade municipalities to increase the number of ambulance transports directed to the Hospital, including meeting with the Chief of the North Providence Fire Department. <u>Id.</u> at ¶¶ 37-38.

The Indictment makes no allegation that Celona's efforts to increase rescue runs to the Hospital involved any type of legislative action.

2. **Consultation Regarding Legislation**

Celona had numerous communications with Driscoll and Urciuoli regarding pending or proposed legislation and RWMC's position with respect to such legislation. Those communications include statements by the Defendants advocating RWMC's position, as well as updates from Celona advising of the status of certain legislation. The legislation includes:

**a. *Alzheimer's Legislation - 98-H 8229***

Senate Bill 98-H 8229, an "Act Relating to Residential Care and Assisted Living Facilities," prohibited health facilities from holding themselves out as offering Alzheimer's care to patients unless the facilities were licensed as nursing homes or hospitals. See Exhibit D. As such, the Bill would have affected all hospitals and nursing homes in Rhode Island.

**b. *Conversion Legislation - 98-S 2796 and 99-S 1053***

Senate Bill 98-S 2796 prohibited directors, trustees, or officers from serving on the board of a newly converted hospital, see Exhibit E, and Senate Bill 99-S 1053 would amend the Hospital Conversion Act by requiring the Department of Health to review acquisitions of all not-for-profit or for-profit corporations by for-profit hospitals. See Exhibit F. As such, these bills would affect all hospitals in Rhode Island.

**c. *Moratorium Legislation – 99-H 6122***

House Bill 99-H 6122, amended the extension of the moratorium on licensing new nursing home beds, as did a companion bill, House Bill 99-S 0509. See Exhibit G and H. Both bills would impact all nursing homes and assisted living facilities in Rhode Island. House Bill 99-H 6122 was never passed by the House. Companion bill 99-S 0509 was passed by the Senate. Celona filed a § 6 Notice recusing himself from the vote

and the deliberation. See § 6 Notice for 99-S 0509, dated June 30, 1999, attached hereto as Exhibit I.

**d. *Cancer Council – 99-H 5220***

House Bill 99-H 5220, proposed the creation of the Rhode Island Cancer Council, Inc., which would provide private and public resources for the establishment and implementation of a state-wide Cancer Plan. See Exhibit J. The Bill would have affected all hospitals and other cancer-related health care providers in Rhode Island.

**e. *PILOT Legislation – 99-H 5086***

House Bill 99-H 5086, would have required tax exempt, not-for-profit institutions in the City of Providence to make up for any potential financial short fall in any funding by the State in the Payment In Lieu Of Taxes program ("PILOT"). See Exhibit K. This Bill would have affected every non-profit organization in the City Of Providence, including all hospitals, universities, private schools, churches, and a myriad other charitable and public interest organizations.

**f. *Bone Marrow Legislation – 99-H 5917***

House Bill 99-H 5917 imposed upon the Department of Health and the Roger Williams Cancer Center the establishment a centralized bone marrow registration list. See Exhibit L. Celona is alleged to have contacted another State Representative, at the request of Fran Driscoll, regarding hospital reimbursement for registration costs associated with the uninsured. After speaking to the other State Representative, Celona advised Driscoll that he learned the Bill was drafted incorrectly and that it would be corrected to cover the registration costs for the uninsured." Accordingly, while this bill related specifically to Roger Williams Hospital, Celona's participation was limited to

unmasking an error in a draft bill, according to the allegations in the Indictment. There is no allegation that Celona engaged in any lobbying activity regarding this bill. Nor is there any allegation as to the likely economic impact correction of the error would have had to Roger Williams Hospital, *i.e.,* a couple hundred dollars a year or more.

**g. *Ovarian Cancer Legislation – 99-H 6183***

In recognition of the threat of ovarian cancer to the female population in the state, House Bill 99-H 6183 would require the Department of Health through the Cancer Council to sponsor annual public education campaigns about ovarian cancer. See Exhibit M. As such, this Bill may have had a tangential impact on health care providers in Rhode Island that treated ovarian cancer, which would include hospitals, oncology practice groups, and other cancer treatment organizations throughout the State.

**g. *Federal Medicare Cuts***

The Indictment references a Celona press statement that urged reversal of federal Medicare cuts. The Indictment further alleges that Celona failed to reveal that he was working on prompt payment issues and utilization review issues for RWMC when he made the press statement. Medicare cuts affect tens of thousands of hospitals and other health care providers all around the country. Medicare is a federal program over which the Rhode Island General Assembly has no jurisdiction. In response to this press statement, Urciuoli thanked Celona for his "support." The "support" to which Urciuoli referred obviously had no connection to any legislative action undertaken by Celona or any other Rhode Island State legislator.

## IV.

## STANDARD OF REVIEW

The standard of review cited in Defendant Urciuoli's Memorandum of Law is adapted in its entirety.

## V.

## ARGUMENT

The legal and factual argument cited in Defendant Urciuoli's Memorandum of Law is adapted in its entirety.

## CONCLUSION

In light of the foregoing, the Government's theory of prosecution as to Frances P. Driscoll fails as a matter of law. Therefore, the Indictment must be dismissed as to Mrs. Driscoll.

Respectfully submitted,

FRANCES P. DRISCOLL,

By her attorney,

Kevin J. Bristow, Esq.
505 Turks Head Building
Providence, Rhode Island 02903
Telephone: (401) 521-2800
Facsimile: (401) 521-2812

**CERTIFICATION**

I certify that I caused a copy of the within Memorandum of Law in Support of Defendant Frances P. Driscoll's Motion to Dismiss the Indictment to be mailed on April 3, 2006 to counsel of record, as stated below:

Luis M. Matos
Dulce Donovan
Assistant U.S. Attorneys
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Thomas G. Briody, Esq. (Counsel for Peter J. Sangermano)
Law Office of Thomas G. Briody
72 Pine Street, First Floor
Providence, RI 02903

Michael J. Connolly, Esq. (Counsel for Robert A. Urciuoli)
1500 Fleet Center
Providence, RI 02903

John A. Pappalardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110