UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| VS. | : | CR 06-02-01-T |
| | : | |
| ROBERT A. URCIUOLI, | : | |
| FRANCES P. DRISCOLL, | : | |
| PETER J. SANGERMANO, JR., and | : | |
| ROGER WILLIAMS MEDICAL CENTER | : | |

**DECLARATION OF EDWARD QUINLAN**

I, Edward Quinlan, being duly sworn, do declare and say:

1. I am the President of the Hospital Association of Rhode Island ("HARI") and I have held that position for 10 years. Part of the mission of HARI is to advocate positions on legislation before the Rhode Island General Assembly on behalf of the hospitals that are members of HARI.

2. I have known Robert A. Urciuoli for more than 11years. I worked closely with Mr. Urciuoli on HARI-related issues when he served as the Chief Executive Officer of Roger Williams Hospital, during the period 1988 through January of 2006. Mr. Urciuoli served as Chairman of HARI during the years of 1994 to 1996 and January 1, 2001 to March 31, 2001.

3. During the period from in or about 1998 to in or about early 2004, I was aware that Senator John Celona had a business relationship with Roger

Williams Hospital because that relationship had been publicly reported. I was also aware that, during the same time frame, Mr. Uciuoli and other representatives of Roger Williams Hospital would urge Senator Celona to take positions on pending legislation that were supported by Roger Williams Hospital and HARI.

4. On or about September 9, 2005, I was interviewed by FBI Special Agent Dennis Aiken and RI State Trooper Sheri Russell. I have a distinct recollection that, during the interview, Special Agent Aiken leaned over the table toward me and asked, "Would you feel betrayed if you learned that Bob Urciuoli had paid a $50,000 bribe to a member of the Senate?" I responded to that hypothetical question that I would be "shocked." I also said to Agent Aiken that the hypothetical he posited was not reflective of anyone I know.

5. The response I gave indicating that I would be "shocked" referred to Mr. Aiken's use of the word "bribe."

6. On August 23, 2006, I met with Attorney Michael Connolly, one of the lawyers representing Mr. Urciuoli in this matter. Mr. Connolly showed me an FBI interview report regarding my September 9, 2005 interview by Agent Aiken, which stated, in part,

> Quinlan was asked what his thoughts would be if he learned that RWMC was funding the consulting payments to Senator Celona at the same time that they were asking Senator Celona to support their position on certain bills.

> Quinlan responded, "I guess I'd be shocked." Quinlan was then asked if Urciuoli or Driscoll told him that was true. Quinlan responded, "Oh, gosh no."

See FBI 302 of Edward Quinlan, dated September 9, 2005, attached hereto as Exhibit A.

7. The FBI interview report substantially misstates the question that Agent Aiken posed to me during the interview, which makes the above-quoted section of the interview report inaccurate and misleading.

8. In fact, if I had been asked the question that is stated in the interview report, my answer would have been words to the effect of, "I was aware that Roger Williams was funding consulting payments to Senator Celona at the same time that Roger Williams representatives were urging Senator Celona to support the positions advocated by Roger Williams Hospital and HARI on certain bills."

9. Indeed, I urged Bob Urciuoli, along with other hospital CEOs, to advocate HARI's positions on certain bills – which would also have been the position of Roger Williams Hospital – to Senator Celona at the same time that I was fully aware that Senator Celona had a business relationship with Roger Williams Hospital.

10. It was my understanding that Senator Celona's position with Roger Williams was publicly disclosed and that Senator Celona was permitted to participate in general healthcare and hospital legislation during that time frame.

11. Agent Aiken never showed me a copy of the interview report attached hereto, and quoted in Paragraph 6 above, before it was shown to me by Mr. Connolly. As written, Agent Aiken's report of my interview does not accurately reflect the statements I made during the interview.

I declare the foregoing statements to be true and accurate to the best of my information and belief, under the pains and penalties of perjury.

Edward Quinlan

# EXHIBIT A

9/9/2005

FD-302 (Rev. 10-6-95)



**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription ______

at

Edward Quinlan, President, Hospital Association of Rhode Island (HARI) voluntarily appeared at the United States Attorney's Office for the District of Rhode Island. He was advised of the identities of those conducting the interview and of the purpose of the interview. Quinlan then provided the following information.

