IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| USA | CRIMINAL ACTION 06-00002T |
| VS. | JULY 19, 2006 |
| ROBERT A. URCIUOLI, ET AL | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE ERNEST C. TORRES

CHIEF JUDGE

(MOTIONS)

APPEARANCES:

FOR THE GOVERNMENT: DULCE DONOVAN, ATTY.
and LUIS MATOS, ESQ.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
(401) 709-5000

FOR THE DEFENDANT Robert A. Urciuoli: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
Boston, MA 02109
(617) 345-9000

RICHARD EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110
(617) 737-8222

FOR THE DEFENDANT Frances P. Driscoll: KEVIN J. BRISTOW, ESQ.
505 Turks Head Building
Providence, RI 02903
(401) 521-2800

1

Williams Medical Center. His conduct with the others differed in that regard.

He hid from the public his relationship with CVS and Blue Cross whereas he early on in all filings and newspapers exposed his relationship with Roger Williams Medical Center.

So what he said about those things and the different entities in that regard and what his criminal conduct was in that regard is both relevant to that, it is also relevant to the exposure that he had in the prosecution by the Government.

In other words, what he told the Government, they were able to prosecute in -- pardon me. They were able to prosecute for whatever crimes he may have told them about. They chose to prosecute and make a deal for only the limited crimes that they charged in the information, and all of that goes to his, basically, inducement to tell the story that he's about to tell in open court.

And so for those reasons, I believe that all of those matters are both appropriately discoverable for discovery in this case and as the general bias of the witness who has made a deal with the Government in that regard.

THE COURT: Well, I'm having difficulty

understanding how what Mr. Celona may have told the U.S. attorney about these others matters comes under the aegis of promises and inducements. Certainly, to the extent that the Government gave him leniency or made other promises to him based on his cooperation, that would definitely -- you'd certainly be entitled to that, but I don't understand why you think the defendants are entitled to probe into what he may have told them about other matters that may be under investigation.

MR. EGBERT: Because those are the matters for which he pled, Judge. These are the matters -- the information is and he pled, and that's the basis of his deal. In other words, the Government's deal with him is that they're going to give him benefits, at least by requesting of you, benefits at the time of sentencing for his very conduct that's described in those 302's. And he's telling them I'm going to give you this information in return for your help with Judge Torres with me.

So that's the essence of his deal. He didn't make a deal for Roger Williams, a deal for CVS and a deal for Blue Cross. He made a deal to provide information to the Government in return for the Government's stepping to bat for him. Unless the Court

want to let Mr. Matos finish his argument.

MR. MATOS: Your Honor, none of these cases have been cited in any of the papers by the defendants. We don't know the circumstances of those cases to a great extent.

I'll make a point in terms of the ethical obligations. We have given letters from Mr. Connolly outlining these issues to the agents to review, your Honor, so we're not asking them to speculate on their own whether there's additional Brady material that is at issue in this case, your Honor.

Your Honor, in regard to the --

THE COURT: Isn't some of the information that's being requested information that, if it exists, the Government would have to produce? I think it was Mr. Sangermano listing, very extensive listing of documents it wanted, which included things like prior convictions.

MR. MATOS: Of course, your Honor, to the extent that exists, we've produced it.

THE COURT: Why can't you just say that?

MR. MATOS: We have said that, your Honor. We've said that to the extent there's exculpatory information, we've produced it. The defendants are fully aware, for instance, of the plea, the terms of

the agreement between the United States and between John Celona, and the colloquy that took place before this Court, your Honor. I believe that's who they're talking about when they're asking for these histories. There are no other people, your Honor, that the Government expects to call that have criminal records.

We've got this laundry list of items, your Honor, many of whom are required to be produced, many are not. Many are just shots in dark at things that they may or may not have been said, but there isn't any specific direction from the defendants to statements or to information that they are aware of that the Government has withheld, that their investigation has indicated the Government has withheld, your Honor, and that's their burden here.

In regards to -- I think we've covered the issue of notes, your Honor. In regards to the redacted Celona 302, we have tried to compromise on that issue, your Honor, despite the fact that we don't believe that it must be required under Brady, because, as Mr. Egbert has demonstrated, it appears he's already -- he already knows the information. He's ready to cross-examine John Celona. He has the issues -- he has knowledge of these statements that some disclosures regarding Roger Williams were made public, but some disclosures

Government, as I said, to disclose evidence that is materially favorable to the defendant that may be in the Government's possession or under the Government's control. I should add here, perhaps as a side note, that although I recognize that the case law on this question is split, it is my view and I tend to follow this, that the disclosure, when it's required, has to be made far enough in advance of trial to allow the defendants to make effective use of it.

