UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CR. No. 06-02-04 (ML) |
| | ) | |
| ROBERT A. URCIOLI, | ) | |
| FRANCES P. DRISCOLL, and | ) | |
| ROGER WILLIAMS MEDICAL CENTER | ) | |

**FRANCES P. DRISCOLL'S MOTION FOR RELIEF FROM PREJUDICIAL JOINDER**

Defendant Frances P. Driscoll, by her attorneys, moves under F.R.Crim.P. 14(a) to sever her case from that of co-defendant Robert Urciuoli on the ground that, in light of her acquittal on Count I charging conspiracy, a joint trial would prejudice her, would compromise her trial rights and would prevent the jury from making a reliable judgment about her innocence or guilt. Defendant states her reasons for this motion more fully in the accompanying memorandum of law, which she incorporates herein by reference.

WHEREFORE, defendant asks that her motion be granted.

Respectfully submitted,
Frances P. Driscoll
By her attorneys,

/s/ John A. MacFadyen
John A. MacFadyen (#1209)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
401-751-5090

/s/ Kevin Bristow
Kevin Bristow, Esq. (#3984)
76 Westminster Street
Providence, RI 02903
401-521-8000

**CERTIFICATION**

I hereby certify that on the 7th day of May, 2008, a copy of this Motion for Relief From Prejudicial Joinder was filed electronically and that it is available for viewing and downloading from the Court's ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ John A. MacFadyen

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CR. No. 06-02-04(ML) |
| | ) | |
| ROBERT A. URCIOLI, | ) | |
| FRANCES P. DRISCOLL, and | ) | |
| ROGER WILLIAMS MEDICAL CENTER | ) | |

# FRANCES P. DRISCOLL'S MEMORANDUM IN SUPPORT OF HER MOTION FOR RELIEF FROM PREJUDICIAL JOINDER

## Introduction

Frances P. Driscoll has moved under F.R.Crim.P. 14(a) to sever her case from that of co-defendant Robert Urciuoli based upon her acquittal of conspiracy to commit mail fraud. Because of the unusual posture of this case, that acquittal makes the risk of unfair prejudice from continued joint litigation unacceptably high. Mr. Urciuoli remains charged with both conspiracy to commit mail fraud and 33 counts of substantive mail fraud. Ms. Driscoll faces only a single count of mail fraud and only as an aider and abettor under 18 U.S.C. § 2. She has a right, protected by the Double Jeopardy and Due Process Clauses of the United States Constitution, not to be forced to defend a second time against an allegation of mail fraud conspiracy, and any facts necessarily decided as part of the acquittal. That right can be adequately protected if, and only if, the jury is able to segregate the law and evidence relevant to the mail fraud conspiracy (applicable only to Mr. Urciuoli) from the law and evidence relevant to the scheme or artifice to defraud component of substantive mail fraud (applicable to both defendants).

This task cannot be accomplished in a joint trial given the nature of the charges and the Indictment as framed. The Indictment alleges these two crimes using terms that are identical factually and all-but identical legally. Nevertheless, this Court will be called upon to clarify,

repeatedly, the difference between a "conspiracy" to commit mail fraud and "devising a scheme" to commit mail fraud. The English language affords few, if any, tools capable of explaining this distinction to a lay jury. And factually, it is not at all clear where the claims of agreeing to devise leave off and jointly devising begins. If the government presses its case too strongly, and suggests, for example, that Ms. Driscoll was complicit in a joint decision to manipulate the information going to the Ethics Commission, this Court will be fielding mistrial motions premised on Ms. Driscoll's acquittal of the conspiracy charge.

The ensuing prejudice will be exacerbated by the substantial imbalance in both the charges and evidence. As the First Circuit noted, Ms. Driscoll played a "more limited" role. *United States v. Urciuoli,* 513 F.3d 290, 293, 297 (1st Cir. 2008). She was convicted in the first trial "of a single count of mail fraud, on the theory that she aided and abetted Urciuoli." *Id.* In addition, a full half of the government's evidence against Mr. Urciuoli – the Blue Cross / Blue Shield negotiations – will be inadmissible as to Ms. Driscoll.

