UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CR. No. 06-02-04(ML) |
| | ) | |
| ROBERT A. URCIOLI, | ) | |
| FRANCES P. DRISCOLL, and | ) | |
| ROGER WILLIAMS MEDICAL CENTER | ) | |

**FRANCES P. DRISCOLL'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HER MOTION IN LIMINE TO PRECLUDE INTRODUCTION OF ANY TESTIMONY OF JOHN CELONA OR, IN THE ALTERNATIVE, FOR FURTHER RELIEF**

**Introduction**

Back on May 7, 2008, Frances Driscoll filed a *Motion in Limine to Preclude Introduction of Any Testimony of John Celona Or, In the Alternative, For Specification Of, and Preclusion Of, Celona Testimony That the Government Has Admitted As Not Credible or Reliable.* This Court's ensuing trial in *United States v. Kramer, et al.,* CR 07-09-01(MML) (CVS trial) has substantially changed the context for this motion, necessitating the filing of this supplemental memorandum.

In the first trial of the Roger Williams matter, the government predicated its case against Ms. Driscoll on a sequence of facsimile communications from John Celona to Ms. Driscoll regarding political affairs in which Roger Williams Medical Center (RW) had an interest. These faxes proved that Ms. Driscoll, having been part of a decision (however unwillingly) to hire John Celona as a consultant, dealt with him on political matters of interest to Roger Williams. The faxes were the fulcrum of the government's case. Indeed, the prosecutor went so far as to argue "Celona [has] lied in the past . . . . [T]he reason we went through so many of the documents during his testimony is because the one thing that John Celona said to you that you can probably all agree with, the documents don't lie." Roger Williams (RW) Tr. 10/2/06:150-151, attached as

*Appendix* (*App.*) *C-49-50.* After the CVS trial, these faxes can no longer carry the government's case. In accord with the First Circuit's opinion in *United States v. Urciuoli, et al.,* 513 F.3d 290 (1st Cir. 2008), this Court instructed the CVS jury that "Rhode Island state law does not prohibit private citizens or entities who have hired a legislator from communicating with that legislator about legislation that might be of interest to them." CVS Tr. 5/30/08:34[1], included as *App. B-13.*

Now the government must establish that, in addition to communicating with Celona on political matters, she knew that Celona was being paid specifically for his political activities and that his job as a consultant for elderly outreach was only a cover for his alleged political function, can the government argue for honest services fraud. John Celona, therefore, is not merely a significant witness against Ms. Driscoll; he is the essential witness. And most critically, his testimony must go substantially beyond the hard evidence of the fax communications.

John Celona, however, is an inveterate liar. This is the second lesson of the CVS case. Unmoored to a particular document or other piece of tangible evidence, his testimony is thoroughly unreliable. On the single most important piece of evidence in the CVS case – the telephone call to the Ethics Commission and the follow-up call to Messrs. Kramer and Ortiz – a matter which Celona had previously described on multiple occasions, he gave testimony which was a "one hundred and eighty-degree departure from his previous testimony before the grand jury and statements that he made to government agents in the some four years now since he first began cooperating with the government." CVS Tr. 5/29/08:9, *App. B-9*. Regarding another key point, the purported meeting with Mr. Kramer where Celona was offered a consultancy for CVS,

[1] Citations are made to the daily copy as defendant does not have access to the official transcript.

the defense proved conclusively that Mr. Kramer was not even in Rhode Island, much less at the event where Celona claimed the conversation took place. CVS Tr. 5/29/08:86-89, *App. B-10-11*.

The government has previously conceded that Celona "lied to his colleagues, his constituents, the Ethics Commission, the public and even to his accomplices." *Government's Motion For Downward Departure Based on Substantial Assistance to the Authorities,* at p. 6, included at *App. D-6.* In the first Roger Williams case, Judge Torres found that "Senator Celona exaggerated the things that he claims to have done in furtherance of the conspiracy," and even that "there is some reason to think that he may have . . . misrepresented or lied about some of those things, . . . ." RW Tr. 9/29/06:47, *App. C-47.* And now there is his CVS testimony. Once is circumstance; twice is coincidence; but three times it's enemy action.

