# APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 07-009ML

UNITED STATES OF AMERICA

VS. MAY 16, 2008
9:00 A.M.

JOHN R. KRAMER and
CARLOS ORTIZ

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,
CHIEF JUDGE

(Jury Trial)



APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DIBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903



INDEX


| GOVERNMENT WITNESS | PAGE |
|---|---|
| Robin Seeley | |
| Direct Examination by Mr. Petalas | 4 |
| Cross-Examination by Mr. Fein | 10 |
| Cross-Examination by Mr. Kiley | 11 |
| Christine Egan | |
| Direct Examination by Mr. Dambruch | 15 |
| Cross-Examination by Mr. Fein | 24 |
| Cross-Examination by Mr. Kiley | 38 |
| John Celona | |
| Direct Examination by Mr. Dambruch | 63 |

EXHIBITS

| DEFENDANT KRAMER | FOR ID | IN FULL |
|---|---|---|
| M-11 | 36 | |




19 MAY 2008 -- 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning. Mr. Dambruch, please or Mr. Petalas.

MR. PETALAS: Yes, your Honor. The first witness today is Robin Seeley.

ROBIN SEELEY, GOVERNMENT WITNESS, SWORN

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Robin Seeley, S-E-E-L-E-Y.

THE COURT: Ms. Seeley, we have a lot of trouble hearing people in this big room. So you can adjust the microphone so that you're comfortable, and then you'll have to speak directly into it and loudly.

THE WITNESS: Okay.

DIRECT EXAMINATION

BY MR. PETALAS:

Q. Good morning, Ms. Seeley.

A. Good morning.

Q. Ms. Seeley, at some point did you become employed by CVS?

A. Yes.

Q. When was that?

A. September 30th, 2002.

Q. And in what capacity?



B-1

105

And Joseph Walsh even said if he wanted to have Tom Ryan come to a meeting and meet with him, and I said I didn't need to meet with Tom Ryan.
Q. Did you make any requests of the CVS representatives during this meeting?
A. No.
Q. Were there any legislative issues discussed during the meeting?
A. Yes. It just was a rundown of the CVS -- excuse me, the pharmacy freedom of choice legislation that had just been defeated; but we had talked about, you know, why we defeated it. And they obviously gave a rundown of why they, you know, why they were voting -- lobbying to defeat it and why we were supporting it.
Q. At the end of that meeting, had you changed your position on any willing provider?
A. No, sir.
Q. Was there any plan put in place for any follow-up or subsequent meetings between the parties who were present for this meeting you just described?
A. No, sir.
Q. Did you have any further contact with any representative of CVS during the 1999 session?
A. The session itself or during that period?
Q. During the period of time when the Senate was

106

still in session.
A. Yes.
Q. And can you describe for us who it was that you had contact with.
A. Jack Kramer.
Q. And where was it that that contact occurred?
A. It was at a Knights of Columbus hall in Warwick at a fundraiser for Senator Michael McCaffrey.
Q. And can you please tell us what happened when you encountered Mr. Kramer at that particular event.
A. Yes. There was a fundraising event, I believe it was in May of that year. And Senator McCaffrey's fundraiser was a buffet style, and I happened to be in an area of an open table, and Jack asked me to sit down. There was one open table that seated about 10, I can vividly recall, and we sat down and started talking.
Q. And what was discussed?
A. We started discussing about CVS and how I was, you know, active in my community with seniors and things like that and that CVS could use another consultant or a consultant.
Q. And who was it that brought up the topic of CVS being able to use a consultant?
A. Mr. Kramer.

107

Q. Had there been any discussion between yourself and any representative of CVS about a consulting position before that date?
A. No, sir.
Q. Had you raised the issue of employment with CVS before Mr. Kramer made that remark?
A. No, sir.
Q. Just to jump back for a minute, you mentioned that this was at a fundraiser?
A. Yes, sir.
Q. Was that the only fundraiser that was going on at that time of year?
A. No, there were several, several fundraisers going on at that time of year for representatives and senators throughout the House and the Senate.
Q. And, in fact, did you have a fundraiser during the spring of 1999?
A. Yes, sir.
Q. And directing your attention to Exhibit Number 73, do you recognize Exhibit Number 73?
A. Yes, sir.
Q. And is that a letter inviting Mr. Kramer to your fundraiser that was scheduled to take place on May 25 of 1999?
A. Yes, sir.

108

Q. Does that refresh your memory as to when your fundraiser was scheduled during the spring of 1999?
A. Yes, sir.
Q. And when was that?
A. May 25th, 1999.
Q. Now, you mentioned that there were a lot of fundraisers during that period of time. Did you attend any of those other fundraisers?
A. Yes, several.
Q. How many?
A. Countless. I tried to attend as many as I could. Many nights we would go from -- maybe go to three a night, two or three a night.
Q. Now, sir, you mentioned that Mr. Kramer raised the topic of CVS possibly needing a consultant. Were there any further details discussed about that situation on that evening?
A. No, sir.
Q. Did you have some subsequent contact with Mr. Kramer during 1999?
A. Yes, sir.
Q. And when was the next time that you had contact with Mr. Kramer during that calendar year?
A. I was asked to go to the corporate office.
Q. Do you recall when that was?



