# APPENDIX C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 12, 2006 9:15 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-1

Q. Did that subsequent meeting between Mr. Urciuoli, Mrs. Driscoll and James McGuirk take place?
A. Yes.
Q. And, again, how soon after you overheard the conversation between Robert Urciuoli and Frances Driscoll?
A. I'm not exactly sure, but within a short time frame.
Q. Where did that meeting take place?
A. Mr. Urciuoli's office.
Q. Was there anyone else in attendance besides the three of them?
A. No.
Q. Was the office -- Mr. Urciuoli's office door open or closed during that meeting?
A. To my recollection, it was closed.
Q. Did Mrs. Driscoll ever discuss with you the potential contract or hiring of Mr. Celona?
A. Not -- we never discussed it. Just in passing. She did make a comment that she didn't think it was a good idea.
Q. Do you recall when in relation to this series of meetings she made that comment?
A. I don't recall the exact time, but I believe it was after the meeting that took place with Mr. McGuirk,

C-2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 13, 2006<br>9:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-3

doing well and they were looking to sell to a for-profit hospital.

And the Hospital Conversion Act, there were several hearings that were put forth by a commission that was chaired by then-Senator Irons. And the Hospital Conversion Act was then amended, and there was a big contentious fight, in a nutshell, saying before -- if memory serves me correctly, before anyone could sell to a for-profit hospital, it would have to be in clusters of three, which basically would put that deal to rest.

Q. So the Hospital Conversion Act would make it more difficult for Roger Williams to merge with Columbia/HCA; is that correct?

A. Yes, sir.

Q. And at the time in 1997, did you have any kind of leadership position in the Senate?

A. No, sir.

Q. Were you a relatively junior senator at the time?

A. Yes, sir.

Q. And can you explain, was there a -- you were a Democrat; is that right?

A. Yes, sir.

Q. And were the Democrats in the majority in the Senate?

C-4

A. Yes, sir.
Q. And who was the leader of the Senate at the time on the Democratic side?
A. The majority leader was Senator Paul S. Kelly.
Q. And what does it mean to be the majority leader?
A. Well, at the time, now it's the president, at the time the majority leader was basically the boss of the Senate. He or she would mandate the flow of legislation, the passage of legislation, the appointments of committees, the appointments of positions, i.e., full-time jobs, the appointments of chairs, vice-chairs and all of the leadership positions in the committees, deputy majority leaders and the like.
Q. And were you -- what was the -- were there different factions within the Democratic party at the time with regard to Senator Kelly?
A. Yes, sir.
Q. And did you belong to any particular group at the time?
A. Yes, sir.
Q. What group did you belong to?
A. The faction of Senator Joseph Montalbano.
Q. Can you explain what you mean by that, by the faction of Senator Joseph Montalbano?

C-5

A. Before I got to the Senate, Senator Joseph Montalbano, who is now Senate president, had taken -- was the other senator in North Providence. And he was part of a group that was aligned with the former majority leader long before I got there, Senator Bevilacqua.

And because I was from North Providence, when I came in, I aligned myself with Senator Montalbano and part of that group. And as a result, basically I became a back-bencher.

Q. What do you mean by back-bencher?

A. I couldn't get much done, couldn't get an office, didn't have much. It was pretty hard.

Q. And what was it that made it hard?

A. Because of the politics of the system.

Q. Who else belonged to the Montalbano group?

A. At the time there was Senator Alves, Senator Walaska, Senator McBurney, Senator McCaffery, Senator Oster, I'm trying to think, Senator Mathieu, I believe Senator Ruggerio. I don't recall the rest of them, but there were a few.

Q. Where did Senator Irons fit into the group?

A. Senator Irons was chairman of the Corporations Committee, and he was with Senator Kelly; but there were always rumblings that Senator Irons, from the day

C-6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 14, 2006<br>9:15 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-7

there were a takeover.
Q. And did you discuss the bill with Frances Driscoll?
A. Yes.
Q. What did she say to you?
A. She said, Do your best to try to kill it.
Q. Did she explain to you why she wanted you to kill it?
A. Because she wanted to try to keep the same board that they have in the event that they were -- that they had gone forward and done anything in the future or if the Hospital Conversion Act was amended or whatever.
Q. If we can provide some context to that, you testified yesterday about the Hospital Conversion Act; correct?
A. Correct.
Q. And the hospital's efforts to sell itself to Columbia/HCA?
A. Right.
Q. Do you remember that? Did you, in 1998, at that time or were you -- let me rephrase that. Were you aware in any way as to whether the hospital was still interested in merging or entering into any kind of financial relationship with other medical institutions?
A. Yes.

