UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CR. No. 06-02-04L |
| | ) | |
| ROBERT A. URCIOLI, | ) | |
| FRANCES P. DRISCOLL, and | ) | |
| ROGER WILLIAMS MEDICAL CENTER | ) | |

# **FRANCES P. DRISCOLL'S OMNIBUS RESPONSE MEMORANDUM**

Defendant Frances P. Driscoll has filed four motions with this Court and has joined in the motions filed by her co-defendant, Robert Urciuoli. Her four motions are:

- a motion *in limine* for preliminary instruction of the jury;
- a motion for relief from prejudicial joinder;
- a motion to strike certain allegations from the indictment or, in the alternative, to preclude submission of the indictment to the jury;
- a motion *in limine* to preclude introduction of testimony from John Celona.

The arguments made in the first three of these motions will be supplemented here. The fourth, the *Motion in Limine to Preclude Testimony From John Celona*, has already been addressed by Ms. Driscoll's *Supplemental Memorandum In Support of Her Motion in Limine to Preclude Introduction of Any Testimony of John Celona Or, in the Alternative, For Further Relief,* filed on June 13, 2008, and, in any event, may be moot if the government elects to forgo calling Mr. Celona as a witness.

## I. **Preliminary Instruction**

### A. **Introduction**

The government has objected to any instruction which would outline for the jury the parameters of Rhode Island ethics law. *See United States' Objection to Defendant Frances*

*Driscoll's Motion in Limine For Preliminary Instruction of the Jury* (*USM:Instructions*). In so doing, it inveigles this Court toward prejudicial error.

Both the *Indictment* and the evidence place Rhode Island's ethics law front and center. *Indictment* included at *Appendix* (*App.*) 35. This is inherent in this case. The basic factual framework is the decision by the Roger Williams entities to hire John Celona, a state senator, as a consultant to perform elderly outreach, while continuing to communicate with him on matters of political concern. These basic facts are joined with an accusation that Ms. Driscoll was complicit in the submission of a materially deficient request to the Ethics Commission for an opinion outlining the permissible scope of Celona's activities under state law.

These parameters notwithstanding, the government insists that this indictment presents a case of "*quid pro quo* bribery," *USM:Instructions*: 8, which is illegal regardless of the terms of Rhode Island law. Hence, it suggests, state law should play no role in this case except insofar as it might bear on defendant's intent. *Id.* at 9.

This Court should not be beguiled. The accusations in this case are not materially different from the charges brought in *United States v. Kramer, et al.* Cr. 07-09-01(MML) (CVS case). Indeed, the operative language of the honest services accusations in this case is nearly word-for-word identical to the CVS indictment.

| Driscoll Indictment | CVS Indictment |
|---|---|
| ¶97. "It was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, power, and authority as a state Senator to benefit the political and financial interests of RWMC and its affiliates." | ¶97. "It was the object of the scheme for defendants Kramer and Ortiz to improperly influence and affect Celona's official actions by paying him money and providing him with gifts, to cause him to use his influence, power, and authority as a state Senator, as a member and chairman of the state Corporations Committee, as a member of the Senate HEW Committee and as a member of the RISLA to benefit the political and financial interests of CVS." |

| Driscoll Indictment | CVS Indictment |
|---|---|
| ¶98. "It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates." | ¶98. "It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with CVS to enable Celona to continue to promote the political and financial interests of CVS." |

Thus, by the *Indictment*'s explicit terms, this is a case of undue influence and non-disclosure of material facts, not "*quid pro quo* bribery," as the government would have it. Faced with nearly identical accusations in the CVS case, this Court instructed the jury on certain components of state law essential for the jurors to perform their constitutional function. It explained the concept of a citizens' legislature, CVS 5/12/08:14, *App. 2*; 5/30/08:32, *App. 4*; it described the class exception, which allows "a legislator to take action on legislation that would affect a private entity for whom the legislator works as long as the legislation would affect that entity to no greater extent than any other similarly situated entities." CVS 5/30/08:33, *App. 5*; 5/12/08:14, *App. 2*; it informed the jurors that "the legislator is the one who is responsible for identifying any actual or potential conflict of interest, determining whether such a conflict, if one exists, needs to be disclosed in determining whether under all circumstances he or she is permitted to participate in legislation." CVS 5/30/08:33, *App. 5*; and it described for the jurors the function of the Ethics Commission. CVS 5/30/08:34, *App. 5*.

These instructions are equally, if not more, essential here.

