# APPENDIX

PART 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**************** C.R. NO. 07-009ML
*
UNITED STATES OF AMERICA *
*
VS. * MAY 12, 2008
* 9:00 A.M.
JOHN R. KRAMER and *
CARLOS ORTIZ *
*
**************** PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,
CHIEF JUDGE

(Jury Trial)



APPEARANCES:
FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT,
KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903
DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT,
ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896
ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903
THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903



INDEX


| GOVERNMENT WITNESS | PAGE |
|---|---|
| John Fegan | |
| Direct Examination by Mr. Dambruch. | 103 |
| Cross-Examination by Mr. DiBiase | 119 |
| Cross-Examination by Mr. Kiley | 148 |


EXHIBITS

| DEFENDANT KRAMER | FOR ID | IN FULL |
|---|---|---|
| M-5 | 132 | |
| N-5 | 132 | |
| O-5 | 132 | |
| U-5 | 145 | |
| W-5 | 135 | |
| X-5 | 146 | |
| Y-5 | 135 | |



12 MAY 2008 – 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning. Members of the jury, before we begin, I need to ask a question of you. If you have an affirmative, that is, a yes, response to the question, I'll ask you to please raise your hand.

If you'll recall last week when we were going through the voir dire, which is jury selection, I told each of you to refrain from listening to or reading any news accounts about this case.

And I understand that sometimes it's hard to completely disregard or ignore something; and I wonder if in the past week, that is, since you were last here, any of you have seen, heard or read any news account involving this case. If you have, I ask you now to please raise your hand. Very good.

And I'll remind you that throughout this trial you must refrain from listening, reading or watching any news accounts involving this case.

If you would, please, now stand and raise your right hands.

(Jury sworn)

THE COURT: You may be seated. Members of the jury, before we begin with preliminary instructions which will help you understand the evidence as it's

Section 1346 of Title 18 defines a scheme or artifice to defraud as including a scheme or artifice to deprive another of the intangible right of honest services.

To sustain its burden of proof on a charge of mail fraud, the Government must prove each of the following elements beyond a reasonable doubt to each Defendant so charged: First, that a scheme to defraud existed substantially as charged in the Indictment; second, that the Defendant knowingly and willfully participated in this scheme with the intent to defraud; and third, that in furtherance of the scheme, the Defendant used or caused the use of the United States mail on or about the date alleged in the Indictment.

The Government may prove that a Defendant had an intent to defraud the public of former Senator Celona's honest services in two ways. The first way is through a bribery-like relationship, that is, that the Defendant gave former Senator Celona a financial benefit with the intent to influence his official actions.

The second way is through proof of a concealed conflict of interest, that is, that former Senator Celona engaged in undisclosed and biased decision making for his personal gain and that the Defendant



intended that he do so.

In order to determine if a Defendant intended to deprive the public of Senator Celona's honest services, you must consider Rhode Island law. In this regard, you should know that legislators in this state serve only part time and that Rhode Island state law permits them to hold jobs working for private entities.

Under Rhode Island state law, private citizens or entities who have hired a legislator may communicate with that legislator about legislation that would affect them, and under certain circumstances that legislator may act on such legislation.

Now I'll return to Count I, the conspiracy charge. Count I alleges that the Defendants, Kramer and Ortiz, in violation of Title 18, Section 371, engaged in a conspiracy to commit honest services mail fraud.

The Indictment alleges that from a time unknown but from at least in or about May of 1999 and continuing until in or about -- from in or about December 2003, in the District of Rhode Island and elsewhere, Defendants Kramer and Ortiz knowingly, willfully and unlawfully combined, conspired, confederated and agreed with each other and with John Celona to commit an offense against the United States,



specifically having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment and for the purpose of executing that scheme and artifice to knowingly and willfully cause to be placed in an authorized depository for mail according to the directions thereon to the person to whom it was addressed matter to be delivered by the United States Postal Service in violation of Title 18, Sections 1341 and 1346.

To sustain its burden of proof as to the offense charged in Count I, the Government must proof each of the following elements beyond a reasonable doubt as to each Defendant:

First, that the agreement as set forth in the Indictment and not some other agreement existed between two or more persons; second, that the Defendant knowingly and willfully joined in that agreement; and third, that one of the conspirators committed at least one of the overt acts set forth in the Indictment in an effort to further the purpose of the conspiracy.