[redacted]

For the past 10 years, Quinlan has been the President of HARI which is a trade organization which has been in existence for 60 years representing the following hospitals in Rhode Island:

Memorial Hospital of Rhode Island
Miriam Hospital
Newport Hospital
Providence VA Medical Center
Rhode Island Hospital
Roger Williams Medical Center
South County Hospital Healthcare System
St. Joseph Health Services of Rhode Island
Westerly Hospital

The mission of HARI is to be a productive advocate for the hospitals in Rhode Island that is capable of working for and with the hospitals to positively influence public opinion, legislative outcomes and regulatory policy. The purpose of such advocacy is to facilitate the hospitals' mission of providing quality health care to the people of Rhode Island. The HARI Board of Trustees consists of representatives from each hospital member. Richard A. Licht and Robert Urciuoli currently serve on the HARI Board of Trustees representing Roger Williams Medical Center (RWMC). Urciuoli served as Chairman of the Board in the 1990s.

In addition to lobbying on behalf if its members, HARI maintains the Rhode Island Health Quality Performance Measure and Reporting Program, participates in the Hospital Preparedness Planning Committee and maintains the RI Statewide Cancer Registry.

Investigation on 9/9/05 at Providence, RI

File # 194B-BS-94790 Date dictated 8/29/05

by SA W. Dennis Aiken, SA G. Russell Griffiths, Det. Shari Russell

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

194B-BS-94790

Continuation of FD-302 of Edward Quinlan , On 9/09/05 , Page 2

HARI's full time Government Affairs lobbyist is Dan Egan. David Belasco was in that position until approximately two to three years ago. Judge Francis Flaherty also acts as a contract registered lobbyist for HARI on a limited basis accumulating approximately $5,000 in lobbying fees per year.

HARI collectively represented all of its member hospitals in its lobbying efforts. HARI would not represent an individual member in any type of activity because its members were competitors and would often be on the opposite sides of an argument. Some legislative bills may be targeted at individual hospitals, such as labor bills, but if those bills affected all member hospitals in the same manner, HARI would lobby regarding those bills. HARI does not have nursing homes or assisted living centers as members.

Quinlan stated that during the Hospital Conversion Act hearings Senator John Celona was a "back bencher." Quinlan does not recall where Celona stood on that issue nor does he recall what role took in a power struggle within the RI Senate at the time. Quinlan stated that the passage of that bill was based somewhat on partisan politics and involved the power struggle within the RI Senate. HARI's position was that hospitals should have the right of self determination. Quinlan recalls that RWMC also had their own lobbyist in this effort with former Governor Phil Noel. Quinlan is not sure if Noel was being paid by RWMC or Columbia, the company which was trying to buy RWMC.

Quinlan stated that in the 1990s, after Harvard Pilgrim and Tufts left the marketplace, Blue Cross & Blue Shield of Rhode Island (BCBSRI) became the dominate health insurer in the market creating almost a monopolistic economy. After BCBSRI gained that power, HARI observed BCBSRI participating in many disruptive practices to include Utilization Review. Utilization Review was a process by which an insurer such as BCBSRI would review the medical services provided by a health care provider such as RWMC to determine the necessity and appropriateness of those services. Utilization Review was having a devastating affect on the economies of the hospitals as they were not getting paid for many services performed. HARI began to attempt to negotiate with BCBSRI regarding Utilization Review, but BCBSRI would not negotiate in good faith because of their monopolistic power. Once negotiations with BCBSRI failed, HARI would communicate with the Department of Health in an attempt to control BCBSRI through regulation. The Department of Health was also often powerless in their regulation of BCBSRI. When negotiation with BCBSRI and regulation through the

Department of Health failed to provide adequate Utilization Review policies, HARI would attempt to regulate BCBSRI through the legislate process. Prompt Payment was another issue which took this route of negotiation, regulation and then legislation.

The Senate Corporations Committee was the home of all of the major issues facing HARI. The activities of that committee were controlled by the Senate leadership and the Chairman of that committee. Quinlan stated that when Senator William Irons was Chairman of the Senate Corporations Committee, Senator Iron's would determine his position on matters and would make that position clear to both sides of a dispute. Senator Iron's position as to Utilization Review was that it should be worked out through the contract negotiation process between BCBSRI and the hospitals. Quinlan stated that this was not working because of BCBSRI's power.

When Senator Celona became Chairman of the Senate Corporations Committee, his style was different from that of Senator Irons in that Senator Celona would bring all of the parties to the table in an attempt to have them work out their differences. Quinlan stated that the actual position of the Senate Corporations Committee was leadership driven by the President and Majority Leader of the Senate. Senator Celona was typically not educated on the issues and was more of a facilitator of attempted resolution. In 2001 or 2002 HARI presented Senator Celona with an award for his willingness to chair working groups.