I don't consider disclosures of exculpatory material that was known to the Government for some time to be sufficient if they are not disclosed until the eve of trial or, even worse, during the trial. So I just mention that, Mr. Matos, and Ms. Donovan, so that there'll be no misunderstanding later as to what the Court's rule is.

Now, getting back to Brady materials, at least initially, the Court has to rely on the integrity and judgment of the prosecutor in determining whether the obligations imposed under Brady have been satisfied.

So representations by the prosecutor that the prosecutor has reviewed the information available to it or under its control and that it has provided all material that comes within the reach of Brady ordinarily is sufficient. That resolves the question

in most cases. And because of the consequences that flow to the Government and perhaps to the individual prosecutor involved from a failure to hand over Brady material, the Government is certainly well-advised to err on the side of handing over the material if there's any question as to whether it's exculpatory or not.

Generally, once that representation is made, the defendant is not entitled to the production of everything in the Government's file to see if perhaps it might contain something that the defendant may consider possibly exculpatory, nor is the defendant entitled to conduct what amounts to comprehensive discovery into the Government's case by asking detailed questions as to what evidence the Government has or does not have.

The only circumstances under which the Court ordinarily goes beyond the prosecutor's representation is where the defendant can point to some good reason to believe either that the Government has exculpatory evidence that it has not provided, or that the Government has not exercised reasonable diligence in reviewing the material in its possession or obtaining relevant material subject to its control to determine whether that material constitutes Brady material.

Now, in this case, the controversy focuses

primarily on the agents' notes. First of all, we have the statements of Mr. Mesolella, who apparently was interviewed by agents and the Government, I think Mr. Matos, I believe it was, stated that he had reviewed the 302's -- the 302, I don't know if there's more than one, but the 302 regarding Mr. Mesolella's statements to agents and had determined that there was no Brady material in that 302.

However, this morning Mr. Pappalardo represented, I should say in fairness for the first time, apparently, that Mr. Mesolella told the investigator, that he, Mr. Mesolella, told agents that he had not discussed any of these matters with Mr. Celona, which appears to if not be directly contradictory of what Mr. Celona apparently is going to testify about, at least was not reflected in the 302.

So based on that representation, I don't think the Government based on that disclosure this morning is in violation of any obligation it may have. First of all, we don't even know if Mr. Mesolella did tell the agents that, there may be a dispute about that, but based on Mr. Pappalardo's representation, the Court will require the Government to at least review their agents' notes of their interview of Mr. Mesolella to determine whether, apart from the 302, those notes

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
: CR 05 80
v. : CRIMINAL NO.
:
: In violation of 18 U.S.C. §§ 1341 and 1346
JOHN A. CELONA :

INFORMATION

The United States Attorney charges:

Introduction

At all times material to this Information:

1. From on or about January 2, 1995, through on or about March 9, 2004, defendant JOHN A. CELONA ("CELONA") was a State Senator elected to the Rhode Island General Assembly and served as a member of the Rhode Island Senate Committee on Commerce, Housing and Municipal Government, formerly the Senate Corporations Committee ("Senate Corporations Committee"). From on or about January 2, 2001, through on or about December 11, 2003, he was Chairman of the Senate Corporations Committee. CELONA also served as a member of the Senate Committee on Health, Education and Welfare from on or about January 2, 1995, through on or about June 30, 1999.

2. The Senate Corporations Committee possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care providers, health care related insurance companies, and

requested the Communications Company Advisory Opinion, CELONA knew that over the past year, he had already been paid by the Communications Company, with money that was provided by the Health Insurance Company, and that the Health Insurance Company conducted business with the State of Rhode Island.

49. It was further part of the scheme and artifice to defraud that on or about December 8, 2003, the day prior to CELONA's scheduled appearance before the Ethics Commission, Communications Company Executives and others known to CELONA and the United States Attorney, prepared and issued a press release ("press release") which CELONA reviewed and which falsely stated, among other things, that CELONA:

a. had been asked to assist in developing some concepts for a Rhode Island current events cable television station;

b. conducted some basic exploratory work on that concept;

c. had been reimbursed by the Communications Company for related out-of-pocket expenses; and

d. would be willing to accept a paid retainer for services but that the Communications Company had not made a final decision on whether to go forward with the project.