A severance would cure a third problem engendered by joint litigation. One of the key pieces of exculpatory evidence as to Driscoll's state mind will be her reliance on the opinion of outside counsel from the Boston law firm of Goodwin, Proctor and Hoar, LLP that the Celona contract was both legal and ethical. *ROGER WILLIAMS MEDICAL CENTER, INC., Report to Executive Committee of Board of Trustees* (Saylor Report), attached as *App. A* at p. 50. In the first trial, M. Urciuoli filed a motion *in limine* seeking to exclude this evidence unless the government would forgo introducing other portions of the Report which were prejudicial to him. *Defendant Robert A. Urciuoli's Motion in Limine to Limit Use of the Report of F. Dennis Saylor*, Docket No. 96. On information and belief, he will be taking the same position here.

This, then, is the unusual case in which a severance is appropriate for two independent reasons: first, there is a "'serious risk'" that a joint trial would compromise a "'specific trial right'" – here, Ms. Driscoll's Double Jeopardy right, her right to be judged in accordance with clear and understandable legal standards, and her right to introduce exculpatory evidence; and, second, a joint trial would "'prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. LiCausi,* 167 F.3d 36, 49 (1st Cir. 1999), *cert. denied sub nom., Durfee v. United States,* 528 U.S. 827 (1999), quoting *Zafiro v. United States,* 506 U.S. 534, 539 (1993).

**Factual Background**

Ms. Driscoll was charged with Mr. Urciuoli, Peter J. Sangermano, Jr. and Roger Williams Medical Center (RWMC) with mail fraud and conspiracy to commit mail fraud based on the mailing of checks for consulting services to then-Senator John A. Celona. Ms. Driscoll was charged with a single count of mail fraud based on a May 4, 2000 mailing of a check to Celona. Urciuoli, Sangermano and RWMC were charged with thirty-five counts of mail fraud, also based on the mailing of checks to Celona.

After an initial trial in 2006, Ms. Driscoll was found not guilty on Count 1, charging conspiracy, but guilty of Count 2, mail fraud. The jury found Mr. Urciuoli guilty of Count 1, conspiracy, and of Counts 3 through 38, mail fraud. It acquitted Sangermano on all counts.

On sentencing, after hearing extensive information regarding Ms. Driscoll's background of extraordinary charitable endeavors throughout her then-67-year life and the precarious state of her health and the health of her husband, the District Court sentenced Ms. Driscoll to eight months' incarceration followed by two years of supervised release, the first eight months of

which to be served in home confinement. On appeal, the First Circuit Court of Appeals reversed the convictions. *Urciuoli, supra.*

RWMC is the parent company for a group of affiliated corporations: the Roger Williams Hospital (RHW), an acute care facility; Roger Williams Realty Corp. (RWR), and Elmhurst Extended Care Facilities, Inc. (Elmhurst), a nursing home. RWR, in turn, was a fifty-percent owner of The Village at Elmhurst, LLC (Village), an assisted-living facility on the Roger Williams campus. The other half of The Village was owned by SANAT Properties, LLP, and Natco Products, Inc., corporations controlled by Mr. Sangermano.

The key events began in the summer of 1997 when Ms. Driscoll was the Senior Vice President for RWMC. Her superior and CEO of RWMC, Mr. Urciuoli, decided to hire Celona as a consultant to augment outreach into the elderly community, which was a major client base for RWMC. 9/18/06:102.[1] Both Ms. Driscoll and the hospital's outside counsel, James McGuirk, Esq. opposed the hire, 9/4/06:32; 9/20/06:198, 205; 9/21/06:179, but ultimately became "resigned to the fact . . . that it was going to occur." 9/21/06:182. This evidence was not disputed.