The government can no longer wash its hands of its witness. It can no longer posture Celona's ongoing lies as "inconsistencies," and take refuge in the position that his credibility is for the jury. It must know now, if not before, that he is an unregenerate liar, someone who can be anticipated with a high level of certainty to lie again, someone who, as the United States Attorney remarkably stated to this Court, "we couldn't be sure until it came out of his mouth what exactly he was going to say at trial. He had taken multiple different sides, and it was impossible for anyone to know exactly what he was going to say." CVS Tr. 5/27/08:22, *App. B-7.* As the gatekeeper for minimally reliable evidence, this Court has the authority to prevent the presentation of testimony from a thoroughly discredited source which is proffered as the basis for the government's case against Ms. Driscoll.

**Factual Background**

The Roger Williams case breaks down into two parts. First, there is the accusation of honest services fraud predicated upon political communications between John Celona and RW personnel. Then there is the charge that Robert Urciuoli used Celona to pressure Blue Cross and

United into reimbursement settlements. The first claim is directed at both Ms. Driscoll and Mr. Urciuoli and depends on the credibility of Mr. Celona's recitation of uncorroborated conversations. The second, against Mr. Urciuoli alone, features Celona as a significant witness, but his testimony describes events which are substantially corroborated by third-party witnesses.

As to the first, Ms. Driscoll's relationship with John Celona began in the summer of 1997 when her superior, Mr. Urciuoli, decided to hire him as a consultant to augment community outreach into the elderly community. RW Tr. 9/18/06:102, *App. C-28*. This hire was opposed by both Ms. Driscoll and the hospital's outside counsel, James McGuirk. RW Tr. 9/12/06:32, *App. C-2;* 9/20/06:198, *App. C-32;* 9/21/06:179, *App. C-42.*

At the time of his employment, Celona belonged to a Senate faction at odds with the leadership. RW Tr. 9/13/06:218-220, *App. C-4-6*. He had so little influence at the Statehouse that he could not even command an office on the premises. *Id.* at 220, *App. C-6*. He did, however, have unparalleled access to the elderly communities of North Providence. Celona testified that, in the summer of 1997, he used that access to persuade Urciuoli to hire him as a consultant. RW Tr. 9/18/06:102, *App. C-28*.

Ms. Driscoll left Roger Williams' employ on May 5, 2000. Thereafter, the trajectory of Celona's political career changed. In January of 2001, his faction vaulted into the leadership, and he was given the important post of chair to the Senate Corporations Committee. RW Tr. 9/15/06:97-100, *App. C-22-25*.

The evidence at the first Roger Williams trial proved that Celona did indeed function as an independent consultant doing senior outreach. He prepared and filed activity reports which revealed a broad array of activities to publicize Roger Williams' subsidiary, The Village at Elmhurst, and the continuum of care concept. *See* G-172, 173, 177, 179, 191, 197, 209, 216. In

an ongoing stream of fax communications, Celona represented that he promoted Roger Williams' elderly outreach efforts by attending, organizing, speaking at or hosting a wide variety of events.[2] Although plainly doing his best to advance the government's case, Celona was forced to concede on cross-examination that he "performed [his contract]," RW Tr. 9/18/06:149, *App. C-29*, and did so "to the best of [his] abilities in good faith and honestly . . . ." *Id.* at 150.

During the entire two-year span before Ms. Driscoll left Roger Williams, the fax record shows her interacting with John Celona on just ten political matters out of the multiple hundreds of health-care bills introduced during this time. In only four instances did she send back a response, G-272, 281, 320, 326, 364, three of which were simple requests for information, G-272, 281, 320, 326, and in one of these three Celona ultimately voted against Roger Williams' position. RW Tr. 9/14/06:210, *App. C-10* (Cancer Commission Bill). There was only one instance in three years where a fax showed that she affirmatively pushed Celona to promote Roger Williams' position, and that was with the Attorney General, not the legislature. G-364; RW Tr. 9/15/06:62-71, *App. C-12-21* (Lifespan merger). With the possible exception of a single (and revenue-neutral) bill, all of this legislation fell within the class exception created by R.I.G.L. § 36-14-7(d).