B-1A

A. I believe it was sometime in July.
MR. DAMBRUCH: If I could have Exhibit 386, please, which I believe has been stipulated to.
MR. CORRIGAN: No objection.
Q. Sir, I'm showing you your calendar for July 8, 9, 10 and 11. Do you recognize that as your calendar?
A. Yes, sir.
Q. And there's an entry for July 8th. Can you tell us what that entry is.
A. It's a meeting at CVS at 12:00 noon.
Q. And looking at that calendar entry, does that help refresh your memory as to when it was the meeting took place at CVS?
A. Yes.
Q. And when was that, sir?
A. Thursday, July the 8th.
Q. Now, how was it that this meeting was arranged?
A. I was called and asked to go up there.
Q. And who was it that called you, sir?
A. I believe it was Jack Kramer's secretary.
Q. And do you know her name?
A. M.J. McOscar (sic).
Q. When she called you to arrange that meeting, did she indicate what the meeting was to be about?
A. No, sir.



Q. Did you, in fact, go to CVS on July 8th of 1999?
A. Yes, sir.
Q. And when you arrived, who did you meet with?
A. Jack Kramer and Carlos Ortiz.
Q. And where did that meeting take place?
A. It was in Jack Kramer's office.
Q. Were there some discussions between yourself, Mr. Kramer and Mr. Ortiz that occurred during the meeting?
A. Yes.
Q. And what were -- what was the substance of those discussions?
A. Well, initially it was talked about the benefits that CVS has in the community of Rhode Island, the corporate support for the less privileged they have in the state through their foundation, through their golf tournament and their road race, and also the support that they enjoy or the cooperation that they enjoy with organized labor, specifically George Nee.
Q. Other than those discussions, was there any discussion about legislative issues?
A. It was briefly spoken about the pharmacy freedom of choice, yes.
Q. In what context, sir?
A. In how it benefited CVS. And then other states,



while Walgreen's was such a proponent for the legislation, in other states the shoe was on the other foot.
Q. Now, during the course of that meeting, was there any discussion about this consultation situation?
A. Excuse me? I knocked the microphone.
Q. During the course of the meeting, was there any discussion about the consulting agreement?
A. Yes, sir.
Q. And can you tell us what was discussed in that regard.
A. They said that in light of the fact --
MR. CORRIGAN: Objection.
MR. SMITH: Objection.
THE COURT: Just a minute. Sustained. It may be stricken. Rephrase. Pin it down to who says what.
Q. Who was it that spoke about the topic of the consulting agreement?
A. At first it was Jack.
Q. Let's focus first, then, on what Mr. Kramer said about the consulting agreement. What did he say?
A. He said that you're active within your community, you do a fine job within your community with your seniors, and that CVS could use someone to -- of your assets to the seniors to bring forth the image of CVS



and the services that they provide.
Q. Did Mr. Kramer indicate to you what it was he expected you to do as a consultant for CVS?
A. Specifically, no.
Q. Did Mr. Kramer say anything about the consulting agreement during this meeting?
MR. CORRIGAN: Objection.
Q. Sorry. Did Mr. Ortiz say anything about the consulting agreement during this meeting?
A. Yes.
Q. And what, if anything, did Mr. Ortiz say?
A. He said that he had observed me during the Senate and had known about my background with my constituent services and dealt with constituents and that, again, I could be an asset to CVS.
Q. Did Mr. Ortiz mention to you or state to you what it was he expected you to do as a consultant with CVS during this meeting?
A. No.
Q. Following that discussion, was there any further discussion during the meeting?
A. No.
Q. Did the meeting at some point come to an end?
A. Yes, sir.
Q. How was it left? Did either Mr. Ortiz and/or



B-2

And Joseph Walsh even said if he wanted to have Tom Ryan come to a meeting and meet with him, and I said I didn't need to meet with Tom Ryan.
Q. Did you make any requests of the CVS representatives during this meeting?
A. No.
Q. Were there any legislative issues discussed during the meeting?
A. Yes. It just was a rundown of the CVS -- excuse me, the pharmacy freedom of choice legislation that had just been defeated; but we had talked about, you know, why we defeated it. And they obviously gave a rundown of why they, you know, why they were voting -- lobbying to defeat it and why we were supporting it.
Q. At the end of that meeting, had you changed your position on any willing provider?
A. No, sir.
Q. Was there any plan put in place for any follow-up or subsequent meetings between the parties who were present for this meeting you just described?
A. No, sir.
Q. Did you have any further contact with any representative of CVS during the 1999 session?
A. The session itself or during that period?
Q. During the period of time when the Senate was



still in session.
A. Yes.
Q. And can you describe for us who it was that you had contact with.
A. Jack Kramer.
Q. And where was it that that contact occurred?
A. It was at a Knights of Columbus hall in Warwick at a fundraiser for Senator Michael McCaffrey.
Q. And can you please tell us what happened when you encountered Mr. Kramer at that particular event.
A. Yes. There was a fundraising event, I believe it was in May of that year. And Senator McCaffrey's fundraiser was a buffet style, and I happened to be in an area of an open table, and Jack asked me to sit down. There was one open table that seated about 10, I can vividly recall, and we sat down and started talking.
Q. And what was discussed?
A. We started discussing about CVS and how I was, you know, active in my community with seniors and things like that and that CVS could use another consultant or a consultant.
Q. And who was it that brought up the topic of CVS being able to use a consultant?
A. Mr. Kramer.



Q. Had there been any discussion between yourself and any representative of CVS about a consulting position before that date?
A. No, sir.
Q. Had you raised the issue of employment with CVS before Mr. Kramer made that remark?
A. No, sir.
Q. Just to jump back for a minute, you mentioned that this was at a fundraiser?
A. Yes, sir.
Q. Was that the only fundraiser that was going on at that time of year?
A. No, there were several, several fundraisers going on at that time of year for representatives and senators throughout the House and the Senate.
Q. And, in fact, did you have a fundraiser during the spring of 1999?
A. Yes, sir.
Q. And directing your attention to Exhibit Number 73, do you recognize Exhibit Number 73?
A. Yes, sir.
Q. And is that a letter inviting Mr. Kramer to your fundraiser that was scheduled to take place on May 25 of 1999?
A. Yes, sir.