C-8

Q. Do you see that document, Mr. Celona?
A. Yes, sir.
Q. A facsimile from you to Frances Driscoll dated June 6th -- excuse me, June 14th of 1999?
A. Yes.
Q. What do you -- what are you advising Ms. Driscoll of that day?
A. It's her advice on the attached legislation that I had faxed to her.
Q. What did you say in the memo?
A. I said, Fran, please advise on the attached legislation. John.
Q. Why were you asking Ms. Driscoll to advise you on legislation?
A. She was one of my bosses.
MR. MATOS: And if I could go to the next page, please.
Q. Do you see that document?
A. Yes.
Q. Is it Senate Bill 99-S 1053?
A. Yes.
Q. Does that appear to be a bill introduced by Senator Paul Kelly?
A. Yes.
Q. And what does the Act relate to?

C-9

A. The Hospital Conversion Act.
Q. It's another Act relating to the Hospital Conversion Act?
A. Correct.
MR. MATOS: Miss Anderson, if you could call out the bottom part of that. Thank you.
Q. And what does the fax that you sent to Fran Driscoll, what does it indicate that the Act would do?
A. The explanation is that this Act would require the Department of Health to review acquisitions of profit or nonprofit corporations by for-profit hospitals. This Act would take effect upon passage retroactive to July 22nd, 1997.
Q. Did this Act have anything to do with the Village at Elmhurst?
A. No, sir.
Q. Why did you send it to Fran Driscoll?
A. Because I was working for her.
Q. Do you remember what, if anything, Fran Driscoll advised you of regarding that Act?
A. She told me to monitor it and try to make sure that it didn't pass.
MR. MATOS: Your Honor, if I could go back to 272, which is previously full, and if I could have the original handed up to the witness, please.

C-9A

A. I voted for it.
Q. Why did you vote for it, Mr. Celona?
A. My mother died of cancer.
Q. And did you tell Frances Driscoll that you had voted for it?
A. No.
Q. Why not?
A. She was so adamantly against the bill, I was concerned that I would lose my job.
Q. If she was adamantly against it, why didn't you --
MR. EGBERT: Judge, could we have a time frame for this conversation?
Q. When did that take place?
A. I believe it was the year after, if memory serves me correctly.
Q. And what happened?
THE COURT: I don't think there was any conversation. I'm not sure which conversation you're referring to, Mr. Egbert, but he said that he never told her. Were you talking about another conversation?
MR. EGBERT: I'm sorry, Judge, when he supposedly voted on this bill.
Q. When did you vote on the bill, Mr. Celona?
A. I believe it was the year after.
Q. And --

C-10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 15, 2006<br>8:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-11

Other than that, I had suggested the more regarding the Village; but on the ones with Roger Williams, when Fran was there, she suggested, you know, the shows.

Q. What do you mean she suggested the shows?

A. She suggested what we should have, and we would talk it out and try to, you know, talk about the logistics and who should be on. In fact, we even did one special, but this was after she was gone. It was a one-hour one.

Q. And when you had people from Roger Williams Medical Center on your show -- did you have Robert Urciuoli on your show?

A. Yes.

Q. Did you have Frances Driscoll on your show?

A. No.

Q. When Robert Urciuoli was on your show, did you disclose the fact that you were working for him?

A. No.

Q. Did he?

A. No.

MR. MATOS: Go to 320, and if I could publish it to the jury, your Honor.

Q. Do you see that?

A. Yes, sir.

C-12

MR. MATOS: Miss Anderson, if you could call out the text, including the fax header.

Q. What is that, Mr. Celona?

A. It's a fax from Fran Driscoll to me.

Q. Dated when?

A. July 23rd, 1999.

Q. And what was Frances Driscoll asking you to do at that time?

A. She was asking me to get minutes regarding a commission which she thought was a legislative commission regarding the Lifespan/Care New England proposed merger.

Q. What did the Lifespan/Care New England proposed merger have to do with Roger Williams Medical Center?

A. Well, obviously if those two large conglomerates of health care facilities merged, they would basically swallow up Roger Williams.

Q. How did you know that?

A. She told me.

Q. And did she tell you why she wanted you to get the minutes about -- what minutes was she asking you to get?

A. They were minutes where -- actually the whole span of minutes, but in particular minutes where Bob had testified, also.

C-13

Q. Did she tell you why she wanted you to get them?
A. Because she wanted to see where the process was going.
Q. And when you say he had testified, what kind of event was taking place? What was -- where was he testifying?
A. Fran thought it was a legislative commission, but then I came to find out it was before the Attorney General's Office.
Q. And what did you come to find out was happening before the Attorney General's Office?
A. There was hearings on that proposed merger because under the existing guidelines of the previously discussed Hospital Conversion Act, there were several hurdles, even with nonprofit hospital conversions, not conversions but joint ventures, that there were several hurdles for them to clear, and one being hearings before the Attorney General, and then there were many others.
Q. And so the Attorney General had to get involved when there was a proposed merger of that nature?
A. Yes, sir.
Q. And what was your understanding that the Attorney General had to do before it went further?
A. Well, obviously he had to give his approval.