**B. <u>The Charges and the Evidence</u>**

Here, as in the CVS case, the government's core claim of honest services fraud is framed in the alternative: improper influence (¶97) and nondisclosure of Celona's relationship with Roger Williams (¶98). In addition, the government alleges (as it must) the independent element

of deceit. ¶102. Rational assessment of each of these allegations will require the jury to understand the basic parameters of Rhode Island ethics law.

1. Undue Influence

The precise language of ¶97 is instructive.

> It was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, . . . .

Three points leap out.

*First*, the allegation is that Celona was paid "pursuant to a consulting agreement," not that he was paid money to which he had no legitimate claim or entitlement (a classic bribe).

*Second*, there is the adverb, "*improperly*" influence and affect. In order to determine what is "improper" as opposed to "proper," the jury necessarily must have a context. And that context is created by the state law provisions which this Court outlined in its CVS instructions, particularly the class exception.

Finally, the accusation here is undue influence caused by the consulting agreement. However much the government attempts to posture this case as a *quid pro quo* bribery, the terms of the *Indictment* are unambiguous: "to improperly influence and affect." This is not a Lincoln Park case, where there was an explicit offer of money for machines. The government has never alleged, and Celona has never claimed, a specific *quid* for a specific political *quo*. Rather, the indictment in this case, like CVS, alleges an ongoing stream of consulting fees to Celona which were concurrent with interactions over politics and Celona taking positions favorable to Roger Williams. In short, it is an "undue influence" case, falling in the "borderland" between outright bribery and conflict-free conduct. *United States v. Urciuoli,* 513 F.3d 290, 296 (1st Cir. 2008).

The language of the indictment aside, as the government well knows, Celona has never claimed he was hired simply to be a stealth political operative, much less that he was paid to

perform specific political actions. To the contrary, even with a motive to stretch the truth in the government's favor, he has testified that he "sometimes" exercised independent judgment, but "[n]ot in all cases." RW 9/15/06:243, *App. 14*. He "did things for Roger Williams," RW 9/18/06:199, *App. 19*, but he could not say he ever sold a specific vote. *Id.* He "worked for [Urciuoli and Driscoll]," RW 9/15/06:243-244, *App. 14-15,* and claimed to do what he did at their instruction, *e.g.,* RW 9/14/06:35-36, *App. 7-8*, but simultaneously acknowledged that he did not do "everything they tell you." RW 9/15/06:243-244, *App. 14-15*. On the Cancer Commission bill which was the subject of a number of faxes with Ms. Driscoll, he voted against Roger Williams' position. RW 9/14/06:210, *App. 9*. He agreed that he never told them he would not exercise his "independent judgment." RW 9/15/06:244, *App. 15*. But he did feel his work on general health care legislation was wrong "[b]ecause it was a conflict of interest." RW 9/19/06:10-11, *App. 21-22*. As for his outreach among senior citizens, Celona testified that he "performed [his contract]," RW 9/18/06:149, *App. 17*, and that he did so "to the best of [his] abilities in good faith and honestly . . . ." RW 9/18/06:150, *App. 18*.

These are the factual parameters within which this Court must instruct a jury: a politician in a part-time legislature is hired by a hospital affiliate, but continues a political dialogue with his employer and, at worst, ceases to exercise his independent judgment on certain legislative affairs. Any notion that a jury can assess whether these events can constitute honest services mail fraud without knowing exactly what state law allows and requires of a part-time legislature is absurd. Jurors cannot make up what is legal or illegal on their own. One juror may say that this is reprehensible activity, that no legitimate company should act like that, and it is effectively a bribe. Another may say that it's not the same thing as a bribe; that it may be bad, but it's not illegal. By seeking to avoid clear instructions on state law, the government is asking this Court to leave the jury in the dark and then vote its prejudices.

This will be particularly true if the government does not call John Celona to the witness stand.[1] Then the prosecution will be asking the jury to infer an illicit scheme or artifice to defraud, and an illicit intent, from a record of facsimile exchanges, none of which come even close to the *quid pro quo* bribery the government asserts in its memorandum. None of these faxes tie the performance of any official act to a monetary payment. Indeed, there is nothing in these faxes that would give anyone pause if they were penned by an ordinary citizen with no financial relationship to the legislator. It is only Celona's consultancy which has brought this fax exchange into court. And, hence, it is necessary for this Court to instruct the jury on what the law says about this kind of a relationship with a legislator.