I now turn to Count XXIII. Count XXIII charges



that the Defendants committed federal program bribery in violation of Title 18, Sections 666(a)(2) and 2. The Indictment alleges that for each of the years 1999, 2000, 2001, 2002 and 2003, the State of Rhode Island received benefits in excess of $10,000 per year from federal programs involving grants, contract subsidies, loan guarantees, insurance and other forms of federal assistance.

From in or about May 1999 through in or about December 2003, in the District of Rhode Island and elsewhere, Defendants Kramer and Ortiz did knowingly and corruptly give, offer and agree to give something of value to any person with the intent to influence and reward an agent of the State of Rhode Island in connection with the business, transaction, and series of transactions of such government and involving something of value of $5,000 or more, namely, Defendants Kramer and Ortiz, as executives of CVS, caused CVS to make approximately $45,000 in payments and to provide other things of value to John Celona, a Rhode Island state senator and an appointed Senate member of the Rhode Island Student Loan Authority, to influence and reward him in connection with the business and transactions of the Rhode Island Senate concerning freedom of choice, pharmaceutical returns,

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

*************** C.R. NO. 07-009ML
*
UNITED STATES OF AMERICA *
*
VS. * MAY 30, 2008
* 9:00 A.M.
JOHN R. KRAMER and *
CARLOS ORTIZ *
*
*************** PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,
CHIEF JUDGE

(Jury Trial)



APPEARANCES:
FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DIBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903
DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896
ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903
THOMAS R. KILEY, ESQ.
Cosgrove Eisenberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903



30 MAY 2008 -- 9:00 A.M.

(The jury is not present for the following)

THE COURT: Before we bring the jury in, I understand, Mr. Fein, you wanted to place something on the record outside the presence of the jury.

MR. FEIN: Thank you, your Honor. We actually have two quick things, one regarding the rebuttal by Mr. Dambruch yesterday, and then Mr. Corrigan would like to address one matter on the instructions.

In addition to asking the jury to find guilt based on innocent conduct, such as PAC contributions, Mr. Dambruch in the rebuttal did something that was emblematic of the prosecution'S improper and prejudicial use of John Celona throughout this trial.

One of the last things Mr. Dambruch said to the jury was to suggest that there could have been some confusion as to what event it was where Mr. Kramer approached John Celona to first discuss the consulting relationship.

This is another instance of the prosecution asking the jury to find what the clear record does not support. Faced with documentary evidence as reviewed in my summation that Mr. Kramer was not even in Rhode Island on the night of the McCaffrey fundraiser, Mr. Dambruch tried to change John Celona's story.



Mr. Dambruch knew that John Celona had never been confused on this point of the first meeting, and he did not ask John Celona if he could have been confused during the testimony because he knew what the answer would be.

In the direct testimony, John Celona testified that he vividly recalled the discussion with Mr. Kramer at the McCaffrey fundraiser. And all of the prior testimony, all of the 302s, all of the agents' notes are very clear about that.

But Mr. Dambruch tried to suggest on rebuttal that it could have happened at Celona's own fundraiser a few days earlier, but John Celona has rejected that suggestion previous to this trial.

In agents' notes, John Celona said, I don't recall seeing Kramer at essentially his fundraiser. In a 302 from 2007, John Celona said he did not recall Kramer attending the fundraiser.

And nonetheless, Mr. Dambruch suggested that during rebuttal, it's something on direct examination that John Celona said he vividly recalled happening at the McCaffrey fundraiser, and we were given no opportunity to rebut that.

THE COURT: I understand you placed it on the record, but what relief are you seeking?

voluntarily and intentionally and with the specific intent to do something the law forbids, that is to say with bad purpose, either to disobey or disregard the law. Thus, if a Defendant acted in good faith, he cannot be guilty of the crime alleged.

To act with an intent to defraud means to act willfully and with the specific intent to deceive or cheat. Thus, a Defendant who acted in good faith cannot be guilty of the crime.

The burden of proving intent, as with all other elements of the offense, rests with the Government. The Government must prove both of the following types of intent beyond a reasonable doubt:

First, that the Defendant intended to cause the public official to deviate from the honest performance of his public duties and, second, that the Defendant intended to deceive the public.

The Government may prove the first kind of intent, that is, the intent that John Celona deviate from the honest performance of his public duties, in either of two ways.