Quinlan stated that the best way to kill a legislative matter is to withhold a vote and send it to committee for study. Bills rarely, if ever, came out of these study committees. Many matters involving Utilization Review and Prompt Payment were sent to working groups for study, but minimal resolution to the issues came out of these working groups.

Quinlan recalls two bills in particular in which Senator Celona was involved. On involved enrollee liability. That bill required insurers to pay hospital bills even if one of their insured customers went to a hospital that did not have a contract with the insurer. Prior to the bill, the hospital would be stuck with the bill. Another bill was a co-pay deductible bill which required that insurers list the co-pay deductible amount on the insurance card.

Quinlan stated that he knew that Senator Celona had a business relationship with a nursing home affiliated with RWMC. He

FD-302a (Rev. 10-6-95)

194B-BS-94790

Continuation of FD-302 of Edward Quinlan , On 9/09/05 , Page 4

is not sure of how he learned this, but believes that Urciouli told him at some point in time. Quinlan was not aware that Senator Celona's pay for his relationship with the nursing home was being funded by RWMC nor was he aware of any type of activity that Senator Celona was performing on behalf of RWMC.

Quinlan stated that based on his observations, Senator Celona had a close relationship with Thomas Lynch of BCBSRI. He assumes that this relationship went as far back as when Lynch was a RI Senator.

Quinlan stated that HARI would not have been involved in any reimbursement rate negotiations between BCBSRI, United Healthcare and RWMC as those were done hospital by hospital. They also would not have been involved in any negotiations to collect monies due to RWMC from BCBSRI or United Healthcare.

Quinlan stated that he has known Frances Driscoll of RWMC for 25 years. Driscoll was very active politically as an individual, but her employment with RWMC primarily involved fund raising. She also had some public relations responsibilities. HARI would primarily communicate with hospital chief executive officers. In the case of RWMC, HARI would primarily communicate with Urciuoli. Quinlan is not aware of any lobbying activity on the part of Driscoll nor is he aware of any relationship or activity between Driscoll and Senator Celona.

Quinlan stated that he recalls the Cancer Council issue in the RI legislature in the late 1990s. House Speaker John Harwood was promoting a bill that would create a Cancer Council to coordinate cancer care, research and education. HARI never took the bill that seriously, but the bill would have provided sweeping powers to the Cancer Council and would take many powers away from hospitals. HARI, Lifespan and Brown Medical School worked with the legislature to reduce the authority of the Cancer Council. Lifespan, a teaching hospital, was deeply concerned about the Cancer Council as was Brown Medical School. Quinlan does not believe that RWMC had any significant interest in the Cancer Council legislation. He was aware of a turf battle in the early 1990s between Rhode Island Hospital and RWMC and that Drs. Paul Calabresi and Arvin Glicksman were among the combatants in that turf battle. Quinlan is unaware of any lobbying activity that Urciuoli or Driscoll were conducting regarding the Cancer Council legislation. He is also unaware of any involvement of Senator Celona regarding this legislation.

Quinlan stated that he specifically recalls 98S 2796 which was a bill prohibiting trustees or officers of a not for profit hospital from serving on the board or as an officer of the hospital upon its conversion to for profit. HARI would have supported this legislation as it was a common sense, ethically motivated bill. The bill's purpose was to prohibit golden parachutes for executives and trustees involved in the conversion contract. Quinlan is unaware of any position that RWMC, Urciuoli or Driscoll took individually on this bill and he is unaware of any involvement of Senator Celona.

Quinlan stated that he would expect that HARI members would tell him if they had a legitimate positive relationship with a particular Senator or Representative who could provide political help in support of HARI's position regarding legislation. HARI's position on legislation was one of consent of the members and he would expect that the members would be open and supportive of the group's efforts once a position was determined. Likewise, Quinlan would be bothered if he learned that a particular member of HARI was acting in opposition to the groups efforts was consent was determined. Quinlan stated that he would be disturbed to learn that a particular member had some type of illegitimate financial relationship with a legislator and was using that legislator to promote or oppose legislation in which HARI was also involved.

Quinlan was asked what his thoughts would be if he learned that RWMC was funding the consulting payments to Senator Celona at the same time that they were asking Senator Celona to support their position on certain bills. Quinlan responded, "I guess I'd be shocked." Quinlan was then asked if Urciuoli or Driscoll told him that was true. Quinlan responded, "Oh, gosh no."