However, when Communications Company Executives issued the press release, CELONA and Communications Company Executives knew that:

e. the Communications Company had previously entered into an agreement with the Health Insurance Company to produce 12 television shows in which CELONA was to participate and be paid;

f. from in or about December 2002 through November 2004, the Health Insurance Company paid money to the Communications Company;

g. from in or about December 2002 through October 2003, CELONA had received a portion of that money;

h. CELONA did not receive the money for exploratory work on a new concept but had been paid for work previously completed;

i. the money that CELONA received did not represent any out-of-pocket expenses;

j. legislation was pending in the Rhode Island General Assembly and before the Senate Corporations Committee which was of importance to the Health Insurance Company;

k. CELONA had taken official positions on that legislation which was favorable to the Health Insurance Company; and

l. public disclosure of the true facts would be harmful to the Health Insurance Company, the Communications Company, their executives and to CELONA.

50. It was further part of the scheme and artifice to defraud that on or about December 9, 2003, the day the false information contained in the press release was published in a local newspaper, CELONA appeared before the Ethics Commission. Knowing the published information was false, CELONA informed the Ethics Commission that any questions regarding his relationship with the Communications Company had been cleared up by the Communications Company's statement as reported in the newspaper that day. CELONA also falsely informed the

FILE No.006 06/24 '98 10:46 ID:Konica 7410 FAX:4014562029 PAGE 7

FEB-17-98 TUE 04:05 PM SEN. JOHN A. CELONA 401 353 6155 P.01

FRANCES P. DRISCOLL
FEB 17 1998
VP PUBLIC RELATIONS & DEV

# Fax Transmission

## Senator John A. Celona

District 36 - North Providence

State of Rhode Island and Providence Plantations

1500 Mineral Spring Avenue
North Providence, Rhode Island 02904-3130

State House, Room 114, Providence, Rhode Island 02903

Office: 401-222-4541
Voice Mail: 401-222-6840, Ext. 136
Pager: 786-3330 FAX: 401-353-6155

**To:** Frances P Driscoll, APR.

**Date:** 2-17-98

**FAX Number:** 456-2282

**Number of pages, including cover:** 4

**SUBJECT:** Fran – enclosed is a copy of 98-H 8229.

Vin Mesolella is out of town, but I will get to him as soon as he returns to first, identify the motive of the bill (i.e. those behind it) and second to work to defeat it before it moves anywhere.

I'll keep you posted

Thank you – John

NOT PRINTED OR TRANSMITTED AT GOVERNMENT EXPENSE.

CONFIDENTIAL
GPH 000830

FD-302 (Rev. 10-6-95)



# FEDERAL BUREAU OF INVESTIGATION

Date of transcription 12/01/2005

Vincent Mesolella was advised of the identities of the interviewing agents, and the nature of the investigation. Mesolella provided the following information:

Mesolella advised that he had read the Providence Journal article written by reporter Mike Stanton pertaining to this investigation and was expecting a contact by investigators. Mesolella began serving in the Rhode Island House of Representatives in 1979. He became Deputy Majority Whip in 1998 and stayed in that position until deciding not to run for reelection in 1999.

Mesolella was shown a copy of 98-H 8229 "AN ACT RELATING TO RESIDENTIAL CARE AND ASSISTED LIVING FACILITIES" which was introduced by Mesollella into the House of Representatives on 3/3/1998. Mesolella advised that he did not have his glasses so Mesolella was told, "This act would prohibit health facilities from holding themselves out as offering Alzheimer's specialized care to patients with concurrent health needs unless the facility is licensed by the department as a nursing facility or hospital." Mesolella stated that he recalled the bill and that he often submitted legislation for the nursing home industry, specifically the Rhode Island Health Association which represented the Rhode Island nursing home community. He recalled that Al Santos was the executive director of this association and that he dealt with Santos often. Regarding this legislation, Mesolella remembered that some assisted living facilities were holding themselves out as Alzheimer facilities. The nursing home industry opposed this because they thought it was unfair for assisted living facilities to hold themselves out to be Alzheimer's units when nursing homes were required to meet certain criteria prior to obtaining that designation. The nursing home industry wanted to make certain that the standards for certification would be uniform. Mesolella was in favor of this legislation.