Thereafter, Ms. Driscoll worked with McGuirk to prepare a consulting agreement which then became the basis for McGuirk's submission of an ethics advisory request to the Ethics Commission. Driscoll's initial communications to McGuirk stated that Celona would be working for "RWMC and its affiliated entities." G-81;[2] 9/20/06:210. McGuirk changed this language to a representation that he would be working for The Villages at Elmhurst and Waterman Lake based on what McGuirk claimed he was told by Mr. Urciuoli that Celona would

[1] Ms. Driscoll refers to the transcript of the first trial by date and page as follows: 9/18/06:102 (transcript of proceedings on September 18, 2006 at page 102).

[2] Ms. Driscoll refers to government exhibits by number, *e.g.,* G-81.

be doing. 9/20/06:214. This shift became a critical part of the government's case at trial when it alleged that the conspirators had deliberately concealed from the Ethics Commission the fact that Celona would be working for RWMC rather than The Village.

In the spring of 1998, prior to McGuirk's submission to the Ethics Commission, Celona and Ms. Driscoll had fax communication regarding two pieces of legislation, G-124, G-137, G-142, as well as multiple communications regarding Celona's efforts to ensure that RWMC received its fair share of emergency rescue runs.[3] The government argued that the failure to disclose this activity to the Ethics Commission through the McGuirk submission established proof of the conspiracy as well as the element of deceit required for honest services mail fraud.

Thereafter, the fax record shows that Celona contacted Ms. Driscoll on just eight other political matters. In only four instances did she send back a response, G-272, G-281, G-320, G-326, G-364, three of which were simple requests for information, G-272, G-281, G-320, G-326, and in one of these three Celona ultimately voted against RWMC's position. 9/14/06:210 (Cancer Commission bill). There was only one instance in three years in which she affirmatively pushed Celona to promote RWMC's position, and that was with the Attorney General, not the legislature. G-364; 9/15/06:62-71 (Lifespan merger). All of these contacts occurred before Celona became Chair of the Corporations Committee, at a time when he had little political power, 9/13/06:218-220, and where the record shows that Driscoll had ready access to far more significant political figures. 9/18/06:100. Further, with the possible exception of a single (and revenue neutral) bill, all of this legislation fell within the class exception created by R.I.G.L. § 36-14-7(b).

[3] It was this rescue run evidence that the First Circuit found could not support an honest services prosecution. *Urciuoli, supra*.

Celona did not testify that his elderly outreach activity was a sham job. To the contrary, he stated that he "performed [his contract]," 9/18/06:149, and did so "to the best of [his] abilities in good faith and honestly . . . ." 9/18/06:150. On the other hand, he also claimed that he worked without guidance from The Village, that his real employer was RWMC, not The Village, 6:100, and that he viewed his activity as part of his function for RWMC. Indeed, he testified, almost as a mantra, that everything he did was at RWMC's behest. *E.g.,* 9/14/06:35-36, 71, 168, 193, 195-196, 198; 9/15/06:32-68, leading to the government's claim that he was RWMC's "errand boy." 10/2/06:28.

Ms. Driscoll left RWMC's employ on May 5, 2000. Thereafter, the trajectory of Celona's political career changed. In January of 2001, his faction vaulted into the leadership, and he was given the important post of Chair to the Senate Corporations Committee. 9/15/06:97-100. He continued to work for RWMC for the next several years; indeed, his contract was renewed, and he was given a raise. 9/15/06:151; 9/25/06:225. According to Celona, his function morphed over time such that, by the end of his tenure as a consultant in 2003, he was spending more time working for RWMC on legislative concerns than he was on elderly affairs. 9/15/06:206.

**Rule 14: The Standard for Severance**

This Court has considerable latitude in ruling on requests for severance under F.R.Crim.P. 14. *United States v. Neal,* 36 F.3d 1190, 1204 (1st Cir. 1994). Because this Court has first-hand exposure to the case, it is in a unique position to evaluate conflicting arguments, consider the ramifications of a severance motion, and strike the balance between preventing prejudice and husbanding judicial resources. *United States v. DeLeon,* 187 F.3d 60, 63-64 (1st Cir. 1999), citing *United States v. O'Bryant,* 998 F.2d 21, 25 (1st Cir. 1993).