John Celona's testimony, however, went far beyond the fax record, embellishing the written record with uncorroborated allegations of direct orders to take legislative action. For example, on March 31, 1998, Celona sent Driscoll a facsimile informing her that "there's still no posted hearing for 98-S 2796. G-147, included at *App. C-51*. At trial, this morphed into a claim without documentary support that Celona had discussed this bill with Driscoll and "[s]he said,

[2] These communications were introduced as exhibits at the first trial. *See,* G-135, 150, 155, 171, 172, 173, 177, 179, 191, 209, 210, 216, 269, 318, 383, 385; U-K(5), S-N(6), S-O(6), S-N(5), S-O(5), S-Q(5).

Do your best to try to kill it." RW Tr. 9/14/06:71, *App. C-8*. Similarly, on July 29, 1999, Celona sent Driscoll a facsimile informing her that he had delivered the minutes of a House hearing to Roger Williams and that he could obtain other minutes if she wished. G-326, *App. C-54*. At trial, the prosecution elicited a claim from Celona that Driscoll wanted him not only to monitor these hearings, but "to do what I can to try to stop it." RW Tr. 9/15/06:68, *App. C-18*. *Compare* G-305, *App. C-52-53* ("Please advise on the attached legislation") with RW Tr. 9/14/06:193, *App. C-9A* ("She told me to monitor it [the legislation attached to G-305] and try to make sure it didn't pass.").

The second half of the Roger Williams case concerns John Celona's facilitation of meetings between Mr. Urciuoli and the CEOs of both Blue Cross/Blue Shield and United Healthcare over reimbursement issues. These meetings took place at the State House in Celona's office. The government premised its accusations, not simply on the testimony of Celona, but also on evidence from James McGuirk, Esq. and Kim O'Connell, Esq.. *See* RW Tr. 9/21/06:61-66, *App. C-34-41*; 9/26/06:9-10, *App. C-44-45*. The actual meetings were described by a number of third-party participants, as well as Celona. *See gen'ly* Testimony of Ronald Battista, Kelly Sheridan, Esq.

Celona did not claim that his function at Roger Williams remained static over the full range of his tenure. To the contrary, he testified that it morphed over time such that, by the end of his tenure as a consultant in 2003 (some three years after Mr. Driscoll had left Roger Williams), he was spending more time working for Roger Williams on legislative concerns than he was on elderly affairs. RW Tr. 9/15/06:206, *App. C-26.*

**<u>The Law</u>**

In *Mesarosh v. United States,* 352 U.S. 1 (1956), the Supreme Court established the cardinal principle that a trial tainted by the presentation of a witness who had previously

committed perjury is a violation of the Due Process Clause. This postulate retains its vitality fifty years hence. *See United States v. Espinosa-Hernandez,* 918 F.2d 911 (11th Cir. 1990); *United States v. Martorano,* 663 F.2d 1113 (1st Cir. 1981); *United States v. Davis,* 442 F.2d 72 (10th Cir. 1971). The First Circuit in particular has been sensitive to problems of perjury, choosing a relaxed standard for the granting of a new trial based on the knowing use of perjured testimony. *United States v. Gonzalez-Gonzalez,* 258 F.3d 16 (1st Cir. 2001), *cert. denied,* 540 U.S. 876 (2003).

As a corollary to *Mesarosh,* "[a]n assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness." *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991). A prosecutor cannot simply throw a witness on the stand like mud against a wall and hope that something sticks with the jury. "The duty to act 'is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it. A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts.'" *Morris v. Ylst,* 447 F.3d 735, 744 (9th Cir. 2006), *cert. denied,* ____ U.S. ____, 127 S.Ct. 957 (2007).