Q. Does that refresh your memory as to when your fundraiser was scheduled during the spring of 1999?
A. Yes, sir.
Q. And when was that?
A. May 25th, 1999.
Q. Now, you mentioned that there were a lot of fundraisers during that period of time. Did you attend any of those other fundraisers?
A. Yes, several.
Q. How many?
A. Countless. I tried to attend as many as I could. Many nights we would go from -- maybe go to three a night, two or three a night.
Q. Now, sir, you mentioned that Mr. Kramer raised the topic of CVS possibly needing a consultant. Were there any further details discussed about that situation on that evening?
A. No, sir.
Q. Did you have some subsequent contact with Mr. Kramer during 1999?
A. Yes, sir.
Q. And when was the next time that you had contact with Mr. Kramer during that calendar year?
A. I was asked to go to the corporate office.
Q. Do you recall when that was?



B-3

stationery.
Q. And what was the date of that letter?
A. May 15th, 1998.
Q. And what did it -- what's the subject matter of the letter? What does it address?
A. The any willing pharmacy legislation.
Q. And in this letter to you, did Mr. Ortiz indicate what position CVS was taking on that particular piece of legislation?
A. Yes.
Q. And what was that, sir?
A. Their opposition to it.
Q. Now, sir, you also mentioned that Mr. Ortiz did something with regard to testimony. Can you describe that for us.
A. Yes. He testified before the Corporations Committee basically outlining verbally what was said in this letter.
Q. And during that testimony, did Mr. Ortiz indicate what, if any, position CVS was taking on the any willing provider legislation before your committee?
A. Yes, sir.
Q. And what was that, sir?
A. That they were against it.
Q. Now, at some point did the committee consider and



vote on the legislation?
A. Yes, sir.
Q. I direct your attention to Exhibit 1, page 13. Sir, Exhibit 1, page 13, is a voting sheet from 5/19, 1998, for the Senate Corporations Committee. And do you see the bill number there, 98-H-8016?
A. Yes, sir.
Q. You previously looked at the sort of front page of the bill that constitutes Exhibit 1. Can you just confirm that that matches up with this labeling.
A. Yes, it does.
Q. And in doing that, does that allow you to determine whether or not this voting sheet relates to that particular piece of AWP legislation?
A. Yes.
Q. And, sir, was a vote taken on May 19th of 1998 on the AWP legislation in the Senate Committee on Corporations?
A. Yes.
Q. Did you participate in that vote?
A. Yes, I did.
Q. And how did you vote, sir?
A. I voted in favor of it.
Q. And does the voting sheet accurately reflect the fact that you voted in favor of that legislation on



that date?
A. Yes, it does.
Q. Now, sir, did you still serve as a member of the Senate Corporations Committee in 1999?
A. Yes, sir.
Q. And do you recall whether or not any willing provider or freedom of choice legislation came up for hearing or consideration before your committee in 1999?
A. Yes, sir.
Q. What was your position on any willing provider or freedom of choice legislation in 1999?
A. I was in favor of it.
Q. And when you say you were in favor of it, what, if anything, did you do in furtherance of that particular position?
A. I co-sponsored a piece of the legislation -- I believe two pieces of legislation.
MR. DAMBRUCH: I'd ask for Exhibit 2, page 2, please.
Q. I'd ask you to take a look at Exhibit 2, page 2. Do you recognize that?
A. Yes, I do.
Q. And what do you recognize that to be?
A. The legislation from the session of 1999, Senate Bill 0008, a bill regarding any willing provider,



pharmacy freedom of choice.
Q. And was that a bill that you had any involvement with?
A. Yes, it was.
Q. And what, if any, involvement did you have with this particular piece of legislation?
A. I was a co-sponsor.
Q. And is that reflected on the bill itself?
A. Yes, it does.
MR. DAMBRUCH: Could we highlight the area "introduced by" and the caption.
Q. And where on the document does it indicate what your involvement was?
A. Where -- at the introduction line, my name is third, in third position.
Q. And what's the significance of your name appearing in that particular line of the legislation?
A. That I was a co-sponsor. The first name is always the sponsor, the prime sponsor, and the subsequent names are the co-sponsors of the legislation.
Q. And this bill dealt with what, sir?
A. Pharmacy freedom of choice.
Q. You co-sponsored it?
A. Yes, sir.
Q. What was your position on this bill?



B-4

A. I was in favor of it.

MR. DAMBRUCH: I'd ask now for Exhibit Number 3 and, again, page 2 of that exhibit, please. And if you could highlight the same portion, the upper portion of the document.

Q. Sir, looking at this piece of legislation which is labeled 99-S-110, do you recognize this document?

A. Yes, sir.

Q. What is this?

A. It's another piece of legislation that dealt with pharmacy freedom of choice.

Q. And what, if any, role did you have with this particular piece of legislation?

A. I was a co-sponsor, also.

Q. And where is that or how is that located on the bill?

A. On the introduction line, my name is third. As I previously stated, the first senator's name is the prime sponsor, and then senators' names thereafter are the co-sponsors.