C-14

Q. And if the Attorney General approved it, what happened after that?

A. I believe it went to the Department of Health.

Q. And what happened at the Department of Health?

A. There would be hearings. And as far as the specifics after that, I think it would go to the legislature, I believe.

Q. So it would go to the Department of Health. Would the Department of Health have to approve it?

A. Yes, sir.

Q. And then it would go to the legislature, is your understanding?

A. Yes.

MR. MATOS: Your Honor, if I could move 326 full, please.

THE COURT: 326 may be admitted as a full exhibit.

(Government Exhibit 326 was admitted in full)

MR. MATOS: If I could publish it, your Honor.

Q. What is 326, Mr. Celona?

A. It's a memorandum initially from myself to Fran Driscoll, but then it's a response on the same memorandum from Fran to me.

MR. MATOS: Miss Anderson, if you could just call out the top half that has the fax header and where

C-15

it says "to" and "from."

Q. It was sent from you to Frances Driscoll; is that correct?

A. Correct.

Q. And then the writing on the top right-hand corner, what does that indicate to you?

A. It was from my phone -- my fax number.

Q. The handwriting, what does that indicate?

A. Oh, I'm sorry. Fax to JC.

Q. And whose handwriting is that?

A. Fran's.

Q. When does that appear to be faxed to you?

A. When?

Q. Yes.

A. The next day.

Q. July 30th, 1999?

A. Yes, sir.

MR. MATOS: Now, Miss Anderson, if you could call out the two bottom paragraphs of that document, please.

Q. Do you see that?

A. Yes, sir.

Q. And what did you advise Ms. Driscoll of?

A. About the fact that I delivered the minutes of the hearing regarding the Lifespan/Care New England

C-16

testimony.

Q. So you had obtained the testimony she had asked you for?

A. Yes, sir.

Q. And did you ask her anything else in regards to that?

A. I asked her if I could continue to get any minutes or any -- if she needed any more assistance on it.

Q. And what did she say?

A. Looks like, Yes, thank you.

MR. MATOS: And, Miss Anderson, if I could have the full document again.

Q. In that memo, are you also advising her about having attended some prostate cancer meeting at the Knights of Columbus?

A. Yes, sir.

Q. Or a prostate. And what was that, do you remember?

A. That was a prostate cancer meeting that I had arranged at Fran's request with the members of the Knights of Columbus who were -- the Knights of Columbus is an organization consisting primarily of men and people -- primarily people over 40 who were susceptible of prostate cancer. And we had brought a physician in there, prostate cancer specialist, I believe his name

was Dr. Keltie, and he talked about the merits of early screening and prostate cancer and how you could -- how you should be able to detect it early.

Q. When you reported to Frances Driscoll about the minutes, did you have any discussions with her about the proposed merger?

A. Yes.

Q. Did she ask you to do anything other than obtain the minutes?

A. To keep monitoring it.

Q. Did she ask you to do anything else beyond that?

A. Yes, to do what I can to try to stop it.

Q. If it was before the Attorney General's Office, why would she be asking you to do something to continue to stop it?

A. To see if I could use any influence I had, whether it be there or in the General Assembly or people who had access to people in the Attorney General's Office.

MR. MATOS: Your Honor, if I could move 364 full, please.

THE COURT: 364 may be admitted as a full exhibit.

(Government Exhibit 364 was admitted in full)

MR. MATOS: If I could publish it, please. Your Honor, if I could obtain the original and flip over to

C-18

the ELMO, please. Apparently we're having trouble with this one.
Q. Mr. Celona, do you see that document?
A. Yes, sir.
Q. And it's a facsimile from you to Frances Driscoll?
A. Yes, and it looks like again it's a reverse one, her back to me.
Q. When you say it's a reversal, do you mean that because of these arrows going back and forth in the heading?
A. Yes, sir.
Q. So you sent it to Fran Driscoll, and there's an arrow indicating she was sending it back to you; is that correct?
A. Correct.
Q. Does it appear that she sent it back to you on February 14, 2000?
A. Yes.
Q. And the subject of the memo is jet ski legislation; correct?
A. Correct.
Q. I'm going to ask you about jet ski legislation in a moment.
MR. EGBERT: Can I have one second? Somebody's messed up the exhibits.

C-19

MR. MATOS: 364.
MR. EGBERT: I'm sorry. I misheard you.
Q. The subject is jet ski legislation; correct?
A. Correct.
Q. I'm going to ask you about that in a moment; but first, since we're on the Lifespan/Care New England issue, what -- and this was the year after you had been looking at the Attorney General's hearings; is that correct?
A. Yes.
Q. What did Fran Driscoll write to you regarding the Lifespan/Care New England merger? If you start after "Mr. Buonnano."
A. I can't --
Q. Do you want the original?
A. Yes. I can't read this one. Thank you. It looks to be like what -- I don't know if it's opposition, Life/Care New England --
Q. If you could start right after "Mr. Buonnano."
A. Oh. Go forward with -- I'm sorry. Go forward with -- now it makes it clear. Go forward with opposing L/CNE, which means Life Care --
Q. Lifespan/Care New England?
A. Lifespan/Care New England, I'm sorry, as indicated in weekend memo. F. I hadn't looked at that "go