In *United States v. Sawyer,* 85 F.3d 713, 741 (1st Cir. 1996) (*Sawyer I*), the First Circuit stressed that "where . . . the line between the merely unattractive and actually criminal conduct is blurred, the court must take pains to explain the difference to the jury." *See also, United States v. Urciuoli,* 513 F.3d 290, 299 (1st Cir. 2008); *United States v. Woodward,* 149 F.3d 46, 67 (1st Cir. 1998). This explanation must include, not only the terms of the government's case, but also the other side of the equation: "We think the jury needs to be told specifically that the defendant has not violated the bribery component of the Travel Act (or committed honest services fraud) if his intent was limited to the cultivation of business or political friendship." *Id.* As applied here, the jury must be told that Ms. Driscoll committed no crime if her purpose was simply to press the hospital's agenda on John Celona even when Roger Williams was at the same time paying him a stipend. This Court should also explain that, as a private party not covered by the Ethics Code,

[1] The government has recently suggested it will not call Celona in its direct case. This leaves the fax record for evidence of Celona's communications with Ms. Driscoll. The government will likely ask the jury to draw inculpatory inferences from this record, but it cannot suggest the faxes prove more than what Celona claimed in his testimony at the first trial, testimony which Senior Judge Torres found to be already "exaggerated" and likely containing "misrepresent[ations] or lie[s]." RW 9/29/06:47, *App. 28*. This testimony sets the outside parameters of the government's case. Any effort to claim *quid pro quo* bribery when Celona himself did not will bring motions for mistrial.

Ms. Driscoll was entitled to rely on Celona to determine when he was being placed in a position of untenable conflict.

The issue here is not simply Ms. Driscoll's subjective intent. The government must prove, as an element of its case against a non-public official, "that the target of the scheme is the deprivation of the official's honest services." *Sawyer I, supra* at 725. A "scheme" which has as its objective the hiring of Celona as a consultant while continuing to work with him as a politician will not have as its target the deprivation of the official's honest services, given the parameters of Rhode Island law. The jury must be sufficiently instructed to decide this component of the government's case, as well as Ms. Driscoll's intent.

The *Indictment* in this case charges undue influence and, if the prior trial is any guide, the evidence will not go beyond this allegation. The defense will argue that the fax evidence falls far short. But either way, the jury must be told what state law requires and allows and what it does not. As the First Circuit put it in *Woodward, supra* at 67 (quoting *United States v. DeStefano,* 59 F.3d 1, 4 (1st Cir. 1995), "[c]lear, accurate, easily understood jury instructions are 'vitally important in assuring that jurors grasp subtle or highly nuanced legal concepts.'"

2. Non-Disclosure

There is a second reason why an instruction on state law is necessary in this case. As noted above, the *Indictment* includes not one, but two theories of honest services deprivation. In addition to undue influence, it charges that Ms. Driscoll was part of a scheme "to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates," ¶98 – in short, non-disclosure or concealment of a conflict of interest.[2] While the government asserts it is not

---

[2] Senior Judge Torres recognized that the government was charging two types of honest services fraud when he instructed the jury in the first trial of this matter. RW 10/2/06:167, *App. 31*.

"presently" proceeding on this theory, *USO:PI* at 3, and it is willing to shear the *Indictment* of suggestions that a simple conflict of interest could constitute honest services fraud, *see United States' Objection to Defendant Frances Driscoll's Motion to Strike Certain Allegations From the Indictment Or, in the Alternative, To Preclude Submission of the Indictment To the Jury* (*USM:Indictment*), it has not struck ¶98's accusation of concealment of a conflict of interest as a basis for prosecution.

The government has not let go of this accusation for a very good reason: it is central to its claim of criminality, *i.e.,* that defendants' conduct in paying John Celona as a consultant was rendered criminal because they allegedly omitted certain material facts in Roger Williams' submission of an ethics advisory request.[3] One need only go to the *United States' Memorandum in Support of its Objection to Defendant Driscoll's Motion for Relief From Prejudicial Joinder* (*USM:Severance*) at pp. 3-5, to see how the government continues to frame its case when it is not seeking to gain a tactical benefit from a categorization as a *quid pro quo* bribery. The government quotes ¶98's accusation of a concealment of a conflict of interest, *id.* at 3, alleges that Ms. Driscoll was complicit in drafting documents which had a "false premise," which "failed to disclose that Celona had been performing political services for RWMC," and which "wholly misrepresented the true identity of Celona's employer and the true nature of the work he was and would be performing." *Id.* at 4. It is hard to see the government's characterization of its