First, the Government may seek to prove beyond a reasonable doubt that the Defendant intended the payments or other things of value provided to John Celona to cause him to alter his official acts, to



change a position which he would otherwise have taken, or to take official actions that he would not have taken but for the payments or other things of value.

A Defendant is guilty of honest services fraud under this theory only if the Government proves beyond a reasonable doubt that the Defendant intended to improperly influence or otherwise improperly affect John Celona's performance of his public duties and thereby to deprive the public of John Celona's honest services.

The second way in which the Government may seek to prove a Defendant's intent to deprive the public of the honest services of John Celona is to seek to prove beyond a reasonable doubt that the Defendant intended for John Celona to fail to disclose a material conflict of interest.

In order to find that a Defendant acted with such intent, the Government must prove that the Defendant believed that a material fact existed and intended for John Celona to fail to disclose that conflict of interest and thereby to deprive the public of John Celona's honest services.

Under each of the approaches above, in determining whether a Defendant intended that John Celona deviate from the honest performance of his



public duties, you must consider Rhode Island state law which, in part, defines those duties. I will instruct you on Rhode Island state law in just a moment.

When considering whether the Government has met its burden of proving that the Defendants acted with the intent that John Celona deviate from the honest performance of his public duties, I instruct you that certain forms of intent are not sufficient.

For example, the intent to gain access to a public official in and of itself does not constitute an intent that the official deviate from the honest performance of his duties, nor does the intent to cultivate business or political friendship with a public official.

Providing political donations, hospitality or entertainment, such as lodging, golf, sports events and the like, does not constitute honest services fraud if the Defendant intended to gain access to the public official or cultivate a business or political friendship with the official without any improper purpose or intent.

In this case, the Indictment charges that the Defendants intentionally engaged in a scheme to deprive the citizens of Rhode Island of the honest services of John Celona, a Rhode Island state legislator.



In order to understand the nature of the honest services owed by a Rhode Island state legislator and determine whether the Defendants intentionally engaged in a scheme to deprive the citizens of Rhode Island of the honest services of John Celona, you must consider Rhode Island state law.

In this regard, I should tell you several things about Rhode Island's system of government and laws regarding its state legislators.

The State of Rhode Island's legislature, which is called the Rhode Island General Assembly, is what is known as a citizens' legislature. This means that, unlike, for example, members of the United States Congress who work full time as legislators, Rhode Island state legislators are members of the community who serve only part time in the state legislature and are paid only modestly for their work as legislators.

Accordingly, Rhode Island state law permits legislators to hold jobs outside the legislature.

This concept of a citizens' legislature, which has been adopted by Rhode Island as well as various other states in the country, often results in situations where a certain piece of legislation under consideration could affect the interests of an entity for whom a legislator works.

Under certain circumstances, legislators can still participate in such legislation. Specifically, Rhode Island state law contains a provision known as the class exception.

This provision expressly permits a legislator to take action on legislation that would affect a private entity for whom the legislator works as long as the legislation would affect that entity to no greater extent than any other similarly situated entities.

This is referred to as the class exception because it applies when proposed legislation treats a class of entities, such as all teachers or pharmacies, alike.

Under Rhode Island state law, the legislator is the one who is responsible for identifying any actual or potential conflict of interest, determining whether such a conflict, if one exists, needs to be disclosed and determining whether under all circumstances he or she is permitted to participate in legislation.

In this regard, legislators are permitted by Rhode Island state law to seek guidance and approval from a public body called the Rhode Island Ethics Commission, but Rhode Island state law does not require them to seek such guidance or approval.

A public official who seeks guidance from the



Ethics Commission may do so by making a request in writing. The Ethics Commission also provides oral advice in response to oral inquiries from public officials.

The Ethics Commission, an independent public agency created by amendment to the Rhode Island state Constitution, adopts, enforces and administers Rhode Island's Code of Ethics which governs the conduct of its public officials, including legislators.

Rhode Island state law does not prohibit private citizens or entities who have hired a legislator from communicating with that legislator about legislation that might be of interest to them.

Again, it is the legislator's responsibility to determine whether or not he may participate in legislation that would affect the entity with whom he has a business relationship and not the private citizen's responsibility to make that determination or to refrain from communicating with the legislator about any such legislation.

Although I have given you this instruction on Rhode Island state law, you are not to determine whether or not Rhode Island state law has been complied with here.