Mesolella has known John Celona for about forty (40) years, from growing up on North Providence. Mesolella he knew Celona's family in that if you wanted lawn equipment repaired or needed ice, you would go to John Celona's shop or the family store across the street. Mesolella and Celona began in politics together. They stayed close for many years, had a political falling out for a

Investigation on 11/30/2005 at Providence, RI

File # 194A-BS-94790 Date dictated 12/01/2005

by SA G. Russell Griffiths/Det Sheri Russell
SA W. Dennis Aiken

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

194A-BS-94790

Continuation of FD-302 of Vincent Mesolella , On 11/30/2005 , Page 2

couple years, then patched things up. Mesolella and Celona would socialize professionally, but not personally.

Mesolella does not recall any conversations with Celona regarding the legislation detailed above, but does not deny that a conversation could have taken place. Mesolella noted that seven (7) years has passed since the legislation had been introduced and his memory has been affected by the lapse in time. Mesolella also advised that he could have had a brief conversation in passing with Celona about the bill, which was common in the legislature. Mesolella said that he has a joking personality, and could have spoken to Celona in a joking manner about the bill.

Mesolella was asked if he knew Peter Sangermano. He is familiar with the name, but does not know him. He believes he knows the name as affiliated with the Village at Waterman Lake.

Mesolella was asked if he knew Fran Driscoll. He may have met her in an official capacity, but would not knew her by sight.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF:

ROGER WILLIAMS MEDICAL CENTER

Testimony of JOHN A. CELONA, a witness herein, heard before the SPECIAL JUNE 2005 GRAND JURY on WEDNESDAY, JUNE 29, 2005, 10:05 A.M., at the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

GERARD B. SULLIVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY
LUIS M. MATOS, ESQUIRE
ASSISTANT U.S. ATTORNEY
DULCE DONOVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY

Vivian S. Dafoulas, RMR-CRR
East Greenwich, RI 02818-2064
(401) 885-0992

(15)

Q. You need to wait until I'm done, okay?

A. I'm sorry.

Q. What kind of job did you ask him for?

A. I asked him for a job at the hospital.

Q. Did you in any way express to him what you thought you could or couldn't do for the hospital, why you could be a benefit to the hospital?

A. Yes.

Q. What did you say to him?

A. I said that I had extensive contacts with seniors in my district and seniors outside of the district also and I knew that some of their concentration to the Hospital Conversion Act was through seniors because of what they had done in North Providence with their Continued Care Program and also maybe with public relations.

Q. And what did Robert Urciuoli say to you?

A. He said he would see what he could do and get back to me.

Q. Did he get back to you?

A. Yes.

Q. In what way?

A. He called me and then put me in touch with Fran Driscoll.

Q. And when he put you in touch with Fran

other partners in it?
A. At the time, no.
Q. Did you come to learn later that what the -- the circumstances of Roger Williams' ownership were or partnership were?
A. Yes.
Q. What were they?
A. They were -- I believe to be a partnership with Peter Sangermano and Diane Sangermano.
Q. When you met with Miss Driscoll and Mr. McGuirk, what did Miss Driscoll, if anything, did she tell you that you were going to be hired to do?
A. They were going to be drafting up a -- a set of job descriptions which I never saw and -- and that I'd be doing work for the Village.
Q. Did she tell you what you would be doing for the Village?
A. Promoting seniors in my district and trying to get people into the Village.
Q. And did she tell you you would be doing anything else besides that --
A. No.
Q. -- at that time?
A. At that time, no.

Q. Did Mr. McGuirk say anything during that meeting?

A. No. He -- he said he would draft an Ethics opinion ruling for me.

Q. What do you mean by that?

A. A request to go before the Ethics Commission and he would draft it up for me.

Q. We've been talking about the Ethics Commission a little bit?

A. Yes.

Q. What is the Ethics Commission? What do you understand that to be?

A. I understand it's a commission in the state of Rhode Island. It's charged with the duty of seeing that public officials have -- have conflicts of interest with their employees or their employers in the jobs that they're going. In a nutshell, that's what I -- I believe that it is.

Q. And -- I'm sorry.

A. And they render opinions upon request on individual elected officials and also they have a set of guidelines to go by.