The United States Supreme Court has articulated the controlling standard for trial courts to use when deciding severance motions.[4] *Zafiro, supra* at 539. A severance should be granted if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* Among the types of prejudice that may warrant a severance is "jury confusion." *United States v. Rodriguez-Marrero,* 390 F.3d 1, 26 (1st Cir. 2004); *accord, United States v. Innamorati,* 996 F.2d 456, 469 (1st Cir. 1993)("Prejudice from joinder can come in various forms, including jury confusion, …").

**The Indictment**

One of the core reasons for tethering Ms. Driscoll's case with Mr. Urciuoli's – the conspiracy charge against both – disappeared with her acquittal of conspiracy. The remaining justification is the allegation that Ms. Driscoll participated with Mr. Urciuoli in the devising / execution of a "scheme and artifice to defraud" the public of the honest services of John Celona. *Indictment* at ¶ 96.

It is this allegation, however, which yields confusing and ultimately unconstitutional results if Mr. Urciuoli and Ms. Driscoll are to be tried jointly. According to the Indictment, the "conspiracy" to commit mail fraud (now charged against Mr. Urciuoli alone) and the "devising" of a mail fraud "scheme" (still charged against both) are virtually indistinguishable legally and literally indistinguishable factually.

---

[4] This standard is broader than the appellate standard used by the First Circuit in assessing severance questions, which narrows commensurate with the breadth of the trial court's discretion. *E.g., LiCausi, supra* at 48-49 (First Circuit reverses the denial of a severance motion only upon a showing of strong prejudice demonstrating a manifest abuse of discretion that deprived defendant of a fair trial); *DeLeon, supra* at 63 (First Circuit will reverse denial of severance only on showing of prejudice so pervasive that it would be likely to effect a miscarriage of justice).

Legally, the only difference between the two is that the conspiracy count charges a conspiracy to devise a fraudulent scheme, and the substantive count charges the devising of the same fraudulent scheme. Indictment ¶¶ 14, 96. The distinction between "conspiring to devise" and "devising" a scheme is subtle, to put it mildly. To "devise, means to "work out or create (something) by thinking; contrive; plan; invent." *New World Dictionary of the American Language* at 386 (2nd College ed. 1980). To "conspire" means to "plan and act together secretly, esp. in order to commit a crime." *Id.* at 304. The concept of "planning" appears in both definitions, a fact that is highly suggestive and, here, problematic. The main difference between the two is of little assistance: "Devising" is something someone can do alone, while "conspiring" requires joint activity. This, however, is a distinction without a clear difference in the context of this case, where the substantive mail fraud count alleges that Urciuoli and Driscoll *together* devised the alleged scheme. Worse, it is yet another source of potential confusion for the jury.

Then there are the factual allegations, which identical for both crimes. Mr. Urciuoli and Ms. Driscoll are alleged to begun devising the mail fraud scheme "in or about August of 1997", exactly the same date that the Indictment alleges that Mr. Urciuoli began conspiring to commit mail fraud. *Id.* at ¶¶ 96, 14. The "Principle Objects of the Conspiracy" (Indictment at ¶¶ 15-16) are word-for-word identical to the "Principle Objects of the Scheme" (Indictment at ¶¶ 97-98). The "Means and Methods of the Conspiracy" (Indictment at ¶¶ 17-20) are word-for-word identical to the "Means and Methods of the Scheme" (Indictment at ¶¶ 99-103). The "Overt Acts" (Indictment ¶¶ 21-94) alleged for the conspiracy are incorporated by reference into the substantive mail fraud charge. Indictment ¶ 103. These two crimes, in other words, were

allegedly committed at the same time, for the same purposes, by the same actions undertaken by the same defendants.