Plainly, the current posture of this case is different from the ordinary *Mesarosh* situation, where the prior perjury by a government witness is discovered only after trial. This, however, does not diminish the principle's vigor. It simply requires its application in a different context.

*Mesarosh* and its progeny imply that where a new trial is required "because the witness's credibility is wholly discredited," that witness will not be called on retrial. *Berry v. United States,* 2007 U.S. Dist. LEXIS 89860 (E.D.Wa.). *See also United States v. Krasny,* 607 F.2d 840 (9th Cir. 1979), *cert. denied,* 445 U.S. 942 (1980). The ability to cross-examine is not a panacea

for perjury. Thus, in a circumstance where the prosecution knowingly used false testimony, but the defense knew it was false and was able to impeach the witness with a prior trial transcript, the Ninth Circuit held that the conviction could not be saved given the absence of a failure to correct the evidence at the time it was given. The point is that "[a]ll perjury pollutes a trial, making it hard for jurors to see the truth." *Id.* at 492.

The *Federal Rules of Evidence* require this Court to act as a gatekeeper for the admission of evidence. F.R. Evid. 104. Rule 403 explicitly allows evidence to be excluded "if its probative value is substantially weighed by the danger of unfair prejudice, . . . ." In the ordinary case, the prior inconsistencies, even perjury, of a witness will not require exclusion. The extraordinary case, however, is different. The Ninth Circuit suggested as much in *United States v. Tamez,* 941 F.2d 770 (9th Cir. 1991). There, a defendant argued on appeal that it was error not to exclude the testimony of a witness who had perjured herself in a co-defendant's trial, albeit on a relatively minor point. The Appeals Court found no reversible error where the defense was aware of the prior perjuries and able to cross-examine. It suggested, however, that if the witness could have been shown to be "a habitual liar who was incapable of testifying truthfully," the situation might have been different. *Id.* at 776.

A witness who testifies about conversations which are unrecorded and have no third-party participants may be beyond the reach of effective cross-examination. Objective disproof of the evidence is likely to be impossible. In its essence, the problem is not different than that which lead the Supreme Court in *Daubert v. Merrill Dow,* 509 U.S. 579 (1993) to require pretrial hearings on expert evidence. A witness proffering junk science to a jury may be cross-examined, but the trial court nevertheless must exercise a gatekeeping function for fear that, cross-examination notwithstanding, the jury may not be able to ascertain the truth.

The prior perjury context is different, but the core problem of an unfair trial remains the same.

**John Celona**

The problem with John Celona as a witness is not that his evidence has been inconsistent in the past, or even that he has previously lied. It is that he has lied *every single time he has been asked to tell the truth.* It has now reached the point where the United States Attorney has conceded that it is "impossible for anyone to know exactly what he [is] going to say." CVS Tr. 5/27/08:22, *App. B-7*__. The line prosecutors charged with presenting Celona as a witness are afraid to confront him with his inconsistencies – to perform their constitutionally mandated to investigate possible perjury – due to their well-founded concern that Celona will slant his testimony to give them what he perceives they want. *See* CVS Tr. 5/23/08:112, *App. B-5A* (MR. DAMBRUCH: I didn't point him to specific sections, Judge . . . . What I did is I asked him to read his testimony. I'll be honest, Judge, my concern was I did not want to tell him how to testify or that he had to testify consistently with anything else."); *see also, United States' Memorandum in Support of Its Objection to Defendant's Motion to Compel Disclosure of Exculpatory and Impeachment Information* at 4 included at *App. E.* ("[E]ven if the United States could divine the truth with absolute certainty to characterize witness statements as truthful or untruthful and were required to do so, it would be unwise to make the attempt.")