Q. And what topic did this particular piece of legislation deal with?

A. Pharmacy freedom of choice.

Q. And what was your position on this bill?

A. I was in favor of it.



Q. Now, as well as co-sponsoring those two pieces of legislation, did you make any sort of public pronouncements?

A. Yes, sir.

MR. DAMBRUCH: Directing your attention to Exhibit 25, please.

Q. Do you recognize Exhibit 25?

A. Yes.

Q. And what do you recognize that to be?

A. It's a news release that I issued announcing my co-sponsorship of the legislation and the reason for.

Q. And why was it that you issued this news release?

A. Because I was in favor of pharmacy freedom of choice.

Q. Now, in addition to issuing the news release, did you do anything else to publicly support these pieces of legislation?

A. Yes. I continuously went out to the public and particularly spoke to the seniors in my district, seniors at the high-rises, and also spoke to a number of my colleagues in the Senate trying to lobby them to support that legislation.

Q. And can you describe for us what type of activity, if any, was going on on this particular issue at the State House in 1999.



A. Yes. There was a quite concerted effort. There was a coalition, I believe the name of it was the Coalition for Pharmacy Freedom of Choice, and it was a coalition of various pharmacies that were not included in the network, such as Walgreen's, some of the independents, I believe, Ann & Hope, which I believe still had a pharmacy, Stop & Shop, people that were not included.

And it was quite a public situation where this coalition were busing a number of people up to the State House for the hearings, for the testimony in support of pharmacy freedom of choice.

Q. And at some point in time were you approached by any representatives of CVS during the 1999 session on this particular issue, that being any willing provider or pharmacy freedom of choice?

A. Yes, sir.

Q. And do you recall who it was that approached you on behalf of CVS during that 1999 session?

A. It was the lobbying firm of Joseph Walsh representing CVS and Jack Kramer and Carlos Ortiz.

Q. Let's begin with Mr. Walsh and/or his firm. Who was it from that firm that you had contact with in 1999?

A. Joseph Walsh, Patrick Lynch, and I don't believe



Gail Wolf had gotten on board then.

Q. And what, if anything, did Mr. Walsh say to you in regard to CVS's position on the any willing provider legislation?

A. That CVS was against the any willing provider legislation.

Q. You mentioned a couple other names. You mentioned Jack Kramer.

A. Yes, sir.

Q. What, if any, interaction did you have with Mr. Kramer in 1999 in regard to any willing provider legislation?

A. He had lobbied and asked me to support -- excuse me, not to support the legislation and talked about how CVS was a local company and employed, you know, X amount of people in Rhode Island and serviced X amount of people, namely seniors and people, and how they started up as a two-man operation and they had grown to a large operation and this would hurt them.

Q. Now, if I may take a step back, I believe I failed to ask you what, if anything, Mr. Kramer had done in 1998. Do you recall what, if anything, Mr. Kramer did in regard to the any willing provider legislation in 1998?

A. I don't believe at that point he did.



B-5

5/23/08



you when it's going to be filed. I want it no later than Tuesday before we start.

MR. DAMBRUCH: Yes, Judge. I think she's finishing it up today.

THE COURT: If she can file it today, all the better. I will tell you candidly I have some grave concerns regarding the exchange you had with Mr. Celona about whether or not CVS was identified in his telephone call with the Ethics Commission, whether that was an imaginary call, whether it really happened, because of the Government's knowledge of his previous testimony, grand jury and during Urciuoli, that he had mentioned CVS.

The concern I have specifically, and you can ask her to address this in her response, was that once you elicited from him the "no" answer, I believe you had an obligation under 3.3 of the Rules of Professional Conduct, 3.3(a)(4), to correct the record.

Instead, what you did was you underscored that false answer by asking him the series of "why not" questions, which then his responses were basically shoveling more dirt on the grave of the Defendants.

I need an explanation, and I'll hear what you have to say in terms of what remedy I should employ; but I will tell you, I'm deeply disturbed by it.



If you want to make a comment now, you can. If you want to wait until your written submission, that's fine. And I don't mean to suggest that I've decided that you have committed any sort of a violation. I'm merely pointing out the rule to you and your obligation and the concern I have in terms of how it affects the trial.

MR. DAMBRUCH: Your Honor, all I can say, and I believe Ms. Donovan will address this in our response, is that my questions to him were founded upon my interactions with him at the three trial preparation sessions; that the first time I met with him in regard to this case was in Pennsylvania and that when I asked him questions about that call, he indicated to me that he -- that his recollection at this point in time was that he had not mentioned the name of CVS.

And he was very specific about that. He persisted in that recollection at each and every one of the two subsequent trial preparation proceedings.

I know he had said some different things before, and we had provided those documents to defense counsel. So when I asked that question, I had a good faith belief that that was what he was reporting his recollection was, and I did not believe that to be perjured testimony. I understand it was inconsistent,



but I did not believe it to be perjured testimony.

THE COURT: That's why I've said I'm not suggesting that I've made such a determination, but I am concerned with the way this thing came out. Even in your pretrial memo, as the Defendants point out, you report that conversation as how he said he had something to do with CVS.

Did you in your meetings with him when he persisted in this now 2008 recollection remind him of what he had said before the grand jury?

MR. DAMBRUCH: We asked him to read his grand jury testimony between the first and second day. He also had some issues with regard to his memory of whether or not he had ever discussed that opinion with Mr. Ortiz or Mr. Kramer.

We asked him again to read his grand jury testimony. After he read it, he assured -- in fact, when I left Pennsylvania, he was still within the position that he didn't recall ever discussing it with the two Defendants.