C-20

forward." That's what made it into context.
Q. And when Frances Driscoll told you to go forward with opposing Lifespan/Care New England as indicated in weekend memo, what did you understand she was saying to you?
A. She was telling me to continue to oppose it any way I could.
Q. And did the Lifespan/Care New England merger have anything to do with the Village at Elmhurst?
A. No, sir.
Q. Who was -- who would it affect at that time?
A. Roger Williams Medical Center.
Q. If we go back to the rest of the memorandum, the jet ski legislation, can you explain what work you did on the jet ski legislation.
A. Yes. Fran had told me about one of the board members of the Roger Williams Medical Center, Mr. Buonnano, and subsequently another member, Mr. Moore, about their problems with jet skis in and around -- I don't know if it was their summer homes or their permanent homes. They wanted me to work on some jet ski legislation for them.
Q. So these were members of the board of trustees of Roger Williams Medical Center; correct?
A. Correct.

C-21

A. I would say December of 2000.

Q. And what did you discuss with Robert Urciuoli?

A. I told him that I was seeking the chairmanship of the Corporations Committee and it looked good that I would get appointed to that commission, to that committee chairmanship.

Q. Why did you know that it looked good that you would get appointed?

A. I had gone through an interview process, but also I had played an integral part in the ascension of Senator Irons and the overthrow of Senator Kelly as the majority leader, as the new majority leader.

Q. Let's back up. Yesterday you testified or maybe the day before about Senator Kelly being in power in the Senate; is that correct?

A. Correct.

Q. What happened in the fall of 2000 to change that?

A. In the fall of 2000, Senator Irons, who was originally part of Senator Kelly's leadership team and it was always rumored that he was in and out, had decided to seek the majority leader's position, and he called me into his office and asked me if I would support him.

Q. And what did you say?

A. I said I would have to -- my first allegiance was

C-22

to Senator Montalbano and I would check with him first. And he said -- he would call him Joey. He said, Joey's on board, but I said I still want to check with him to keep my word to him. And I did. And then I gave Senator Irons my word that I would support him.

Q. By supporting him, what did you do?

A. I tried to get other senators to support his candidacy, worked on other campaigns, as did other senators from Senator Montalbano to Senator Walaska, Senator McCaffery and everyone else, to work for candidates across the state to try to get elected, our candidates get elected that were committed to Senator Irons in the caucus for them to vote for Senator Irons as majority leader against Senator Kelly.

Q. How successful was that?

A. It was successful.

Q. When did you learn that it had been successful? Was it during the November elections?

A. Pretty much it was official -- it was official in the November elections; but when we had won some strategic primaries, we had known we were on the way. But as you know, in politics anything can happen, but -- so it had to be official in November, obviously.

Q. And the primaries were when, approximately?

A. September.

C-23

Q. After September, you had a pretty good feeling about it?
A. We had a good feeling, but we still hadn't had all of the votes that we needed.
Q. And what was that good feeling based on?
A. Some of the elections that we had worked on that we were successful in.
Q. By successful, the candidates that would support Senator Irons --
A. Yes, sir.
Q. -- had won?
A. Yes, sir.
Q. And then in November that became official?
A. Yes, sir.
Q. That more candidates supporting Senator Irons had won as opposed to candidates supporting Senator Kelly?
A. Correct.
Q. Was Senator Kelly reelected?
A. Yes, he -- to his Senate seat.
Q. And as a result of Senator Irons' ascension to, was it Senate president or Senate majority leader?
A. At the time it was Senate majority leader.
Q. As a result of his ascension to Senate majority leader, what did that mean to you?
A. Obviously my power and my influence rose

C-24

dramatically.
Q. Why was that?
A. Because I was part of the leadership team now.
Q. That's when you were appointed to be Corporations Committee chair?
A. Yes, sir.
Q. And you were successful in that?
A. Yes, sir.
Q. And going back to your conversation with Robert Urciuoli, approximately when was that conversation?
A. December 2000.
Q. And what did you say to Robert Urciuoli?
A. I told him that it looked good that I would be appointed chairman of the Senate Corporations Committee and that, as you know, all the health care legislation at that time would be going through the Corporations Committee.
Q. Why would the health care legislation be going through the Corporations Committee?
A. That's just the way it had been for years. There are certain bills that have been traditionally transferred to various committees, and health care bills had always gone to the Corporations Committee. Some had gone to Finance. Some had gone to HEW, but