---

[3] The government characterizes the contents of the April 6, 1998 ethics advisory request (drafted by James McGuirk, Esq., not Frances Driscoll) as "lies." *USM:Instruction*:9-10. In fact what the government is claiming is that the request omitted certain material facts, most importantly that John Celona was already performing a number of functions on behalf of the Roger Williams Medical Center, as well as on behalf of The Village at Elmhurst, the Roger Williams entity which was his direct employer. These activities included, most significantly, his work on the rescue runs and, to a much lesser degree, several fax communications regarding two pieces of legislation: 98-H-8229 (the Alzheimer's Bill), G-124; and 98-S-2796, a bill relating to directors of converted non-profits. G-137, 142.

case as "*quid pro quo* bribery" as anything other than a legal label attached for the tactical purpose of avoiding the kind of instruction which resulted in an acquittal in the CVS case.

The continuing centrality of this accusation requires this Court to explain to the jury the function of the Ethics Commission and the basic parameters within which the ethics advisory request was submitted: specifically, the fact that it is the legislator's responsibility to avoid improper conflict and that there are circumstances (the class exception) where Rhode Island law allows the employer of a legislator to continue to interact with him/her on legislative matters which have an impact on the employer's affairs.

A recent development in the law makes precise instruction in this area particularly critical. On June 17, 2008, the United States Court of Appeals for the District of Columbia Circuit, decided *United States v. Safavian,* ___ F.3d ___, 2008 U.S. App. LEXIS 12691 (D.C.App. 2008). Safavian was charged with falsifying and concealing material facts in violation of 18 U.S.C. § 1001(a)(1) based upon material omissions in an ethics advisory request he lodged with the General Service Administration's general counsel. The Court concluded that no charge of concealment could lie in the absence of a legal duty to disclose.

By parity of reasoning, the mere omission of material facts in an ethics advisory request to the Rhode Island Ethics Commission cannot be the exclusive basis on which a scheme or artifice to defraud within the meaning of 18 U.S.C. § 1341 is proven, at least where the defendant, as a private citizen, has no legal responsibility of full disclosure. It will be impossible for the jury to understand this nuance of the case unless this Court gives instructions which outline the function of the Ethics Commission and the parameters within which the ethics request at issue here was submitted.

3. Deceit

Even if the government were to eliminate its second theory of honest services fraud (the non-disclosure/concealment of a conflict), this issue would necessarily remain in the case through the deceit element. In *Sawyer I, supra* at 732-733, the First Circuit stressed that, not only must the government prove an intent to deprive the public of honest services, but it must also prove an intent to deceive. Paragraph 102 of the *Indictment* alleges this deceit component by tracking the accusation of ¶98 that Ms. Driscoll sought to conceal Celona's conflict of interest with Roger Williams. Hence, the issue of non-disclosure/concealment of a conflict of interest is central to this case, regardless of the government's honest services theory. This in turn necessitates the instructions which this Court gave in the CVS case in order for a juror to assess the government's claim in its real world legal context.

**C. *Urciuoli***

Against all this, the government pulls isolated quotations from the *Urciuoli* opinion in an effort to suggest that the First Circuit has endorsed a retrial without the kind of instructions which this Court found necessary in CVS. *USM:Instructions*: 5-8. This effort fails for multiple reasons.

*First,* the First Circuit's observations were predicated on a record in which Celona testified for the government. If, as the government has indicated to this Court, it will not call Celona in its direct case, then there will be virtually no evidence that Celona was Roger Williams' "errand boy," as the government argued in the last trial. RW 10/2/06:28, *App. 30.* To the contrary, the fax record shows extensive activity by Celona on elder affairs.[4] The government will likely present certain employees of The Village to testify that they were not aware that Celona was working for The Village (implying, therefore, that he was not). For every

[4] In the Appendix, Ms. Driscoll proffers a list of the exhibits introduced at the first trial, documenting Celona's extensive elderly outreach activity. *App. 33.*

one of these employees, however, the defense can produce another who will testify that s/he was well aware of the consultancy. And, in any event, the very nature of a consultancy is that the person works independently and may have little or no contact with his/her employer's premises. The point here is not to argue the evidence in advance, but merely to note that the evidence is, at worst, mixed, and if Celona is not a witness for the government, then the accusation of a *quid pro quo* bribery must be proved circumstantially from this very mixed bag.