You are here to decide whether or not the



Government has proven beyond a reasonable doubt all of the elements of the crimes charged against the Defendants.

The Government may prove the second kind of intent, that is, that the Defendant intended to deceive the public concerning his conduct, either through the Defendant's own acts of deception towards the public or the Defendant's efforts to ensure the official deceived the public with respect to the payments to the official.

Evidence that the Defendant intended to cause the official intentionally to fail to disclose material information about payments to that official is sufficient to show that the Defendant intended that the public be deceived with respect to the Defendant's alleged payments to the official.

Under this element, the Government must prove that the Defendant intended to deceive the public about the payments to Celona. Thus, proof that Celona acted under a material conflict of interest alone is not sufficient to prove honest services mail fraud unless you also conclude that the Defendant intended for any such conflict to be concealed from the public.

At bottom, the Government must present sufficient evidence to establish a Defendant's intent



that the public be deceived with respect to payments to the public official.

Intent or knowledge may not ordinarily be proven directly because there is no way of directly scrutinizing the workings of the human mind.

In determining what the Defendant knew or intended at a particular time, you may consider any statements made or acts done or omitted by the Defendant and all other facts and circumstances received in evidence that may aid in your determination of the Defendant's knowledge or intent.

You may infer, but you certainly are not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

It is entirely up to you, however, to decide what facts are proven by the evidence received during this trial.

The use of the mails in furtherance of the scheme is an essential element of the offense of mail fraud. The use of the mails itself need not be false or fraudulent.

It is not necessary that the Government prove all of the details alleged in the Indictment concerning the precise nature and purpose of the scheme or that

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 06-02T

UNITED STATES OF AMERICA *

VS. * SEPTEMBER 14, 2006
9:15 A.M.

ROBERT A. URCIUOLI, et al *

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

Q. Mr. Celona, do you see 172 on your screen?
A. Yes, sir.
Q. And what is 172, Mr. Celona?
A. It's a report of activities from February 1998 through May of 1998.
Q. Why did you -- is this a document that you created?
A. Yes, sir.
Q. And why did you create that document?
A. At the direction of Fran Driscoll because she showed -- she told me that she wanted to have some justification for the Board at Roger Williams Medical Center.
Q. And the document states that it's reported activities for February 1998 to May 1998. Do you see that?
A. Yes.
Q. And what's the first thing that you listed for that time period as your activities during that time frame?
A. Research entire amount of legislation filed; determine bills that pertained to hospitals, catered retirement living, nursing homes and assisted living.
Q. And why did you research and determine bills that pertained to hospitals?

7

A. Because Fran told me to.
Q. When did she tell you to do that?
A. Prior to that and during that period of time through --
Q. I'm sorry.
A. Through the calls and the faxes and the -- I didn't have e-mail then, but. . .
Q. Let me take you back to Government's 118, the contract that you signed. The consulting agreement, what did the consulting agreement tell you you were to do in regards to legislative issues?
A. Keep abreast of legislative issues and regulations at local, state and federal levels that could impact the Village, delivery of care with particular emphasis on efforts to regulate or license assisted living facilities.
Q. And Government 172, what did you actually do?
A. I researched -- in addition to that, I researched legislation that dealt with hospitals, also.
Q. When you started working in February, did you have any discussions with Fran Driscoll about what to do in regards to work for the Village?
A. No.
Q. Did she tell you to go to the Village and get training on their services?

8

A. I voted for it.
Q. Why did you vote for it, Mr. Celona?
A. My mother died of cancer.
Q. And did you tell Frances Driscoll that you had voted for it?
A. No.
Q. Why not?
A. She was so adamantly against the bill, I was concerned that I would lose my job.
Q. If she was adamantly against it, why didn't you --
MR. EGBERT: Judge, could we have a time frame for this conversation?
Q. When did that take place?
A. I believe it was the year after, if memory serves me correctly.
Q. And what happened?
THE COURT: I don't think there was any conversation. I'm not sure which conversation you're referring to, Mr. Egbert, but he said that he never told her. Were you talking about another conversation?
MR. EGBERT: I'm sorry, Judge, when he supposedly voted on this bill.
Q. When did you vote on the bill, Mr. Celona?
A. I believe it was the year after.
Q. And --

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 06-02T

UNITED STATES OF AMERICA *

VS. * SEPTEMBER 15, 2006 8:30 A.M.