Q. Guidelines to go by for what?

A. For ethical practices.

Q. For public officials?

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF:

ROGER WILLIAMS MEDICAL CENTER

Testimony of JOHN A. CELONA, a witness herein, heard before the SPECIAL JUNE 2005 GRAND JURY on THURSDAY, JULY 7, 2005, 9:50 A.M., at the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

GERARD B. SULLIVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY
LUIS M. MATOS, ESQUIRE
ASSISTANT U.S. ATTORNEY
DULCE DONOVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY

Vivian S. Dafoulas, RMR-CRR
East Greenwich, RI 02818-2064
(401) 885-0992

JOHN A. CELONA,

called as a witness and having been first duly sworn, testified as follows:

EXAMINATION

BY MR. MATOS:

Q. Good morning, Mr. Celona. Mr. Celona, we are back with your testimony before the grand jury.

I'd like to remind you that you remain under oath and that the same admonitions that you were given last week regarding your testimony and your rights before this grand jury as well as your obligations to testify truthfully remain intact.

Do you understand that, Mr. Celona?

A. Yes, I do.

Q. Mr. Celona, we're going to pick up where we left off last week and you'll notice that there is a binder with some documents in front of you. Do you see that?

A. Yes.

Q. That binder contains Grand Jury Exhibits 1 through 28 that we reviewed last week.

We're going to go over some of those because we didn't finish going through those last week and then we'll move on to some additional exhibits, so when I go from 1 to 28, you only need to turn to the binder

Williams Medical Center?

A. That's correct.

Q. And you had previously, as we discussed, been working on the ambulance run issue as well as the legislation that affected whether officers from a non-profit could remain as officers where a non-profit were to be sold to a for-profit hospital, correct?

A. Correct.

Q. And once you received that Ethics opinion, you did not make any effort to advise the Ethics Commission that the circumstances on which they based their decision were different from what had been represented to them, did you?

A. No.

Q. You never went back and told them?

A. No.

Q. You didn't get all the facts?

A. No.

Q. And you never asked Mr. McGuirk to do that?

A. No.

Q. And Ms. Driscoll or Mr. Urciuoli, to your knowledge, never made any effort to do that by contacting you and suggesting that that needed to be

done, is that correct?

A. No, they never did. They were -- they were the ones who had set up McGuirk with me for this but not for the -- they never asked me about amending it or redoing one or putting another one in or anything like that. And when I say, "this," it was Exhibit 28.

MR. MATOS: Thank you.

Q. If you look at Grand Jury Exhibit No. 26, do you see that, Mr. Celona?

A. Yes, sir.

Q. That's the request for an advisory opinion that was submitted to the Ethics Commission, is that correct?

A. Yes.

Q. Mr. Celona, attached to the request for an advisory opinion was a copy of the consulting agreement that had been submitted to you by Roger Williams, correct?

A. Correct.

Q. And the consulting agreement that was attached to the request for an Ethics Commission decision was not signed by either you or Peter Sangermano, correct?

A. Correct.

Q. That's the one thing that was specifically prohibited, correct?

A. Correct.

Q. Because you had actually had told them you were working for the Village and they said you can't work on anything affecting the Village in your role as a senator, correct?

A. Correct.

Q. They said it's a no-no, right?

A. Right.

Q. And Sangermano got a copy of that Ethics Commission opinion, right?

A. Yes.

Q. And Fran Driscoll had a copy of that?

A. Yes.

Q. And you had a copy of it?

A. Yes.

Q. And do you know if -- do you know whether Bob Urciuoli had a copy of it?

A. I believe so.

Q. And everyone knew the one thing John Celona can't do is work on assisted-living facility legislation --

A. Right.

Q. -- correct?

A. Correct.

Q. The issue about the hospitals wasn't addressed because none of you ever told the Ethics Commission that you were working for the hospital, correct?

A. Correct.

Q. And what did you write to Fran Driscoll on 3/23/1999?

A. "Fran, Peter Sangermano contacted me regarding two bills, both the same that extend the moratorium on the licensing of new nursing home beds to July 1st, 2001. He has asked that I have a rep and a senator introduce the attached amendment in committee along with the amendment faxed -- the amendment he faxed, the attached fax sheet regarding the amendment. Please advise."

Q. Why did Peter Sangermano ask for you to have a representative or a senator introduce the attached amendment?

A. Because he knew I couldn't introduce it myself.

Q. And did you ever say to him, I won't do it because the Ethics Commission doesn't want me to do that?

A. No.