As the First Circuit suggests, *Urciuoli, supra* at 293, the only way to make sense of Ms. Driscoll's acquittal on the conspiracy charge but conviction on the wire fraud count is that the jury found her guilty of the latter on an aiding and abetting theory. Indeed, as a matter of constitutional principle, Ms. Driscoll cannot be retried following her acquittal except as an aider and abettor. This must be so because the facts on which the government premised its accusation against Ms. Driscoll as a principal were necessarily decided by the first jury in Ms. Driscoll's favor. *Sealfon v. United States,* 332 U.S. 575 (1948) (acquittal on conspiracy precludes retrial on substantive offense if facts necessary to proof of latter necessarily decided by acquittal); *Ottomano v. United States,* 468 F.2d 269 (1st Cir. 1972), *cert. denied,* 409 U.S. 1128 (1973) (retrial of substantive offense not barred by conspiracy acquittal where defendant convicted on aiding and abetting theory).

Ms. Driscoll's first jury was instructed on conspiracy in the following terms:

> The essence of the offense of conspiracy is participating in a plan or scheme to do something unlawful.
>
> 10/2/06:176
>
> * * * *
>
> If a Defendant understands the unlawful nature of a plan or scheme and knowingly participates or becomes a member of the conspiracy and willfully assists in the attempt to accomplish the purpose, that Defendant may be a member of a conspiracy even though he or she played a relatively minor role.
>
> 10/2/06:178
>
> * * * *
>
> In order to establish that a Defendant joined the conspiracy willfully, it must be shown that the Defendant joined or participated with the intent to advance or further the unlawful objectives of the conspiracy.

10/2/06:179

The Indictment alleged (and still alleges) as both the "Means and Methods of the Conspiracy" and the "Means and Methods of the Scheme" the following:

> It was part of the conspiracy/scheme that Defendants, URCIUOLI, DRISCOLL, SANGERMANO AND RWMC caused The Village to enter into a consulting agreement with Celona in order to provide him money in exchange for his political support, to include support for matters in which RWMC and The Village had an interest, which were pending before the Rhode Island General Assembly and the Senate Corporations Committee.
>
> Indictment ¶¶ 17, 99.
>
> * * * *
>
> It was further part of the conspiracy/scheme that Defendants, URCIUOLI, DRISCOLL, SANGERMANO AND RWMC, and Celona deceived the State of Rhode Island and its citizens concerning his relationship with RWMC by, among other things: (a) disguising the nature of Celona's relationship with RWMC by having The Village hire and pay Celona; (b) failing to disclose Celona's conflict of interest, including to the Ethics Commission; (c) providing false and misleading information to the Ethics Commission; (d) seeking an advisory opinion from the Ethics Commission based on false, misleading and incomplete information.
>
> Indictment ¶¶ 20, 102.

In light of the trial court's instructions, it is simply not possible that the jury could have found that Ms. Driscoll was complicit in this conduct as part of the mail fraud and still have acquitted her of the conspiracy allegations. Instead, the jury must have rejected the government's argument that her conduct was criminal at the outset of the events at issue, when she was deputed to help James McGuirk, Esq. to prepare a consulting agreement for Celona.[5] Instead, it must have found that, as time went on, she became aware that Mr. Celona was

[5] The evidence was unrebutted that both Ms. Driscoll and Mr. McGuirk opposed hiring Celona.

spending more time on political activities for RWMC than he was on elderly outreach, yet she continued to interact with him. Celona himself testified that his job morphed over time, with the work for RWMC increasing as his elderly outreach for The Village at Elmhurst decreased, 9/15/06:206.[6]

On retrial, the jury will be called upon to hold Ms. Driscoll absolutely harmless of any allegation of mail fraud conspiracy as a matter of constitutional mandate, while at the same time it must consider whether Mr. Urciuoli participated in a mail fraud conspiracy that is all but indistinguishable from the mail fraud scheme in which Driscoll is also charged, but only as an aider and abettor. Any trial that requires mental gymnastics at this level is unlikely to yield results that are either reliable or fair.