John Celona lied repeatedly to government investigators. *App. D-4-6*. He lied repeatedly to the Ethics Commission. Transcript of 8/25/05 in *United States v. Celona,* C.R. No. 05-80T at p. 28-29, included as *App. A-2-3.* He lied in the grand jury. *App. D*-5. He lied to the IRS. *Supplemental Memorandum of Law of Defendant John R. Kramer in Further Support of Defendants' Motion For a Declaration of Mistrial With Prejudice Or For Other Appropriate Relief* (*Supplemental Memorandum*) at p. 24-26, included in its entirety as *App. F* and

incorporated here. He lied in the Roger Williams trial. RW Tr. 9/29/06:47, *App. C-47; App. D-5*. And he lied repeatedly in the CVS trial.

In this last instance, the defense was able to expose Celona changing his testimony on critical points in his effort to shore up a flagging case. That was bad. But it was far worse that this was the second of two successive trials in which this happened. In the Roger Williams trial too, Celona "recovered" a memory on a critical point right before trial. Undoubtedly with a sour taste in his mouth, the government prosecutor reported to Judge Torres that "[w]hile witnesses are certainly required to testify to their best recollection on the day they give testimony, at least some trial testimony, concerning when he first requested a job from Robert A. Urciuoli, contradicted prior statements and testimony. *App. D-5*. And yet, in CVS, he went ahead and did it again.

At a second critical point in the CVS case, Celona described the first time he was approached by Mr. Kramer of CVS to become a consultant. CVS Tr. 5/16/08:106, *App. B-1A*. He testified seamlessly that it happened at a McCaffrey fundraiser on May 27, 1999 when they were sitting alone. *Id.* However, Mr. Kramer was fortunate enough to have had credit card receipts proving that he was in New Jersey at the time. CVS Tr. 5/16/08:86-89, *App. B-10-11*. But what is Ms. Driscoll supposed to do when Celona starts describing conversations he purportedly had with her which cannot be objectively disproved.

In his *Supplemental Memorandum,* Mr. Kramer makes a compelling case that Celona is an instinctive and consistent liar, and further that the government has been at best tepid in its enthusiasm to expose this fact. *App. F*. Prior to the CVS trial, this Court attempted to cauterize the risk by requiring the government to catalog all of Mr. Celona's prior lies. What came back was a two-page summary of an interview with Celona, who claimed that he could not remember

exactly what he had been lying about. FD-302 Report of 3/8/08, quoted in *Defendants' Memorandum in Law in Support of Defendants' Motion For Declaration of Mistrial With Prejudice Or For Other Appropriate Relief* at p. 5. Why didn't he provide more? "I don't want to lie about lying" was his response. *Id.* And then he started lying all over again.

If the government's essential witness cannot tell the truth even about his proven lies, if the government cannot tell whether and when he will lie again, then the witness should not be presented at trial when the testimony will be, in substantial measure, uncorroborated and yet essential to the government's case.

The government should be precluded from calling Mr. Celona as a witness under F.R. Evid. 403 and U.S. Const. Amend. V.

**Restriction on Testimony**

In the alternative, if this Court should determine that the government may present Mr. Celona as a witness, it should stringently restrict his testimony to matters which he can set on a concrete foundation. Mr. Celona should not be permitted to claim to remember conversations which he cannot situate at precise times and places and therefore avoid the kind of devastating impeachment which Mr. Kramer was able to employ regarding the McCaffrey fundraiser. Further, Mr. Celona should not be permitted to testify in unmoored generalities: "Everything I did was at Ms. Driscoll's direction," and the like. And finally, he should be required to limit his testimony to the actual words he said and the actual words she said, without being able to deliver express or indirect conclusions about what she knew or understood.

Only in this way can Ms. Driscoll have a trial which satisfies the requirements of the *Rules of Evidence* and U.S. Const. Amends. V, VI.

Respectfully submitted,
Frances P. Driscoll
By her attorneys,

/s/ John A. MacFadyen

John A. MacFadyen (#1209)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
401-751-5090

/s/ Kevin Bristow

Kevin Bristow, Esq. (#3984)
76 Westminster Street
Providence, RI 02903
401-521-8000

**CERTIFICATION**

I hereby certify that on the 13th day of June, 2008, a copy of this Supplemental Memorandum was filed electronically and that it is available for viewing and downloading from the Court's ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ John A. MacFadyen