When he came here to Rhode Island, he indicated that he now did recall that he had discussed the matter with Mr. Kramer -- Mr. Ortiz but couldn't recall the presence of Mr. Kramer. So we asked him to read his grand jury testimony. I didn't point him to specific



sections, Judge.

THE COURT: That's what I'm asking you. Did you point it out to him and say, Look, on five different occasions under oath at a time closer, and also you've got the 302s from the FBI agents, you said you talked -- you mentioned CVS? Did you do that?

MR. DAMBRUCH: I did not specifically point to him. What I did is I asked him to read his testimony. I'll be honest, Judge, my concern was I did not want to tell him how to testify or that he had to testify consistently with anything else.

I asked him a question. We asked him to review his grand jury transcripts over the night. And then as we left, we had asked to take those with us because of his concerns, et cetera. So that was what I did, and I based my questions on those preparation sessions.

THE COURT: I have to tell you, it does not look good. I am less concerned with the exchange regarding whether or not it was Kramer and Ortiz or just Ortiz because the line of questioning there was not as, I think, direct.

But I am concerned with the fact that once you elicited from him, No, I never said CVS, that there were the follow-up questions which were clearly designed to elicit from him a response that was I think



B-5A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| * | |
| UNITED STATES OF AMERICA * | |
| * | |
| VS. * | MAY 27, 2008 |
| * | 9:00 A.M. |
| JOHN R. KRAMER and * | |
| CARLOS ORTIZ * | |
| * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

Unsigned



B-6

THE COURT: Not I don't recall. I didn't say it.

MR. CORRENTE: I didn't say that, which was inconsistent with what he said before. So the prosecutor, I think quite rightly, gave him his prior grand jury testimony and said, Read this.

What did we do? In our opening statement, we presented what we expected his testimony to be, and what we said in our opening statement was consistent with his grand jury testimony. That's what we thought he was going to say. So we couldn't be sure until it came out of his mouth what exactly he was going to say at trial.

He had taken multiple different sides, and it was impossible for anyone to know exactly what he was going to say.

THE COURT: Except that if the disclosure had been made to the Defendants that he had, in fact, recanted that portion of his testimony and then the prosecutor went on to open with what his grand jury testimony had been as opposed to what the new position was, the defense would have been ready for that. That's why I say I think you're missing the point.

MR. CORRENTE: But, your Honor, our obligation to turn that over even as impeachment only has -- only

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 07-009ML
UNITED STATES OF AMERICA
VS. MAY 29, 2008
9:00 A.M.
JOHN R. KRAMER and
CARLOS ORTIZ
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,
CHIEF JUDGE

(Jury Trial)



APPEARANCES:
FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DIBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903
DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896
ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903
THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903



29 MAY 2008 -- 9:00 A.M.

(The jury is not present for the following)

THE COURT: I understand that counsel for Mr. Ortiz wishes to address a matter to the Court outside the presence of the jury.

MR. SMITH: Yes, your Honor. Judge, I'd like to put on the record the reasons why Mr. Ortiz is not availing himself to call John Celona for cross-examination.

At the outset, I want the Court to understand that I take no pleasure in the predicament that the Government finds itself, a finding by this Court that there was a Brady violation of relevant and material evidence, that material was not disclosed in a timely fashion and, therefore, some prejudice ensued.

But to understand Defendant Ortiz's position, we have to look at the Government's opening. John Celona had an answer for them. I made a telephone call, I had an oral conversation with someone at the Ethics Commission, and I can work for CVS.

Attorney Fein on behalf of Mr. Kramer countered. Mr. Celona told Jack Kramer and Carlos Ortiz what the Ethics Commission had told him, that it would be okay to work for CVS and that he could vote on legislation that affected CVS so long as it didn't affect CVS



alone. So we have crossed the Rubicon, the die is cast, there's no going back.

The defense in this case is truly a partnership and joint enterprise. What Attorney Fein told this jury affects the Defendant Ortiz to the same degree.

So what remedy has the Court allowed? Perhaps a stipulation. This was tried, but the parties could not agree on the language to cure the problem. The Court has refused to dismiss the case with prejudice. The only possible remedy available to the defense was to call Celona back.

Bear in mind this is the John Celona about whom Judge Torres declared in the Urciuoli trial transcript of 9/29/06, page 47, that Celona exaggerated things, which it seems he clearly did, even whether he misrepresented or lied about some of those things, and certainly there's some reason to think he may have done that as well.

And I have marked as Ortiz's Exhibit A just for this motion only. It is the Government's motion for a downward departure filed in Mr. Celona's case on 1/26/07.

On page 3, the Government states, under cross-examination, Celona was forgetful, sometimes evasive, and occasionally belligerent. He developed a



B-8

180-degree departure from his previous testimony before the grand jury and statements that he made to Government agents in the some four years now since he first began cooperating with the Government.

However, I was also aware that the Defendants in this case, in part due to their very diligence in insisting that the Government provide Brady material, had in their possession all of the grand jury testimony which was contrary to what Mr. Celona testified to here in his direct examination, had access to not only the typewritten 302s prepared by the agents but also the agents' notes, notes of Mr. Celona's attorney during the course of -- taken during the course of those interviews, as well as access to portions of Mr. Celona's pre-sentence report.

And so with all of that information, I felt that the Defendants in this case were certainly armed with sufficient information to impeach the witness.

The remedy I fashioned, that is, to provide the defense counsel with yet another opportunity to confront Mr. Celona with his new-found memories now some eight years after the fact, I thought would have given the Defendants the opportunity to impeach him on that score as well.