2003, were you paid approximately over $250,000?
A. If that's what it adds up to, yes.
Q. And is that what's represented by the checks that are in front of you?
A. Yes, sir.
Q. And your pay increased over the course of the years; is that correct?
A. Yes.
Q. And as your pay increased, what happened to the amount of work you were doing for the Village at Elmhurst?
A. It decreased.
Q. What happened to the amount of work you were doing for Roger Williams Medical Center?
A. It increased.
Q. When you stopped working -- by the time that your contract was terminated, approximately how much -- if you could give a percentage of work that you did for the Village at Elmhurst vis-a-vis the hospital, what would that be?
A. When I stopped working?
Q. Yes.
A. Probably 90 percent hospital, 10 percent Village, and 10 percent was on my own, most of it.
Q. And, Mr. Celona, the checks that you have in front

C-26

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 18, 2006<br>9:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-27

Q. Well, didn't you look at it a minute ago?
A. If that's what it says, Mr. Egbert.
Q. So you told him the story, and then you pitched him with your talents; right?
A. Yes.
Q. And that was what you were trying to do to get a job?
A. That's right.
Q. And when you pitched him with your talents, you pitched him with your knowledge of senior affairs; correct?
A. Right.
Q. You pitched him with your high constituency of seniors; correct?
A. Correct.
Q. You pitched him with the fact that the senior population had been strong supporters of you during your elections?
A. Yes.
Q. Correct? And you pitched him with the fact that you were a recognizable face amongst the seniors who was both trusted; correct?
A. I believe so.
Q. And listened to; correct?
A. Yes.

C-28

Q. And you did. It told you to research about assisted living; right?

A. Yes, sir.

Q. And you did?

A. Yes, sir.

Q. And it told you to talk to people about the Village at Elmhurst, and you did; right?

A. Yes.

Q. And it told you to go out and try to promote the Village at Elmhurst among seniors, and you did; right?

A. Yes.

Q. That was what you contracted to do, and that's what you did; right?

MR. MATOS: Objection, your Honor.

THE COURT: Overruled.

A. Can I --

THE COURT: Overruled. You may answer.

A. I did, but I wasn't contracted to do things for Roger Williams Medical Center.

Q. We'll get to that. First let's get -- but we do agree now at least on this, that you had a contract with the Village and you performed your contract; correct? Right?

A. Yes.

Q. Okay. So -- and you did it to the best of your

abilities in good faith and honestly; right?
A. Tried.
Q. No question about that?
A. Glad you're calling me honest now.
Q. No question about that; right?
A. Right.
Q. And so with regard to all this stuff we heard for three days about I did it on my own, I did it on my own, I did it on my own, what you did is perform under the contract as agreed; right?
MR. MATOS: Objection, your Honor.
THE COURT: Overruled. If that's not right, you can say so.
A. That's not right. I did it with no direction, independent research, independent visits, independent requests to get people to come to places, to speak about the Village without any request whatsoever or guidance or even an official first day regarding my employment with the Village at Elmhurst.
MR. EGBERT: Your Honor, I'm going to just put my copy on for now, if I may, of the contract.
Can I have the ELMO, please. Thank you.
Q. Your responsibilities on the contract that you signed began with that you were to become knowledgeable with all aspects of the quality of care provided by

C-30

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 06-02T
*
UNITED STATES OF AMERICA *
*
VS. * SEPTEMBER 20, 2006
* 9:30 A.M.
ROBERT A. URCIUOLI, et al *
*
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-31

A. I would say late August or early September of '97.
Q. And what was discussed regarding John Celona when you were on the telephone with Bob Urciuoli?
A. We were having a conversation about a variety of things, and he said that he had been approached by Senator Celona and asked if there was anything that he could do to gain employment or consultancy with the hospital.
Q. And did Bob Urciuoli say anything else to you about what John Celona had said to him?
A. He said that he was undergoing some financial trouble at the time and that Bob told me that he felt sorry for him and --
Q. What did you say to Bob Urciuoli?
A. I said, Gee, Bob, I said, I just don't know what Senator Celona could do for any of the entities, you know, in the medical center. He has no experience in the health care field. He had this lawnmower business. I couldn't imagine anything that he could do to benefit the hospital or any of the affiliates and, to boot, he was a state senator.
Q. What else, if anything, did you say about, to boot, he was a state senator?
A. That it would present enormous conflicts, that it would be difficult for -- that's probably all we said

C-32

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 21, 2006<br>9:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-33

A. Excuse me. After what point in time?
Q. After Frances Driscoll left.
A. Just once.
Q. Can you describe when that was.
A. I think it was in 2003.
Q. And where did that conversation take place?
A. Over the phone.
Q. And what did you discuss with Robert Urciuoli that day in 2003 over the phone?
A. We were discussing the Blue Cross contract.
Q. And what was going on with the Blue Cross contract at that time?
A. Bob was trying to negotiate for increased reimbursement with Blue Cross.
Q. And who was he trying to negotiate with?
A. Ultimately with Ron Battista, the executive director or president of Blue Cross.
Q. And did Robert Urciuoli tell you what the issue or what issues were of moment regarding Blue Cross?
A. Not on that phone call.
Q. Not on that phone call?
A. We weren't discussing -- I knew what the issues were because -- I knew what the issues were.
Q. Had he told you what the issues were?
A. Yes.