*Second,* the First Circuit was operating from an appellate vantage which does not view the record *de novo*. Hence, the Circuit took the government at its word that Celona's consultancy was "a sham or largely sham job." *Urciuoli, supra* at *3. This Court does not have the luxury of a one-sided view of the evidence. Rather, it must instruct the jury, not only on the prosecution's characterization of the facts, but on the theory of the defense as well. *E.g., United States v. Gamache,* 156 F.3d 1, 8-9 (1st Cir. 1988). As represented *supra,* this defense will present evidence that Celona's consultancy was real and effective. Further, unless the government not only calls Celona after all, but he (once again) changes the testimony—this time to allege an explicit linkage between his consultancy and political action—there will be no *evidence* that there was ever a *quid pro quo* agreement between Celona and any defendant, much less Frances Driscoll.

Instead, as in the CVS case, there will be *argument*: argument from the government that Celona's receipt of consultancy fees concurrent with his alleged political activities for Roger Williams was comparable to a bribe; and argument from the defense that these activities were permissible under state law. This kind of "borderland" conduct, *Urciuoli, supra* at 296, demands precise instruction. In the words of the First Circuit, here, as in the Blue Cross situation, "the government's allegations may add up to bribery but the central wrong is not the usual problem of buying votes." *Id.* at 297.

Finally, there is the point that the *Urciuoli* opinion is more than a little obscure, making reliance on individual phrases or sentences perilous. Two points, however, emerge with some clarity from the Circuit's opinion. First, while "[t]he relationship between state law and the federal honest services statute is unsettled," *id.* at 298, the Circuit has now acknowledged that "in some circumstances, state law [may] bear on what 'services' are owed by a state legislator." *Id.*[5]

Second, the Circuit's remedy for legal uncertainty and the possibility of juror confusion is to throw the ball back in this Court's lap with the admonition of the need for clear instructions. *Id.* at *24. This Court should err on the side of caution and in favor of the jury understanding more than it needs to make a rational decision, rather than less.

**D. <u>Conclusion</u>**

In sum, however much the government may seek to push its square peg of a case into the round hole of a *quid pro quo* bribery, the facts in this case will not be materially different in kind from those advanced in the CVS trial, except that here, the Ethics Commission will play a more central role in the events. This difference makes the instructions this Court gave in the CVS case more necessary, not less.

Instructions outlining the parameters of state ethics law are essential to a fair trial of this case. In their absence, this jury will be uninformed and unable to perform its constitutional function, all in violation of U.S. Const. Amend. V.

## II. Severance

### A. Introduction

The government says that severance is inappropriate here despite Ms. Driscoll's acquittal of conspiracy for four reasons:

---

[5] The panel opinion did not purport to state definitively what those circumstances are. And it is impossible to predict with certainty what a second (and presumably different) panel might say if another appeal were ever necessary.

- The fact that she was acquitted of conspiracy proves that the jury will not be confused if she is tried with Urciuoli a second time;

- Any confusion can be cured with simple jury instructions saying that the charge is devising a scheme and not conspiring to devise a scheme;

- The disparity between the many charges against Urciuoli and the single charge against Fran Driscoll is not alone enough to warrant severance; and

- The Saylor Report is not exculpatory, and is therefore inadmissible, because Ms. Driscoll had a guilty mind before she read it.

Every one of these grounds lacks footing in both fact and law:

- The first point is rhetoric, not substance. No one knows how the first jury drew the distinctions it did.

- As to the second, the government itself continues to confuse the evidence against Ms. Driscoll with the evidence against her co-defendant, which does not augur well for the re-trial. While insisting instructions will suffice, the government offers no assistance whatever in crafting language that will distinguish for the jury the difference between "devising a scheme" (the charged crime) and "conspiring to participate in a scheme" (the acquitted crime), particularly in the context of an Indictment that describes the two in virtually identical terms.

- On the disparity issue, the government sets up and bats down a straw person. Ms. Driscoll is not saying the disparity *alone* is enough. The point is that the disparity exacerbates the other problems presented here, a point the government does not address.

- And, finally, as to the Saylor Report, the government argues that Ms. Driscoll had a guilty mind before she read the report, so it cannot be exculpatory. The facts, however, are up to the jury.