ROBERT A. URCIUOLI, et al *

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

10

that was favorable to Landmark?
A. No.
Q. Was she still your boss?
A. No.
Q. Who became your boss after that?
A. Bob.
Q. Robert Urciuoli?
A. Yes, sir.
Q. And after Frances Driscoll left, did you continue to send documentation to Robert Urciuoli about legislation like you had with Frances Driscoll?
A. Yes.
Q. And had you done so on occasion in the past as well?
A. Yes.
Q. And shortly after Frances Driscoll or at some point after -- let me back up. At some point in 2000, was your consulting agreement revised?
A. Yes, sir.
Q. You had been working there for a couple of years; is that correct?
A. Yes, sir.
Q. And how did it come about that your consulting agreement was revised?
A. I asked that it be revised.

11

Q. Did you ask for a raise?
A. Yes.
Q. Who did you first ask for a raise?
A. Bob.
Q. What did you say to Robert Urciuoli?
A. I said if it was possible, I would like a raise.
Q. Did you explain to him why you wanted a raise?
A. Yes.
Q. What did you say to him?
A. I felt that I was doing my job and working hard and doing everything that they had wanted me to do and felt it was justified.
Q. And when you asked Robert Urciuoli for a raise, did he ask you for any data or information about the work that you had been doing for the Village at Elmhurst?
A. No, sir.
Q. Did he ask you for any information about how many referrals you had made to the Village at Elmhurst?
A. Not at that time, no.
Q. Did he ask you for information about referrals you had made to Elmhurst Extended Care?
A. No.
MR. MATOS: If I could move, your Honor, 417 full.

12

THE COURT: 417 may be admitted as a full exhibit.

(Government Exhibit 417 was admitted in full)

MR. MATOS: If I could publish page 2 of that exhibit, please, your Honor.

Q. Do you see that document, Mr. Celona?
A. Yes, sir.
Q. Is it a letter from Peter Sangermano forwarding to you the revised consulting agreement?
A. Yes.
Q. It's dated October 16, 2000?
A. Correct.
Q. Had you gone to Peter Sangermano and asked him for a raise?
A. No.
Q. Had you had discussions with Peter Sangermano about revising your consulting agreement?
A. Me personally, no.
Q. What do you mean by not personally?
A. I went to Bob.
Q. Why didn't you go to Peter Sangermano?
A. I considered Bob my boss.
Q. Did Peter Sangermano call you about this matter in any way?
A. No.

Q. You exercised your independence; right?
A. Not in all cases.
Q. Sometimes?
A. Sometimes.
Q. And then you testified that Fran Driscoll was your boss, Bob Urciuoli was your boss; right?
A. Yes.
Q. Peter Sangermano was your boss; right?
A. Fran and Bob more so.
Q. But Peter, too; right?
A. Yup.
Q. Diane; right?
A. Not so much. I never mentioned that.
Q. And that there's three more people out there that basically you do whatever they tell you; right?
A. You're talking the three --
Q. Yeah. You do whatever they tell you; right?
A. Regarding their interest.
Q. Whatever they tell you, you do?
A. Except my vote on the cancer bill.
Q. Except your vote on the cancer bill. We're going to get to that. Basically everything they tell you, you do; right?
A. I worked for them.
Q. Everything they tell you, you do?

A. I worked for them.
Q. Okay. Do you do everything they tell you? Yes or no?
A. I worked for them.
Q. Do you do everything they tell you? Yes or no?
A. Everything except the cancer bill.
Q. Everything except that. And did you tell them, did you say to them, Hey, I'm not going to exercise any independent judgment in my life with you? Did you tell them that?
A. No.
Q. Did you tell any -- strike that. Did Bob Urciuoli ever tell you to keep your interest with Roger Williams Medical Center secret? Did he ever tell you that?
A. I can't recall.
Q. You can't recall? That would be a pretty important thing to remember, wouldn't it?
A. Do you want me to tell you the truth?
Q. Well, okay. When's that going to start?
MR. EGBERT: I apologize, Judge.
THE COURT: The jury will disregard the last comment.
A. I'm trying to be professional. I wish you would, too.
Q. I'm asking you a question. You have been briefed,

15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 18, 2006<br>9:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

16

Q. And you did. It told you to research about assisted living; right?

A. Yes, sir.

Q. And you did?

A. Yes, sir.

Q. And it told you to talk to people about the Village at Elmhurst, and you did; right?

A. Yes.

Q. And it told you to go out and try to promote the Village at Elmhurst among seniors, and you did; right?

A. Yes.

Q. That was what you contracted to do, and that's what you did; right?

MR. MATOS: Objection, your Honor.