**Risk of Prejudice**

The Supreme Court has charged this Court to sever joint co-defendants when a "specific trial right" is compromised, or when a joint trial would "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro, supra* at 539. One "trial right" at issue here is Ms. Driscoll's right under U.S.Const. Amend. V not to have to defend twice against the same criminal allegation. Having been acquitted of mail fraud conspiracy, she has a constitutional right not to have to re-litigate the charge. *United States v. Henry,* 519 F.3d 68, 71-21 (1st Cir. 2008)(Double Jeopardy "'shields a defendant from second prosecution for the same offense after either a conviction or an acquittal,…" (quoting *United States v. Pacheco,* 434 F.3d 106, 111-112 (1st Cir. 2006)(citation omitted))).

---

[6] Based on *Sealfon,* Ms. Driscoll will seek limiting instructions regarding the employment contract evidence and ensuing request for an advisory opinion which will inform the jury that she is not a co-conspirator, that this evidence may not be used to establish her complicity, and which will preclude the government from arguing that she agreed with Mr. Urciuoli and Mr. Celona to create a sham job as a cover for illicit political activity.

The Double Jeopardy threat works synergistically here with the risk of prejudice to Driscoll's right to clear instructions on the applicable law. This case presents an insurmountable practical problem of distinguishing the mail fraud conspiracy charge, which cannot constitutionally be considered against Ms. Driscoll, from the substantive charge of "devising" a mail fraud "scheme" under an Indictment which charges the two in all but indistinguishable terms. The usual antidote to the prejudice caused by joint criminal litigation is cautionary instruction. *E.g., United States v. Neal,* 36 F.3d 1190, 1204-1205 (1st Cir. 1994). Here, however, clarifying instructions will nearly impossible to frame in such a way as to avoid jury confusion, given an Indictment that charges the "scheme" to be fungible with the "conspiracy". Jury confusion, in turn, will compromise the reliability of any verdict as to Ms. Driscoll's innocence or guilt. *Zafiro, supra* at 539.

Then there is the problem that Ms. Driscoll is charged in but a single count of a 38 count Indictment, so that her guilt or innocence will have to be assessed in a joint trial dominated by evidence inadmissible as to her. Ms. Driscoll was present for less than half of the time span (August 1997 to January 2004) charged in the Indictment. During her tenure, Celona was a back-bencher with little power in the General Assembly. That changed, but only after Driscoll had left RWMC's employ in 2000. *Urciuoli, supra* at 292 (Driscoll left RWMC in 2000); *id.* at 296 (Celona became chair of powerful health-related committees in 2001 and 2002); *Indictment* ¶ 6 (Celona became Chairman of the Senate Corporations Committee in 2001).[7] One entire

---

[7] The Indictment induces confusion in this regard by acknowledging that Driscoll had left RWMC by *May of 2000* (Indictment at ¶ 2), but nonetheless asserting that she influenced Celona *"in his official actions as … Chairman of the Senate Corporations Committee …",* a position that the Indictment admits Celona did not hold until *January 4, 2001*. Indictment ¶¶ 6, 101 (emphasis supplied). Ms. Driscoll has moved to amend the Indictment to remove this inaccurate and prejudicial allegation. *See Frances P. Driscoll's Motion to Strike Certain Allegations From the Indictment* and supporting memorandum.

category of wrong-doing out of the two alleged – the allegations concerning Blue Cross and United Health – occurred only after Ms. Driscoll had left RWMC and after this shift in Celona's power had taken place.[8] *Id.* at 292, 296-297.

Even in the aspect of the case which does involve Ms. Driscoll -- Celona's alleged actions promoting or blocking legislation of interest to RWMC – the First Circuit has observed that the government's case against her is much weaker than its case against Mr. Urciuoli. *Id.* at 297. The First Circuit could make sense of her simultaneous acquittal of mail fraud conspiracy and conviction of a single mail fraud count by concluding that she was convicted, not as a principal, but only as an aider and abettor. *Id.* at 293 ("Driscoll was convicted of a single count of mail fraud, on the theory that she aided and abetted Urciuoli."). As noted *supra*, this means the jury must have rejected the government's allegation that she became criminally involved at the outset of the conspiracy/scheme, which in turn will require warrant limiting instructions from this Court regarding the employment contract evidence. *Sealfon, supra*.