The Defendants are well within their bounds to



make a determination in the best interest of their clients to either take me up on that offer or to decline, but the fact that the Defendants have now declined that offer does not change the previous ruling of the Court with respect to the delayed disclosure Brady violation in this case.

And again, as I said, I think that the remedy fashioned by the Court is in keeping with First Circuit precedent on this issue.

Before I bring the jury in, let me just see counsel very quickly for scheduling.

(Bench conference held off the record)

(The jury is present for the following)

THE COURT: Good morning, members of the jury. Did you enjoy your day off? Good. Are you ready to go to work? Excellent.

As I told you at the beginning of this case, after all of the evidence has been presented, you would hear the closing arguments of counsel.

Now, that doesn't mean that the lawyers are going to stand up and have an argument with you. What it means is that each attorney will present to you an argument, that is, a summary of the evidence and an interpretation of that evidence from the perspective of the client he represents.



As I know you have throughout these proceedings, I ask that you give each of the attorneys your close and undivided attention.

I should also tell you that our schedule today will be a little bit different than it has been during trial. First, the Government will present its closing argument to you. After Mr. Dambruch is through, we will take a very brief 10-minute break to give you a chance to stretch.

When we come back, Mr. Fein will present the closing argument on behalf of Mr. Kramer. We'll then take another very brief 10-minute break, again, to give you a chance to stretch, after which we'll hear from Mr. Kiley, and the Government in criminal cases does have the right to present rebuttal argument. This is so because it is the Government's burden to prove its case beyond a reasonable doubt.

So after that second break, you will hear from Mr. Kiley on behalf of Mr. Ortiz, and then you will hear again from Mr. Dambruch.

Mr. Dambruch.

I'm sorry, Mr. Kiley? Oh, Mr. Kiley. Yes. I almost forgot about you.

MR. KILEY: Your Honor, in light of the Court's ruling, the Defendant Ortiz also rests. And, your



Honor, we renew our Rule 29 motion with the supplement.

THE COURT: That's fine.

MR. FEIN: And, your Honor, we renew our previously made motion as well.

THE COURT: Okay. Again, you'll recall that when a party rests, that means that that party has completed its presentation for you.

Mr. Dambruch, please.

MR. DAMBRUCH: Thank you, your Honor. May it please the Court, counsel and members of the jury. Good morning. As Judge Lisi just explained, this closing provides me with an opportunity to summarize the evidence presented in this case from the perspective of the Government.

I would like to do that with you this morning on a variety of topics that have been addressed by the evidence during the course of this proceeding, and the first of those topics is John Celona and his history and involvement with a series of pieces of legislation, alternatively referred to as any willing provider or freedom of choice.

In 1998 and 1999, John Celona was a supporter and vocal advocate for freedom of choice legislation. He advocated for and voted in favor of freedom of choice legislation in 1998, and you will be able to



B-9

a number of reasons, including the fact that Mr. Walsh has no motive, no reason, no interest in doing anything other than giving you his honest recollection. Mr. Walsh was called as a Government witness in this case.

I'm not going to review the various problems with Celona's recollection of the meeting, the timing that he originally said was in the summer, but then he says it's during the session; and Joe Walsh told you that's not the case, that the session would have been over.

John Celona said it was in the summer, but it was in advance of the McCaffrey fundraiser where Mr. Kramer approached him. Well, that McCaffrey fundraiser was in May.

Other problems like the presence of other senators there that Joe Walsh says that's not his recollection. It was a meeting with John Celona.

And this is an event, by the way, that John Celona -- what I'm going to get to now, the next event I'm going to talk to you about, the McCaffrey fundraiser, is an event that John Celona told you he, quote, "vividly recalled."

And that would be what the prosecutors -- what Mr. Dambruch elicited from John Celona is his presence



at the McCaffrey fundraiser in late May of 1999 where he says Mr. Kramer approached him and suggested the consulting relationship completely out of the blue.

Now, recall that John Celona doesn't even put Mr. Kramer at the State House meeting. And so Jack Kramer shows up at the McCaffrey fundraiser, sits down at a table with John Celona and suggests, We'd like you to work for CVS. It doesn't make any sense.

But it gets worse. Let's look at some CVS records for this event. Kramer K-2. This, ladies and gentlemen, is a request for a check. We asked Ms. Bibeault about this document, if you recall. It's the McCaffrey fundraiser, the McCaffrey fundraiser that John Celona told you is the place where Jack Kramer approached him.

CVS got one ticket for that fundraiser, and what happened to that one ticket? Betty's note on the right-hand side, "Given to Todd for him to attend per Jack."

If we can go to the next page of that document, please. On this page you see the invitation for the McCaffrey fundraiser on the bottom left. If we could go to the top for a moment. This is all Ms. Bibeault's very careful record keeping that she testified to you about. You see the check, $25, which is admission for



one. And then on the bottom right, please. The McCaffrey fundraiser, "Yes, Todd Andrews."

We have Ms. Bibeault's testimony, slide 25-D, regarding her handwriting on that first page that I just showed you. "What note did you write there," she was asked. "It says 5/27, given to Todd for him to attend per Jack." And honestly, in her honest testimony, because she didn't have a clear recollection, "I don't have a clear recollection of physically giving it to him that many years ago; but based on the note that I have, it was my practice to write a note after I had given somebody a check."

Now let's see where Mr. Kramer was this evening, on that particular evening. Let's look at Mr. Kramer's calendar, Kramer L-2. You'll see at the bottom left the McCaffrey fundraiser is listed on his calendar at the Knights of Columbus in Warwick, but then let's go up and see what happened to Mr. Kramer at the top.