C-34

Q. What had he told you the issues were?
A. The way the health care system, reimbursement system was set up, it was counter-intuitive because Medicare paid a flat fee, for example, for replacing a knee, and you got $1,000 for the knee whether you stayed in the hospital for three days or ten days.

Roger Williams was the most efficient hospital in the state, and their length of stay was the envy of the other hospitals. However, every dollar that he saved on Medicare by getting people out early, he was penalized for it because Blue Cross paid on a per diem.

So if -- and you couldn't discriminate between Blue Cross patients and Medicare patients. So if Bob got somebody out of the hospital in three days and the Medicare allowance is five days, that would be fine. He would save two days' worth of expenses.

However, Blue Cross would penalize him because they would only pay him for three days, even though they'd pay a hospital down the street four, five, six, seven days, depending on how long the person stayed there.

Bob's position was, he wanted the same deal as with Medicare. He thought that Blue Cross should appreciate his efforts at efficiency and somehow split that savings with the hospital.

C-35

Q. And he told you those things?
A. Yes.
Q. And did he talk to you about what kind of relationship, if any, he had with Ron Battista at that time? Who was Ron Battista?
A. Ron Battista is the president, chief operating officer, he's the decisionmaker at Blue Cross.
Q. And what did he say -- what did Bob Urciuoli say was his relationship with Ron Battista?
A. I mean, he knew Ron Battista. I mean, he was friendly with him but in a social sense.
Q. And in a business sense?
A. Well, that blew hot and cold, and at this particular time Ron Battista was not interested in addressing this issue.
Q. And did Robert Urciuoli tell you that?
A. Yes.
Q. And the conversation, the phone conversation that you had in 2003 regarding John Celona, what did Robert Urciuoli say to you?
A. I think I said something like, It doesn't look like we're making any progress with Blue Cross. And he said, Well, things may be changing because John Celona's going to set up a meeting and invite Ron Battista in to discuss it, the issue.

C-36

Q. Did he explain to you why having John Celona invite Ron Battista, why that would make things change?
A. No.
Q. What did you say in response to that?
A. I said, Bob, Senator Celona's going to set up the meeting? And he said, Yes. I said, I think that's a bad idea. I said, You know, in what capacity is he setting up this meeting, as a state senator, you know? I just don't understand why he's getting involved, and it just doesn't appear right.
Q. Did you say anything else to him in that regard?
A. I said that, you know, I didn't know in what capacity he was acting by setting that meeting up, was it legislative or a concerned citizen or what was he doing setting that meeting because, you know, I just didn't know what it was. And I didn't think we had any guidance on whether that was acceptable or not, and I didn't think it was worth taking the risk.
Q. What did you mean by the fact that you didn't think you had any guidance on it?
A. Well, I don't think it was covered by the Ethics Commission -- I mean, it wasn't even contemplated by the ethics request.
Q. And did you say that to Robert Urciuoli?
A. Not in those terms, no.

C-37

Q. In what terms did you say it?
A. I mean, I said, It's a bad idea, and it doesn't look right, and you shouldn't do it, and I just don't know what capacity he's acting in. The reason I said that was --
Q. I'm not asking for your reasons. I'm just asking you what you said to him. Okay?
A. That's what I said.
THE COURT: We'll take our morning recess now. Members of the jury may return to the jury room.
(The jury is not present for the following)
THE COURT: Unfortunately, Mr. McGuirk, you're spending most of your time standing.
THE WITNESS: I'm all right.
THE COURT: You may step down. Court will be in recess.
(Recess)
(The jury is present for the following)
THE COURT: Is it getting a little chilly in here for you again? I notice some of you are bundling up.
JUROR: In the jury room.
THE COURT: We'll see what we can do about that. All right, Mr. Matos, you may continue.
MR. MATOS: Thank you, your Honor.

C-40

Q. Mr. McGuirk, when we left off, we were talking about your conversation with Robert Urciuoli regarding the Senator Celona meeting with Ron Battista. Do you remember that?

A. Yes.

Q. What I'd like to ask you, in response to the comments that you made to Robert Urciuoli about whether it was a good idea or not, what did Robert Urciuoli say to you?

A. He said, Well, it's all set up.

Q. Did he change his mind -- did he indicate to you that he changed his mind after you told him it wasn't a good idea?

A. No.

Q. What, if anything, did you do in regards to -- did you have any other conversation about that meeting during that telephone conference?

A. With Bob?

Q. Yes.

A. No.

Q. What did you do afterwards in regards to that?

A. I called the general counsel, Kim O'Connell, and I said to her that I had just spoken with Bob and that Bob -- that Senator Celona was going to set up a meeting between Bob and Ron Battista at the State

C-41

second.

(Pause)

Q. As you testify here today under oath, can you say with certainty that Fran Driscoll did not, in your and Mr. Urciuoli's presence, say that she did not -- that she thought hiring John Celona was a bad idea or not a good idea?