Ms. Driscoll will address each of the government's substantive points *seriatim.*

## B. <u>Instructions as a Remedy</u>

### 1. <u>On-Going Factual Confusion</u>

The government asserts that Ms. Driscoll was responsible for misleading the Ethics Commission into thinking that Celona worked for the Village, when in fact he worked for RWMC. *See United States' Memorandum in Support of Its Objection to Defendant Driscoll's Motion for Relief from Prejudicial Joinder* (*USM:Severance*: 8) ("Urciuoli *and Driscoll* caused

James McGuirk, RWMC's outside counsel, to send an April 6, 1998 letter to the Ethics Commission stating that Celona was employed by the Village to promote services provided to senior citizens.")(emphasis supplied). The government repeats this assertion not once, but twice. *See also USM:Severance*: 5 n.7 ("Urciuoli and Driscoll had McGuirk draft the submission to the Ethics Commission stating that Celona was retained by the Village to promote the Village to the elderly,…").

In fact, according to the uncontradicted first-trial testimony of James McGuirk, Esq., the attorney who drafted and presented the request to the Ethics Commission, Ms. Driscoll provided him with a draft description of Celona's responsibilities that stated (accurately) that he worked for "RWMC and its affiliated entities", not for the Village. RW 9/20/06:210, G-81; *App. 24.* It was *Mr. McGuirk* who then amended Ms. Driscoll's language to substitute the Village for RWMC, and he did so *at Urciuoli's behest*, not Frances Driscoll's. RW 9/20/06:213-214, *App. 25-26.*[6] Not a shred of evidence in the first trial suggested that Ms. Driscoll orchestrated this change.

---

[6] McGuirk's testimony is as follows:

Question: "The first document that Fran Driscoll prepared indicated that the objective was to work for Roger Williams Medical Center; is that correct?
Answer: "Correct."
Question: "And the first document you prepared [changed that to] the Villages at Elmhurst and Waterman Lake? Do you see that?"
Answer: "Yes."
Question: "Who made that change from Roger Williams Medical Center to Villages?"
Answer: "I did."
Question: "And why did you make that change?"
Answer: "Because I thought that Fran had it wrong ….So I changed all the references to the medical center to the Village at Elmhurst, and we added Waterman Lake."
Question: "And that was based on your understanding of what the relationship was supposed to be; is that correct?"
Answer: "That's correct."
Question: "And you obtained that understanding from whom?"
Answer: "From Bob [Urciuoli]."

RW 9/20/06:213-214, *App. 25-26*.

The government's confusion here presages the confusion likely to infect a new trial if Mr. Urciuoli and Ms. Driscoll are tried jointly. Now that the conspiracy charge is gone, the government cannot attribute actions taken by Mr. Urciuoli to Ms. Driscoll. Yet it persists in doing so nonetheless, repeatedly attributing to her evidence that is relevant to Urciuoli alone. *See*, *e.g.,* in addition to the above, the government's assertion that "defendants" paid Celona a total of $260,000.00, when the government's evidence shows that Ms. Driscoll left RWMC's employ in May, 2000 and therefore could not have been complicit in any payments to Celona made after that date, *Indictment* ¶ 2, *App. 35*; and the government's assertion that "defendants" rewarded Celona for his work with raises up to $1,000 a week, even though Celona testified that he asked Urciuoli for his first raise (to $892 a week) in 2000, and was given that raise in October, 2000, after Ms. Driscoll had left. RW 9/15/06:86-88, *App. 11-13*. All subsequent raises post-dated Ms. Driscoll's tenure.

If the government itself cannot keep the evidence against these two defendants separate, despite its familiarity with the evidence and with the legal consequences of the conspiracy conviction, how can one expect the jury to be clear?

3. <u>On-Going Legal Confusion</u>

The government neither cites nor addresses the leading case of *Sealfon v. United States,* 397 U.S. 436 (1970) (discussed in *Francis P. Driscoll's Motion to Strike Certain Allegations from the Indictment or, In the Alternative, To Preclude Submission of the Indictment to the Jury* at 5), which holds that the prosecution may not present to a second jury factual issues that were determined in the defendant's favor in a prior prosecution. It makes no effort to assist the Court in instructing the jury on the difference between "conspiring to devise a scheme" and "devising a scheme." If anything, the government muddies the waters on the difference between conspiracy to devise and devising, which bodes ill for Ms. Driscoll, who has a constitutional right not to be

re-tried on issues already resolved in her favor, as well as a due process right to clear legal instructions.