THE COURT: Overruled.

A. Can I --

THE COURT: Overruled. You may answer.

A. I did, but I wasn't contracted to do things for Roger Williams Medical Center.

Q. We'll get to that. First let's get -- but we do agree now at least on this, that you had a contract with the Village and you performed your contract; correct? Right?

A. Yes.

Q. Okay. So -- and you did it to the best of your

17

abilities in good faith and honestly; right?
A. Tried.
Q. No question about that?
A. Glad you're calling me honest now.
Q. No question about that; right?
A. Right.
Q. And so with regard to all this stuff we heard for three days about I did it on my own, I did it on my own, I did it on my own, what you did is perform under the contract as agreed; right?
MR. MATOS: Objection, your Honor.
THE COURT: Overruled. If that's not right, you can say so.
A. That's not right. I did it with no direction, independent research, independent visits, independent requests to get people to come to places, to speak about the Village without any request whatsoever or guidance or even an official first day regarding my employment with the Village at Elmhurst.
MR. EGBERT: Your Honor, I'm going to just put my copy on for now, if I may, of the contract.
Can I have the ELMO, please. Thank you.
Q. Your responsibilities on the contract that you signed began with that you were to become knowledgeable with all aspects of the quality of care provided by

18

contract, did you?

MR. MATOS: Objection, your Honor.

THE COURT: Overruled.

Q. Did you?

A. Excuse me? Explain the question.

Q. You didn't go and sell your vote with regard to that contract, did you?

A. No, you're wrong.

Q. Oh, you did?

A. I did things for Roger Williams.

Q. What vote did you sell?

A. Specific votes?

Q. Yeah. What vote did you sell?

A. There were more than specific votes.

Q. What vote did you sell?

A. I can't give you exact votes standing here. There are thousands of votes, but I can --

Q. That's the essence -- sir, that's the essence of the issue here, isn't it?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

Q. Well, let's see if we can juxtapose something, and that is you took a bribe from CVS; right?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 19, 2006<br>9:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

20

Ethics Commission said you could do with regard to general health care bills?

A. It was my understanding that the Ethics Commission said I could not participate on specific bills that were dealing with anyone that was paying me.

Q. What? Did you understand the Ethics Commission --

A. The Ethics Commission --

Q. Please.

THE COURT: Let him finish the question, and then you can answer.

Q. Did you understand the Ethics Commission bill to say that you could deal with general health care legislation? Yes or no?

A. General health care legislation, but it also -- explanation?

THE COURT: That may not be required, a yes or no answer, Mr. Egbert, as long as it's responsive to the question. Read the question back to Mr. Celona.

(Pending question read)

A. To deal with general health care legislation?

Q. To participate and vote on general health care legislation.

A. To participate and vote?

Q. To participate --

A. That's what you're saying? That's the word I was

21

looking for.

Q. To participate and vote.

A. And you're saying did I understand that to mean to participate and vote? Is that what you're saying?

Q. Did you understand the Ethics Commission opinion to say that you could participate -- fully participate and vote on broad-based legislation involving general health care issues of public interest?

A. If that's what it says.

Q. Do you know what it says? Does it sound familiar to you?

A. Yeah, it sounds familiar to me, but you're leaving out a significant part.

Q. I'm leaving out a significant -- what's the significant part I'm leaving out?

A. Roger Williams was paying me.

Q. Pardon me?

A. Roger Williams was paying me.

Q. And why is that significant to you?

A. Because it was a conflict of interest.

Q. Okay. And let's just break that down for a minute. Roger Williams Medical Center owned a percentage of the Village, didn't they?

A. I didn't know that they owned a percentage.

Q. But now you know they do; right? Forget what you

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 06-02T

UNITED STATES OF AMERICA *

VS. * SEPTEMBER 20, 2006
9:30 A.M.