There will also be repeated instructions required concerning co-conspirator hearsay, which will be admissible against Mr. Urciuoli under F.R.Crim.P. 801(d)(2)(e), but inadmissible against Ms. Driscoll. The first trial was rife with Celona's assertions concerning statements Mr. Urciuoli allegedly made. *E.g.,* 9/14/06:79 (Urciuoli allegedly told Celona to kill the bill); 9/14/06:164 (Urciuoli allegedly told Celona that the tobacco settlement money should go to the hospitals); 9/14/06:196 (Urciuoli allegedly told Celona he opposed the cancer commission bill);

---

[8] Because Ms. Driscoll "had nothing to do with the insurance phase of the case," *Urciuoli, supra* at 292, Ms. Driscoll will be entitled to an instruction that jurors cannot find her guilty of mail fraud unless they find that the scheme existed prior to May of 2000 without relying on any of the post-2000 insurance-related evidence. The government, however, will want the jury to assess its case against Mr. Urciuoli on the totality of the evidence, without any cut-off mid-way through the time frame charged.

9/15/06:122-123 (Urciuoli allegedly told Celona that Blue Cross "keeps cranking us around regarding our payments" and asked Celona to set up meetings to try to get payments); 9/15/06:136 (Celona allegedly put pressure on Blue Cross at Urciuoli's behest); 9/15/06:167-168 (Urciuoli allegedly asked Celona to set up meeting with United Health because negotiations were not going well). These statements came in against both defendants in the first trial in light of the common conspiracy charge pressed against both. That will not be true this time around.

While the co-conspirator hearsay problem and Driscoll's minor role in relation to her co-defendant may not be enough by themselves to justify severance, when added to the confusion and prejudice inherent in the joint trial of these two near-identical criminal charges, the risk of prejudice far outweighs the interest in judicial economy

Finally, there is the problem of the exculpatory evidence that is critical for Ms. Driscoll, but potentially objectionable to Mr. Urciuoli. In July of 1998 (approximately five months after Celona began his employment with RWMC), the RWMC Board hired outside counsel, F. Dennis Saylor, Esq. (now Judge Saylor), from the Boston law firm of Goodwin, Proctor and Hoar to investigate certain allegations of wrong-doing that had been made against Urciuoli. Excerpt from *Roger Williams Medical Center, Inc., Report to Executive Committee of the Board of Trustees* (copy attached as *App. A*)(Saylor Report). The allegations fell into four categories: (1) alleged abuse of meal and entertainment expenses; (2) alleged abuse of travel expenses; (3) alleged charging of miscellaneous personal expenses to the hospital, including some home and office furnishings, personal telephone calls, and charitable contributions; and (4) alleged improper efforts to direct vendor and other contracts to personal friends. *Id.* at p. 1. None of the allegations concerned Ms. Driscoll.

In this context, counsel looked at "the allegation that state Senator John A. Celona (D-North Providence) was given a 'no-show' job at the Village at Elmhurst assisted living center as payment for his efforts on behalf of the hospital during the Columbia/HCA matter." *Id.* at 49. When conducting that investigation, counsel stated that he reviewed, not only at the Ethics Opinion, the consulting agreement and various other materials, but also "memoranda to Francis (*sic*) P. Driscoll, Senior Vice President, External Affairs, Corporate Community Development." *Id.* at 50. These memoranda included facsimile communications from Celona which later formed the heart of the government's case against Ms. Driscoll. *E.g., App. B-F* (facsimiles from Celona to Driscoll, each with a bates-stamp at the lower right prefaced by the letters "GPH" for Goodwin, Proctor and Hoar indicating that they came from the office that produced the Saylor Report). In one of these facsimiles, Celona stated that he would "work to defeat" House Bill 98-H-8229 "before it moves anywhere." Facsimile from Celona to Driscoll, dated 2-17-98, stamped "GPH 000830", attached as *App. B*. All of these facsimiles were central to the government's case in the first trial. The Report's conclusion, however, is unequivocal: "[W]e find no basis for concluding that the contract was illegal or unethical." *Id.*

Ms. Driscoll intends to introduce the Saylor Report, which she read and on which she relied, as evidence of her innocent state of mind as the relationship with Celona went forward after July of 1998.[9] The issue is not whether outside counsel was correct or incorrect in his conclusion, but what Ms. Driscoll fairly understood when she read it.