You'll see a reference to Cape May. That's the weekend home in New Jersey. Top center, please. Thank you. You'll see the arrows for Friday and Saturday indicating the weekend on the top of the Friday Saturday portion. And then let's look at Thursday, the day of the McCaffrey fundraiser. At noon, "CM."

And let's look at what Ms. McCusker told you,



and that's slide 25-C, please. "Did Mr. Kramer frequently leave earlier than Friday to begin his weekend?" "Oh, yes. Well, if you're going to New Jersey you do." "And would he leave on Thursdays consistent with the calendar?" Answer, "Yes."

There's more. I'd like to show you Kramer M-2. You haven't had a chance to see this document yet. It was agreed to in the stipulation. This is Jack Kramer's American Express bill for Jack Kramer's American Express card. You'll see May 26th he was in Providence at the -- charging something at the Westin and then May 27 where the calendar shows Cape May, the Elmwood Barn, Elmwood Park, New Jersey.

It shows a meal at the Elmwood Barn, and I'd like to show you one more document. Actually, staying on this document for a moment, you see reference to food and beverage at the Elmwood Barn.

Let's go to the second page, please. At the top, the charges, again on May 27th you see a gas charge at Sunoco in Elmwood Park, New Jersey; and then for the weekend you see a series of charges in New Jersey and then returning to Rhode Island on May 31st, getting gas again.

And you can watch the trip because you see the weekend in New Jersey, you see gas, filling up on



B-10

May 30th in Cape May, New Jersey, and you see stopping for food in Fairfield, Connecticut, on May 31st.

I'd like to show you one more document on this, Kramer N-2. It's actually the receipt from the dinner at the Elmwood Barn, and the parties have agreed that -- the parties have agreed that Kramer O-2, this is the actual receipt, and Kramer O-2 is an accurate, readable copy of the receipt so you can actually, without straining your eyes too much, see what it says.

This is a representation of the information on N-2. Both are in evidence. Date, 5/27/99, the Elmwood Barn, Elmwood Park, and on the top you see the dinner at Table 11, $42. And if you look at the top right of the receipt, you see the time, 2046, military time, 8:46 p.m.

What does that tell you about the quality of the Government's case against Mr. Kramer? What does it tell you that Mr. Dambruch would elicit from John Celona that Mr. Kramer approached him at the McCaffrey fundraiser and repeated again today when Mr. Kramer was hundreds of miles away?

I'd like to refer to the September 23rd, 1999, letter. It's kind of a third example of how Mr. Celona pursued CVS for a consulting relationship, a legitimate consulting relationship, but that he pursued CVS.



We've talked about bringing Ryan up, we've talked about the McCaffrey fundraiser, and now I'd like to talk to you about the September 23rd, 1999, letter.

Mr. Dambruch in his summation today referred to it as a proposal letter sent by Celona and referred to the after receiving the proposal. Well, ladies and gentlemen, we're fine with this letter. We're happy that it exists. It actually supports our case very much.

But you'll notice that the only evidence you have of this letter is an unsigned copy that was recovered during the state search of John Celona's home.

There's no evidence in the record that this was sent. There's no evidence that it was received. It may well have been; but you should know that, as I said, my words and Mr. Dambruch's words are not evidence. The evidence are the exhibits and the testimony.

Mr. Dambruch spent a lot of time with Mr. Celona reviewing the letter and asking him if he ever did any of those things. Do you remember that, going through those various points in the letter as if that showed some evidence of a crime?

Let's look at the letter. It's Government



Exhibit 98. It's Mr. Celona's story to you that Jack Kramer in early July asked him to write a proposal about what he could do for CVS. Several problems with that. You've gotten to know John Celona. You knew how he operated and how he was trying to get work. Do you think he waited two-and-a-half months when CVS Corporation invited him to submit a proposal for work?

Do you think when he submits that proposal he doesn't refer to the fact that you asked me to, pursuant to your request? Do you think he just left that out?

Had Mr. Kramer asked him to submit a proposal, again, not that there's anything wrong with that, but had he, don't you think Mr. Celona would have written it a little sooner than two-and-a-half months and don't you think he would have referred to the fact that Mr. Kramer asked him to do that?

If I could just have you call up Kramer Exhibit J-22. You've seen other letters that Mr. Celona wrote in attempting to gain consulting work. Here's a letter to Mr. Lancia at Ocean State. "Dear Mr. Lancia, it was nice to meet with you today and discuss the objectives of Ocean State Hearing Aid Center. Per your instruction, I am forwarding you a consulting agreement that outlines the services that I



can provide your company."

These aren't just my words. These are John Celona's words. There he followed up on the same day as the meeting, and he referred to the fact that he was asked to do it. It makes sense one would do that if one's trying to get -- if one is trying to get work and one has been invited to submit a proposal.

You'll see also, we're not going to look at it right now, but he did that in the 1/3/01 e-mail chain. He referred to Mr. Ortiz's request that he submit some information. He knew how to do that.

But let's go back to -- let's go to slide 28-E for a moment, please. Despite Mr. Dambruch's direct examination asking John Celona if he ever actually did any of those things in the letter, let's look what happened when Mr. Corrigan asked him on cross-examination.

Mr. Corrigan asked him, "In the letter, did you write anywhere that you personally would have a role in any of those five items?" Answer, "I'd have to examine the letter before I could answer that."

"Please take your time and do that, sir." "It doesn't look to be me personally saying that I would be there."