A. She didn't say it was a bad idea with Bob and myself there.

Q. And you're certain of that now; is that correct?

A. Yes.

Q. Are you also certain, though, at some point in that same time frame she said to you directly that she did not think it was a good idea to hire Mr. Celona?

A. She did.

Q. Now, at some point -- is it accurate to say that at some point you had a conversation with Mrs. Driscoll where you said something like, you know, Maybe if I don't get to this right away, Bob will change his mind or forget about it?

A. Yes.

Q. I'm not calling him Bob. That's what you would have said at the time; is that correct?

A. Yes.

Q. That's how you would have addressed him or

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * *     C.R. NO. 06-02T
*
UNITED STATES OF AMERICA *
*
VS. *     SEPTEMBER 26, 2006
*     9:30 A.M.
ROBERT A. URCIUOLI, et al *
*
* * * * * * * * * * * * * * * *     PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-43

Q. Did he explain to you why?
A. No.
Q. At the time -- did you learn at any time from November or December of 2002 until the end of 2003 whether that payment split had actually been effectuated?
MR. EGBERT: Objection.
THE COURT: Overruled. You may answer that yes or no. Either you learned or you didn't learn.
A. No.
Q. Prior to that time, did you have any knowledge from Robert Urciuoli about how Peter Sangermano -- how John Celona was being paid?
A. Prior to December 2002, no, I did not.
Q. After the contract was revised in December of 2002, Ms. O'Connell, did you have any subsequent conversations with Robert Urciuoli about John Celona?
A. Yes.
Q. Can you explain how that -- when that was and how that came about.
A. That came about in early summer of 2003, I think May or June of 2003. I received a call from Jim McGuirk, outside counsel to the hospital. Mr. McGuirk called me and told me that he had had a brief conversation with Bob Urciuoli in which Mr. McGuirk

asked how the negotiations between the hospital and Blue Cross were going on the recent contract, and Jim McGuirk advised me at that time that Bob Urciuoli said that they were going okay and that John Celona was going to facilitate a meeting between the hospital and Blue Cross.

Q. And did Mr. McGuirk say anything else to you?

A. He told me that he had said to Bob at the time that he thought that that looked strange, and he asked why John Celona was -- what John Celona's involvement was.

Q. Did he say anything else to you or ask you to do anything?

A. He told me that Bob Urciuoli said that John was there to facilitate the meeting. He then said he told Bob at the time that he thought it looked strange. That was the end of their conversation, and then Jim called me and asked me to talk to Bob about it.

Q. And did you go and talk to Robert Urciuoli about it?

A. I did.

Q. Did you speak to him in person or on the telephone?

A. I believe I spoke to him in person.

Q. Do you remember where that conversation took

C-45

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 29, 2006<br>2:00 P.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Rule 29 Motions)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

C-46

If the Defendants engaged in a scheme to pay Senator Celona money to use his office for the benefit of Roger Williams or to commit acts in the -- under the authority of his office that benefited Roger Williams rather than disinterestedly representing the interests of the citizens that he represented, it doesn't matter whether Senator Celona exaggerated the things that he claims to have done in furtherance of the conspiracy, which it seems to me he clearly did, or even whether he misrepresented or lied about some of those things, and certainly there's some reason to think that he may have done that as well.

The important thing, though, is whether there was a conspiracy that existed to have him act in his official capacity on behalf of Roger Williams or in a manner that benefited Roger Williams and/or its affiliates in exchange for the compensation that he was receiving under the consulting agreement. It doesn't matter if the scheme was successful or not or the degree to which it was successful.

Furthermore, if the Defendants engaged in a scheme to pay Senator Celona for using his office in a way to benefit Roger Williams or its affiliates, it doesn't matter whether he was employed by the Village at Elmhurst or by Roger Williams itself or by any of

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | OCTOBER 2, 2006<br>9:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

C-48

of work decreased. And as I explained to you during my first comments to you, if you look at the evidence, 2000, 2001, 2002, 2003, the Government's exhibits are primarily arranged in chronological order, you'll see what kind of work he was doing, a couple TV shows, showing up at a summer barbecue, a couple pizza wars. That's the consulting agreement? And then compare that to what he was doing in order to earn his keep.

All the defense attorneys focused a good amount of time on John Celona, as they should; but, ladies and gentlemen, I told you from the initial time that I addressed you at the beginning of the trial that John Celona had lied in the past.

And, ladies and gentlemen, you also know from Judge Torres who has explained to you and will explain to you again that the ultimate sentencing decision is Judge Torres'. We will make a recommendation to the judge, but it's your job to determine whether John Celona and every other witness who appeared before you was credible.

And, ladies and gentlemen, we have made no bones about who John Celona is to you, but -- and the reason that we went through so many of the documents during his testimony is because the one thing that John Celona said to you that you can probably all agree with, the

documents don't lie. That's what he said. When he saw the documents, the documents don't lie.

And if you go and look at all the documents and put them all together, you'll see that the Defendants in this case are guilty.