Thus, the government asserts that: "Just because the jury did not find that she conspired with Urciuoli to commit honest services mail fraud, does not mean that it concluded that she did not *initially orchestrate* the scheme to defraud and commit acts in furtherance of the scheme early in Celona's relationship with RWMC." *USM:Severance*: 8 (underlined emphasis original; italicized emphasis added). It claims that it is therefore entitled to argue at the retrial that she was involved in "the outset of the scheme." *Id.* at 11. But how is the jury to understand the difference between "conspiring" to devise a scheme (which cannot be re-litigated) and "initially orchestrating" that scheme, which allegedly can? The government does not say.

The difference between these two allegations is vanishingly thin. The trial court told the first jury that "the gist of a conspiracy is the *agreement" to commit a crime*. RW 10/2/06:176, *App. 32* (emphasis supplied). It went on: "The essence of conspiracy is *participating in a plan or scheme* to do something unlawful." *Id.* This is all but indistinguishable from "initially orchestrating" a scheme, which according to standard dictionary definitions means acting together at the beginning of an effort to achieve a goal.[7] Under any reasonable understanding of the English language, the acquittal of conspiracy *does* mean that the jury concluded that she did not "initially orchestrate the scheme to defraud …," to use the government's words. *USM:Severance*: 8-9.

The government gives not the slightest suggestion how this Court should instruct the jury to make a distinction which no one to date has been able to enunciate.

---

[7] According to *Miriam Webster Online Dictionary,* http://miriam–webster.com/dictionary:
- "Initial" means "of or relating to *the beginning*" (emphasis supplied);
- "Orchestrate" means to arrange or *combine* so as to achieve a desired or maximum effect" (emphasis supplied); and
- "combine" means "to act together."

Then there is *Sealfon, supra,* which the government does not address. Under *Sealfon,* the government is precluded from re-litigating any issue of fact necessarily decided in Ms. Driscoll's favor in the first trial. The government insists that there is no bar to supplementing a conspiracy charge with a parallel substantive count. *USM:Severance*: 8-9. This misses the relevant point. Ms. Driscoll does not argue that the second trial is precluded altogether because the conspiracy charge is inconsistent with the substantive charge. She can be tried as an abettor, predicated on her assistance to someone else's plan. The point is that, under *Sealfon, supra,* the government will be precluded from presenting against her those aspects of the case which were decided in her favor, specifically "participating in a plan or scheme to do something unlawful," to use Senior Judge Torres' words. RW 10/2/06:176, *App. 32*. "[C]ollateral estoppel need not apply to a whole count but instead can control a single element of a count or trial." *United States v. DeVincent,* 632 F.2d 155, 160 (1st Cir. 1980). Thus, the first acquittal will "delimit the scope of the evidence on retrial". *United States v. Marino,* 200 F.3d 6, 12 (1st Cir. 1999). And that in turn will further complicate this Court's responsibility to ensure that the jury considers only legally appropriate evidence.

**C. <u>Disparity in the Evidence</u>**

Here, too, the government's argument is wide of the mark. Even if evidentiary disparities do not "'by themselves'" justify severance (*USM:Severance*: 9, quoting *U.S. v. Cardascia,* 951 F.2d 474, 482 (2nd Cir. 1991)), those disparities do exacerbate other sources of confusion. The combined effect of all of these grounds for confusion is so great, and the confusion so likely to occur, that Ms. Driscoll's right to a fair trial is in jeopardy unless her case is severed from that of her co-defendant.

**D. <u>The Saylor Report</u>**

The government's core claim is that the Saylor Report is not exculpatory because, "[a]t the time that the Saylor report was authored, July 2, 1998, Driscoll and Urciuoli had already devised and were executing the scheme to defraud." *USM:Severance*: 10.[8] In the government's view, the report could not have caused Ms. Driscoll to believe the Celona contract was legal because she had already participated in a fraud on the Ethics Commission on whose report the Saylor Report relied. *Id.* at 11.

There are two problems with this argument, both fundamental. First, the first jury concluded Ms. Driscoll's was not involved in the inception of the alleged scheme when it acquitted her of conspiracy. Therefore, it is not true as a matter of law that Ms. Driscoll had already defrauded the Ethics Commission as of July 2, 1998.

Second, even if the first jury did not decide this issue adversely to the government, the question whether Ms. Driscoll did or did not defraud the Ethics Commission is for the second jury to decide, not for the government to assert as proven fact. If the jury decides she did not participate in any fraud on the Ethics Commission, then the Saylor report is highly exculpatory of the overall charge.