ROBERT A. URCIUOLI, et al *

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

23

Mr. Celona was to keep abreast of legislative issues that could impact the medical center?
A. Yes.
Q. Did you understand the medical center to be Roger Williams Medical Center?
A. Yes.
Q. And did it indicate to whom Mr. Celona was to report?
A. Senior vice president, external affairs.
Q. And who was that?
A. Fran Driscoll.
Q. And what was your understanding for whom this job description had been prepared?
MR. CONNOLLY: Objection. Foundation.
THE COURT: Sustained.
Q. Did you have an understanding of who the intended -- let me try to rephrase that. Did you have a meeting with Robert Urciuoli and Frances Driscoll where he said -- where he told you to go and get it done? Correct?
A. Correct.
Q. And then Frances Driscoll sent you Government Exhibit 81, which was the draft job description; correct?
A. Correct.

Q. You said this was your first -- basically your first draft; is that correct?

A. Yes, I believe so.

MR. MATOS: Miss Anderson, if you could call out the part of the document that says "consulting responsibilities" and then "objective."

Q. Do you see that, Mr. McGuirk?

A. Yes.

Q. The first document that Frances Driscoll prepared indicated that the objective was to work for Roger Williams Medical Center; is that correct?

A. Correct.

Q. And the first document that you prepared states that the objective is to heighten awareness amongst seniors (the elderly) of the greater Providence community as to the programs and services available at the Villages at Elmhurst and Waterman Lake. Do you see that?

A. Yes.

Q. Who made that change from Roger Williams Medical Center to Villages?

A. I did.

Q. And why did you make that change?

A. Because I thought that Fran had it wrong. I didn't know why she put the medical center in there.

Our entire conversation with Bob, we didn't have any place to use Senator Celona except the Village at Elmhurst to exploit his elderly relations.

So I changed all the references to the medical center to Village at Elmhurst, and we added Waterman Lake.

Q. And that was based on your understanding of what the relationship was supposed to be; is that correct?

A. That's correct.

Q. And you obtained that understanding from whom?

A. From Bob.

Q. And it indicates services available at the Villages at Elmhurst and Waterman Lake; right?

A. Yes.

Q. Why did you include -- let me back up. Was Waterman Lake part of Roger Williams Medical Center?

A. No.

Q. Was there any financial relationship between Roger Williams Medical Center and the Village at Waterman Lake?

A. Business relationship? I mean, I can explain the relationship. We -- I think that's how Bob became familiar with Mr. Sangermano, is that the Village at Waterman Lake was the first of this type in our service area, assisted living.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.R. NO. 06-02T

UNITED STATES OF AMERICA *

VS. * SEPTEMBER 29, 2006 2:00 P.M.

ROBERT A. URCIUOLI, et al *

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Rule 29 Motions)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

27

If the Defendants engaged in a scheme to pay Senator Celona money to use his office for the benefit of Roger Williams or to commit acts in the -- under the authority of his office that benefited Roger Williams rather than disinterestedly representing the interests of the citizens that he represented, it doesn't matter whether Senator Celona exaggerated the things that he claims to have done in furtherance of the conspiracy, which it seems to me he clearly did, or even whether he misrepresented or lied about some of those things, and certainly there's some reason to think that he may have done that as well.

The important thing, though, is whether there was a conspiracy that existed to have him act in his official capacity on behalf of Roger Williams or in a manner that benefited Roger Williams and/or its affiliates in exchange for the compensation that he was receiving under the consulting agreement. It doesn't matter if the scheme was successful or not or the degree to which it was successful.

Furthermore, if the Defendants engaged in a scheme to pay Senator Celona for using his office in a way to benefit Roger Williams or its affiliates, it doesn't matter whether he was employed by the Village at Elmhurst or by Roger Williams itself or by any of

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * C.R. NO. 06-02T
*
UNITED STATES OF AMERICA *
*
VS. * OCTOBER 2, 2006
* 9:30 A.M.
ROBERT A. URCIUOLI, et al *
*
* * * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

29

It's a memorandum from John Celona to Frances Driscoll updating her on the rescue run issue and handwriting from Frances Driscoll. Karen, tell him to hold. I want to talk to Robert Urciuoli.

They were talking about this, ladies and gentlemen, but they weren't talking about stopping him. They were talking about using him.

And, ladies and gentlemen, let me explain something to you about the virtue of the legislation. It doesn't matter if Roger Williams Medical Center had a good reason or a bad reason to oppose certain legislation. It doesn't matter if they thought that they were right.