It will be important for Ms. Driscoll to place the exculpatory portion of this report in the context of the report as a whole in order to make clear that this was anything but a "whitewash"

[9] There are a number of ways Ms. Driscoll might introduce her reliance on this document, including *inter alia* as part of her own testimony or through the testimony of witnesses who have first-hand knowledge that she read this report. Without revealing trial strategy here, counsel represents that evidence that she read and relied on this report will be admissible at trial.

by a compliant agent of the Board of Trustees. The Report is hard-hitting and critical, a fact which makes the exculpatory conclusions it reaches regarding Celona both more credible in general and more worthy of Ms. Driscoll's reliance in particular.

The timing of this report is also telling. Now that Ms. Driscoll has been acquitted of conspiracy, the jury will be asked to determine at what point, if any, she became part of a scheme that she did had nothing to do with at the outset, when the conspiracy was first allegedly entered by others. Being told by an authoritative source shortly after Celona's hire that it was neither "illegal [n]or unethical" for her to be interacting with Celona as she had been doing, is powerful evidence that she did not "knowingly and willfully" go forward with the intent to defraud the public.[10] *United States v. Woodward,* 149 F.3d 46, 54 (1st Cir. 1998).

On information and belief, however, co-defendant Urciuoli will object to introduction of the Saylor Report, given other aspects of the report that are highly prejudicial as to him (but not as to Ms. Driscoll). This problem will likely be exacerbated by the government's probable response to the Saylor Report. The government may attempt to undermine the Report's exculpatory conclusion by arguing that outside counsel received only a partisan selection of documents on which to rely. This claim (even if supportable) is irrelevant to Ms. Driscoll, who did was not involved in the selection of documents given to counsel. Hence, this Court may find

---

[10] The government should not be permitted to parse the words of the Saylor Report in an effort to narrow the import of its conclusion concerning the Celona contract. What matters here is what a lay reader like Fran Driscoll reasonably understood from the Judge Saylor's statement that he relied on "memoranda to Francis P. Driscoll" in concluding that the contract with Celona was legal and ethical. Certainly, at least one thing must have seemed obvious to such a reader: The memoranda Ms. Driscoll was receiving from Celona were not acts of crime. Indeed, it is not possible for those facsimiles to be legal and ethical, as the Report said they were, and at the same time for them to constitute acts of mail fraud, which is what the government is alleging here.

itself in the position of having to instruct the jury that the government's rebuttal to the Saylor Report is applicable only to Mr. Urciuoli, but is ineffective as to Ms. Driscoll.

None of these problems will occur if the cases are tried separately.

**Conclusion**

The risks outlined – which threaten both specific trial rights and the reliability of any jointly reached verdict -- can be avoided only by independent litigation of the remaining charge pending against Driscoll. She therefore respectfully asks that this Court sever her trial from that of co-defendant Robert Urciuoli.

Respectfully submitted,
Frances P. Driscoll
By her attorneys,

/s/ John A. MacFadyen
John A. MacFadyen (#1209)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
401-751-5090

/s/ Kevin Bristow
Kevin Bristow, Esq. (#3984)
76 Westminster Street
Providence, RI 02903
401-521-8000

**CERTIFICATION**

I hereby certify that on the 7th day of May, 2008, a copy of this Motion and Memorandum For Relief From Prejudicial Joinder was filed electronically and that it is available for viewing and downloading from the Court's ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ John A. MacFadyen