"Mr. Celona, you didn't write anywhere in the



B-11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 07-009ML

UNITED STATES OF AMERICA *

VS. * MAY 30, 2008
* 9:00 A.M.

JOHN R. KRAMER and *
CARLOS ORTIZ *

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,
CHIEF JUDGE

(Jury Trial)



APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DIBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903
DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896
ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903
THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903



30 MAY 2008 -- 9:00 A.M.

(The jury is not present for the following)

THE COURT: Before we bring the jury in, I understand, Mr. Fein, you wanted to place something on the record outside the presence of the jury.

MR. FEIN: Thank you, your Honor. We actually have two quick things, one regarding the rebuttal by Mr. Dambruch yesterday, and then Mr. Corrigan would like to address one matter on the instructions.

In addition to asking the jury to find guilt based on innocent conduct, such as PAC contributions, Mr. Dambruch in the rebuttal did something that was emblematic of the prosecution'S improper and prejudicial use of John Celona throughout this trial.

One of the last things Mr. Dambruch said to the jury was to suggest that there could have been some confusion as to what event it was where Mr. Kramer approached John Celona to first discuss the consulting relationship.

This is another instance of the prosecution asking the jury to find what the clear record does not support. Faced with documentary evidence as reviewed in my summation that Mr. Kramer was not even in Rhode Island on the night of the McCaffrey fundraiser, Mr. Dambruch tried to change John Celona's story.



Mr. Dambruch knew that John Celona had never been confused on this point of the first meeting, and he did not ask John Celona if he could have been confused during the testimony because he knew what the answer would be.

In the direct testimony, John Celona testified that he vividly recalled the discussion with Mr. Kramer at the McCaffrey fundraiser. And all of the prior testimony, all of the 302s, all of the agents' notes are very clear about that.

But Mr. Dambruch tried to suggest on rebuttal that it could have happened at Celona's own fundraiser a few days earlier, but John Celona has rejected that suggestion previous to this trial.

In agents' notes, John Celona said, I don't recall seeing Kramer at essentially his fundraiser. In a 302 from 2007, John Celona said he did not recall Kramer attending the fundraiser.

And nonetheless, Mr. Dambruch suggested that during rebuttal, it's something on direct examination that John Celona said he vividly recalled happening at the McCaffrey fundraiser, and we were given no opportunity to rebut that.

THE COURT: I understand you placed it on the record, but what relief are you seeking?



B-12

Under certain circumstances, legislators can still participate in such legislation. Specifically, Rhode Island state law contains a provision known as the class exception.

This provision expressly permits a legislator to take action on legislation that would affect a private entity for whom the legislator works as long as the legislation would affect that entity to no greater extent than any other similarly situated entities.

This is referred to as the class exception because it applies when proposed legislation treats a class of entities, such as all teachers or pharmacies, alike.

Under Rhode Island state law, the legislator is the one who is responsible for identifying any actual or potential conflict of interest, determining whether such a conflict, if one exists, needs to be disclosed and determining whether under all circumstances he or she is permitted to participate in legislation.

In this regard, legislators are permitted by Rhode Island state law to seek guidance and approval from a public body called the Rhode Island Ethics Commission, but Rhode Island state law does not require them to seek such guidance or approval.

A public official who seeks guidance from the



Ethics Commission may do so by making a request in writing. The Ethics Commission also provides oral advice in response to oral inquiries from public officials.

The Ethics Commission, an independent public agency created by amendment to the Rhode Island state Constitution, adopts, enforces and administers Rhode Island's Code of Ethics which governs the conduct of its public officials, including legislators.

Rhode Island state law does not prohibit private citizens or entities who have hired a legislator from communicating with that legislator about legislation that might be of interest to them.

Again, it is the legislator's responsibility to determine whether or not he may participate in legislation that would affect the entity with whom he has a business relationship and not the private citizen's responsibility to make that determination or to refrain from communicating with the legislator about any such legislation.

Although I have given you this instruction on Rhode Island state law, you are not to determine whether or not Rhode Island state law has been complied with here.

You are here to decide whether or not the



Government has proven beyond a reasonable doubt all of the elements of the crimes charged against the Defendants.

The Government may prove the second kind of intent, that is, that the Defendant intended to deceive the public concerning his conduct, either through the Defendant's own acts of deception towards the public or the Defendant's efforts to ensure the official deceived the public with respect to the payments to the official.

Evidence that the Defendant intended to cause the official intentionally to fail to disclose material information about payments to that official is sufficient to show that the Defendant intended that the public be deceived with respect to the Defendant's alleged payments to the official.

Under this element, the Government must prove that the Defendant intended to deceive the public about the payments to Celona. Thus, proof that Celona acted under a material conflict of interest alone is not sufficient to prove honest services mail fraud unless you also conclude that the Defendant intended for any such conflict to be concealed from the public.

At bottom, the Government must present sufficient evidence to establish a Defendant's intent



that the public be deceived with respect to payments to the public official.

Intent or knowledge may not ordinarily be proven directly because there is no way of directly scrutinizing the workings of the human mind.

In determining what the Defendant knew or intended at a particular time, you may consider any statements made or acts done or omitted by the Defendant and all other facts and circumstances received in evidence that may aid in your determination of the Defendant's knowledge or intent.

You may infer, but you certainly are not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

It is entirely up to you, however, to decide what facts are proven by the evidence received during this trial.

The use of the mails in furtherance of the scheme is an essential element of the offense of mail fraud. The use of the mails itself need not be false or fraudulent.

It is not necessary that the Government prove all of the details alleged in the Indictment concerning the precise nature and purpose of the scheme or that



B-13