They all chastised John Celona. One of the interesting things that Mr. Egbert said was calling him a lawnmower salesman, that was demeaning. Calling him a liar is not demeaning. Calling him a lawnmower salesman is demeaning.

Being a lawnmower salesman, that was honest work, ladies and gentlemen. That's not the point of this case. What that means is that John Celona was completely unqualified to do what they claim he was doing, but he was qualified to be a legislative -- to be on their legislative payroll.

With regards to Blue Cross and United, they said that Ron Battista wouldn't stand up here and tell you that he was pressured. Of course not. Ron Battista was CEO of Blue Cross/Blue Shield, but he told you the reality. He knew he was going to have a political problem if he didn't deal with the issue, and John Celona underscored that problem.

Kelly Sheridan told you, We have to deal with the issue. We knew that he was chairman, and you

J 1998

VP PUBLIC RELATIONS & DEV

# Fax Transmission

G-147

## Senator John A. Celona


*Deputy Majority Leader* *District 36 - North Providence*

State of Rhode Island and Providence Plantations

1500 Mineral Spring Avenue
North Providence, Rhode Island 02904-3130

State House, Room 145, Providence, Rhode Island 02903

Office: 401-222-3472
Voice Mail: 401-222-6640, Ext. 136
Pager: 786-3330 FAX: 401-353-6155


To: Fran Driscoll, APR

Date: 3-31-98

FAX Number:

Number of pages, including cover: 1

SUBJECT: Fran - The letter by Harry McGuirk is fine and please send.

Also the seniors are ready & waiting for us at Centredale Manor.

Call with any questions.

John

Rader - Fran - Forget who author letter but need it signed + given

NOT PRINTED OR TRANSMITTED AT GOVERNMENT EXPENSE.

P.S. - There is still no posted hearing for 98-S 2796.

John

RWMC000746

C-51

# Fax Transmission

---

**Senator John A. Celona**
District 36 - North Providence
State of Rhode Island and Providence Plantations

51 Pinewood Drive
North Providence, Rhode Island 02904-3426

State House, Room 145, Providence, Rhode Island 02903

Home: 401-353-3042 Office: 401-222-3472
Voice Mail: 401-222-6640, Ext. 136
Pager: 786-3330 FAX: 401-353-6155
E-mail: sen-celona@rilin.state.ri.us

---

**To:** Fran Driscoll, APR
**Date:** 6-14-99
**FAX Number:**
**Number of pages, including cover:** 2
**SUBJECT:** Fran – Please advise on the attached legislation

JAC

NOT PRINTED OR TRANSMITTED AT GOVERNMENT EXPENSE.

LC03510

# STATE OF RHODE ISLAND

99-S 1053

IN GENERAL ASSEMBLY

JANUARY SESSION, A.D. 1999

## AN ACT

RELATING TO THE HOSPITAL CONVERSION ACT

99-S 1053

Introduced By: Senator Paul S. Kelly

Date Introduced: June 2, 1999

Referred To: Senate Committee on Corporations

It is enacted by the General Assembly as follows:

SECTION 1. Section 23-17.14-12 of the General Laws in Chapter 23-17.14 entitled "The Hospital Conversions Act" is hereby amended to read as follows:

~~23-17.14-12. Review process by department of health for conversions involving for profit corporation as the acquiree.~~ 23-17.14-12. Review process by department of health for conversions involving for profit hospital as the acquiree. – The department of health shall review all proposed conversions involving a for profit ~~corporation~~ hospital as the acquiree and either a for profit ~~hospital~~ corporation or a not for profit ~~hospital~~ corporation as the acquiror in accordance with the provisions for change of effective control pursuant to section 23-17-14.3 ~~or~~ and 23-17-14.4.

SECTION 2. This act shall take effect upon passage and be retroactive to July 22, 1997.

LC03510

EXPLANATION

BY THE LEGISLATIVE COUNCIL

OF

AN ACT

RELATING TO THE HOSPITAL CONVERSION ACT

***

This act would require the department of health to review acquisitions of profit or non profit corporations by for profit hospitals.

This act would take effect upon passage and be retroactive to July 22, 1997.

G-326

Call! Fax to JC

# MEMORANDUM

TO: FRANCES P. DRISCOLL, APR
Senior Vice President, External Affairs,
Corporate Communications & Development
Roger Williams Medical Center

FROM: JOHN A. CELONA

DATE: July 29, 1999

SUBJECT: Prostate Cancer meeting with Knights of Columbus & Lifespan/Care New England merger hearing

Is the August 20th date approved regarding the presentation at Dillon K of C Hall on Douglas Avenue in North Providence?

I deleivered the minutes of both hearings dealing with the Lifespan/Care New England merger to Karen at RWMC. Those of the House commission in total, including the hearing that Bob testified at and the minutes of the Attorney General's hearings.

If you wish, I can continue to attain the minutes of future hearings for your review and records. Please advise.

326