Finally, the government claims that the Report's conclusion concerning the legality of the Celona contract "removes this issue from the jury's hands." *USM:Severance*: 11. This is nonsense. This Report is admissible, not as opinion evidence concerning the legality of the

[8] The government begins its argument with a perfunctory claim that a decision on the admissibility of the Saylor Report is premature, citing the fact that Ms. Driscoll did not submit this report in the first trial and may decide not to do so in the second. *USM:Severance*: 10; *see also, id.* at 11 (claiming the need for the Report is speculative). In the first trial, which was joint, Mr. Urciuoli and Ms. Driscoll had to compromise on any number of evidentiary questions. Ms. Driscoll is asking this Court now to remove the tension between the two defenses by severing the cases. If the Court defers the decision on admissibility and ultimately decides that this report is admissible for Ms. Driscoll but inadmissible against Mr. Urciuoli, a mistrial is likely and then all parties will be in the unfortunate position of having to begin the litigation for yet a third time.

Celona contract, but rather as one of the circumstances of which Ms. Driscoll was aware that contributed to her state of mind at the relevant time. *See* F.R. Evid. 704 (opinion testimony is not objectionable because it embraces the ultimate issue to be decided by the jury unless it is expert opinion as to defendant's state of mind).

## III. <u>Striking Portions of the Indictment</u>

Although the government makes a number of concessions in response to Ms. Driscoll's motion to strike, the remaining allegations of the *Indictment* continue to be both confusing and inconsistent.

*First,* the government agrees to strike the portions of ¶¶20 (charging conspiracy) and 102 (charging mail fraud) which allege that the conspiracy/scheme was deceptive because Ms. Driscoll failed to disclose Celona's relationship with RWMC. *United States' Memorandum in Support of Its Objection to Defendant Frances Driscoll's Motion to Strike Certain Allegations from the Indictment or, In the Alternative, to Preclude Submission of the Indictment to the Jury* (*USM:Indictment*) at 4-5. In so doing, it appears to acknowledge that state ethics laws place the disclosure obligation on Celona, not on the people with whom he does business. Yet, at the same time, however, as noted *supra,* the government retains the language of ¶98, which embodies its alternative theory of the willful non-disclosure/concealment of Celona's relationship with Roger Williams. It also reiterates ¶100's allegations that as a "Means and Method of the Scheme," Ms. Driscoll "knowingly and willfully failed to disclose to the public" that Celona was paid for his political support (*USM:Indictment*: 5-6, quoting ¶100). And it does so while simultaneously arguing that this Court should not tell the jury that Ms. Driscoll had no legal duty whatever to make this disclosure. *See USM:Instructions*. This approach is confusing to the point of being misleading, all to the detriment of the defendant.

The government also claims, without precedent or reasoning, that the conspiracy acquittal "does not mean that [Ms. Driscoll's] participation in the scheme commences after the consulting agreement was finalized and after the April 4, 200[6] letter to the Ethics Commission…", asserting as fact that the jury did not conclude that Ms. Driscoll "initially orchestrated" the scheme. As argued *supra,* this argument fails as a matter of basic linguistics.

Most important, the government neither addresses nor cites *Sealfon v. United States,* 332 U.S. 575 (1948). In *Sealfon,* the United States Supreme Court prohibited later litigation of facts necessarily decided by a previous conspiracy acquittal. Those facts are embodied here in ¶99 (alleging that "Driscoll … caused the Village to enter into a consulting agreement with Celona…") and ¶102 (alleging that she deceived the public by her activities in relation to the Ethics Advisory request). The government does not discuss these paragraphs, but instead takes refuge in the accurate but unhelpful generalization that a conspiracy acquittal is no bar to subsequent litigation of substantive mail fraud. *Id.* at 9-10. This may be so but it does not answer the problem posed here.

Respectfully submitted,
Frances P. Driscoll
By her attorneys,

/s/ John A. MacFadyen

John A. MacFadyen (#1209)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
401-751-5090

Kevin Bristow, Esq. (#3984)
76 Westminster Street
Providence, RI 02903
401-521-8000

Larry Tipton, Esq.
*Pro Hac Vice Counsel*
Law Office of Larry Tipton
One Center Plaza, Suite 220
Boston, MA 02108
617-227-1308

**CERTIFICATION**

I hereby certify that on the 7th day of July, 2008, a copy of this Memorandum was filed electronically and that it is available for viewing and downloading from the Court's ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ John A. MacFadyen