You can't hire a state senator to be your in-house legislative errand boy just because you think you're right and everyone else is wrong, just because you want your interests to be first above everyone else's interest, ladies and gentlemen. So whether there was virtue to the rescue run argument or not, they are improperly using John Celona.

If we could go to Government 122, Miss Anderson, Senate Bill 2796. I'm sorry, 137. If you could call that out.

This was a bill that dealt with the Hospital Conversion Act. It was testified to you it would

Center and its affiliates and/or the Village Retirement Communities and its affiliates.

And also the Indictment charges that a further object of the alleged scheme was to deceive the citizens of Rhode Island concerning Senator Celona's relationship with Roger Williams Medical Center in order for Senator Celona to continue to promote the political interests of Roger Williams Medical Center and its affiliates and the Village Retirement Communities and its affiliates.

And as I've indicated to you, either of those objectives would be sufficient to establish a fraudulent purpose.

However, you cannot return a guilty verdict unless all of you agree that the Government has proved that the alleged scheme had one or both of those objectives. Those are the objectives charged in the Indictment.

If you find that the Government has proven only one of those objectives, you cannot return a guilty verdict unless all of you agree which objective has been proven.

In other words, you can't return a guilty verdict if some, but not all, of you conclude that the only objective of the alleged scheme was to pay

at some time during the existence of the conspiracy, one or more of the members of the conspiracy knowingly performed at least one of the overt acts described in the Indictment in order to further or advance the purposes of the conspiracy.

Now, before I go further in explaining to you what a conspiracy is, I want to tell you it's important to remember that a conspiracy to commit a crime and actual commission of the crime are two separate and distinct offenses.

The gist of the offense of conspiracy is the agreement to violate the law or commit a crime. So one may be guilty of conspiracy even though the crime that was the object of the conspiracy was never committed. In this respect, it differs from aiding and abetting, which I'll explain a little further later.

The essence of the offense of conspiracy is participating in a plan or scheme to do something unlawful. And, therefore, one who participants in a conspiracy may be guilty even though the goal of the conspiracy was never accomplished.

In order to establish that a conspiracy existed, there must be proof that the alleged members of the conspiracy reached a mutual agreement or understanding to try and accomplish some unlawful purpose, but proof

## Elderly Outreach Activity

4/6/98: Pilot program for RWMC's on-site physician agenda at Centerdale Manor. G-135,G-150.

4/15/98: RWMC's US TOO "Politics of Prostate Cancer" support group. G-155,G-172.

5/21/98: Woonasquatucket Valley Rotary Club. G-172.

5/27/98: "Day of Seminars and Demonstrations for Healthy Living" at Village at Waterman Lake. G-171.

6/4/98: Teamster retirees meeting. G-173.

6/14/98: North Providence Fraternal Order of Police Associates. G-177.

6/16/98: North Providence Lions Club. G-177.

6/18/98: Meeting re mailing letters to Centerdale Manor residents. G-177.

6/23/98: Meeting with Karen Testa (Executive Director of Senior Center). G-179.

6/29/98: Village's "Musical Concert on the Lawn." G-191.

8/9/98: Chocolate Sundae event at Village. G-209.

8/11/98: Blood screening program for Centerdale Manor residents. G-209.

8/25/98: Alzheimer's Association Memory Luncheon at Village. G-209.

8/31/98: Meeting re physicians' visits. G-210.

9/17/98: Village event re "Eating for Life." G-216.

9/18/98: Centerdale Manor home visits. G-216.

9/23/98: Educational forum on long-term care insurance and assisted living at Salvatore Mancini Center. G-216.

10/29/98: Village's second annual fashion show. G-216.

2/16/99 TV interview with Village presenters Linda Gershon and Dr. Stukides on "For Your Health" show. U-K(5).

2/22/99: Brook Village physician home visit presentation. G-269.

7/15/99: Village's second annual summer barbeque. G-318.

1/29/00: Referral of prospective resident. S-N(6); S-O(6).

2/8/00: Referral of prospective patient. S-N(6); S-O(6).

3/1/00: Village fashion show. S-N(5).

4/7/00: Village's jewelry show. S-O(5).

4/19/00: Project Blueprint Health Care Forum. G-383, 385.

5/2/00: Elmhurst spring breakfast. S-Q(5).