UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

Case No. 07-1327

---

UNITED STATES OF AMERICA,

Appellee

v.

FRANCES P. DRISCOLL,

Appellant

RECEIVED AUG - 8 2007 U.S. DISTRICT

---

# BRIEF OF APPELLANT FRANCES P. DRISCOLL

---

John A. MacFadyen, Esq. (#13514)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
(401) 751-5090

Attorney for Frances P. Driscoll

(EXHIBIT 1)

work on general health legislation, he felt it was wrong "[b]ecause it was a conflict of interest." 9:10-11.

## V. SUMMARY OF THE ARGUMENT

This appeal concerns core elements of honest services fraud. The "fraud" portion of this crime, limned in *Sawyer/Woodward* trilogy, is now well-established: it is fraud to pay a legislator for a specific official act (bribery); it is fraud to pay him/her for an ongoing sequence of favorable official acts (quasi-bribery); and it is fraud to cause a legislator to fail to make material disclosures to the public, resulting in personal gain.

The "honest services" component of the crime is less certain. This Court has yet to address the ambit of this term when the alleged conduct falls outside the fraud heartland. Is it a "deprivation of honest services" if a third party seeks official action by a legislator who s/he knows has a conflict of interest? The indictment charged that it was, and the trial court's instructions permitted convictions on this basis. Yet the court refused to inform the jury of terms of Rhode Island law which *expressly permits* a legislator to act on proposed legislation so long as the conflict is no greater than that shared by his/her occupation at large.

This was prejudicial error. The question as to when and whether conflictful public activity is "honest" or "dishonest" must be determined by reference to state

ethics rules, not to some federal common law of good government. Each state has its own answer depending both on the form of its representative government and on local law setting ethical requirements for legislators. Taking legislative action while laboring under a conflict of interest may be "honest" in some circumstances and "dishonest" in others, the circumstances varying from state to state.

Rhode Island has a citizen legislature. As a member of this Court has observed, "[u]nlike many legislative bodies, including the United States Congress, most Rhode Island legislators are part-time ...." *National Association of Social Workers v. Harwood,* 69 F.3d 622,637 (1[st]Cir. 1995) (Lynch, J. dissenting). Legislators are paid no more than a stipend, 4:215-216, essentially to cover expenses. The session lasts six months or less, and is held in the late afternoons and evenings. *National Association, supra* at 637.

Necessarily, most legislators hold down outside jobs—most of them fulltime. The Rhode Island Government Owners Manual (2003-2004), U-G(*App.472*), lists each legislator and summarizes his/her employment. One finds teachers, insurance brokers, union representatives, and the like. *Id.* John Celona was listed as a consultant to the Village at Elmhurst. *Id.*

Every one of these legislators brings to state government both the knowledge and the interests of her/his particular profession. Inevitably, the personal economic circumstances of each legislator influences his/her public judgments. As a federal

court recently observed in considering South Dakota's part-time legislature, "[c]itizen legislators cannot avoid considering their own personal circumstances and how any rule of law or statute might impact them, as well as their constituents. They routinely do that." *Braun v. E.I. Dupont DeNemours & Co.*, 2006 U.S.Dist. LEXIS 37431 (D.S.D.).

Put another way, some level of conflict is integral to the legislative process in a state with a part-time citizen legislature. As an Indiana appeals court noted: "In our state's system of part-time citizen legislators, we must accept and anticipate that these public servants will hold employment outside of the legislature. We must also accept and anticipate that some degree of conflict is inherent in the system." *Wurster v. State of Indiana,* 708 N.E.2d 587,594 (Ind.App. 1999), *aff'd in part and rev'd in part,* 715 N.E.2d 341 (Ind. 1999).

The federal criminal law should be construed to respect the incidents of Rhode Island's choice of governmental system unless a Congressional override is clear on the face of the statute. As applied here, that respect required the trial court to instruct the jury that the Rhode Island public was not deprived of the honest services of a legislator simply because he functioned under a conflict of interest, if that conflict was permitted by state law.

The failure to give this instruction left jurors to apply the trial court's general standard for honest services deprivation – the failure to exercise independent

judgment – in the event that they concluded, as the defense argued and the evidence supported, that Driscoll did not hire Celona as a cover for a quasi-bribery, but that she did seek to further RW's political interest with him, knowing of his conflict. Hence, the jury may have entered its verdict of guilty on the basis of findings which, as a matter of law, cannot support a conviction for honest services fraud.

Frances Driscoll therefore asks that this Court reverse her conviction.

## VI. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON RHODE ISLAND ETHICS LAW WHILE UTILIZING AN "INDEPENDENT JUDGMENT" STANDARD FOR THE DEPRIVATION OF HONEST SERVICES.

### A. Introduction

The government charged this case broadly. In addition to accusations of quasi-bribery and deliberate non-disclosure, the single count of conviction for Driscoll (Count 2) alleged that the public was deprived of its right to have Celona's "services performed free of deceit, favoritism, bias, conflict of interest and self-enrichment." *App.53*. As one part of the alleged "Means and Methods" of the scheme, it accused Driscoll of pressing Celona to take "official action … refrain from taking official action" and "to influence other legislators to act or to fail to act in such a way as to benefit RWMC and its affiliates." *App.53*.

neither of which impacted RW more than other medical facilities, bringing it within the "class exception" under Rhode Island law. Further, it could have found that Driscoll initially proposed identifying Celona's job objective as promoting "RWMC" as well as the Village. G-81(*App.123*);10:210. An independent attorney took this language out, 10:214, and was responsible failing to inform the Commission of the only fact Celona claimed to conceal: his financial relationship to RW. 7:232. Driscoll's editing of McGuirk's mission statement is justifiable on its own merits, *i.e.,* that it was inappropriate to include a "treatise on strategic planning" in the agreement. 11:8.

Celona conceded that he did not conceal his loyalty to RW. He told anyone who asked, and some who didn't, U-H(*App.475*): "If somebody brought it up to me, I would always say I'm loyal to Roger Williams." 7:236. Nor was there any evidence from Celona or otherwise that Driscoll or Urciuoli sought to conceal their relationship.

**3. <u>Summary</u>**

In these circumstances, a reasonable juror could well have concluded that Driscoll did not participate in the hiring of Celona for the purpose of making use of his (dubious) political services. Similarly, given Celona's glaring lack of credibility, the jury may have rejected Celona's claims that he had communications with Driscoll and Urciuoli in which he received legislative marching orders. On

the other hand, the fax record established that Driscoll had a number of interactions with Celona in which she received political information, and one in which she asked him to take a legislative position. And she did this knowing he was on RW's payroll and hence had a conflict of interest.

The defense argued below that, as a matter of law, this conduct was not criminal under state or federal law. If this position is correct, then Driscoll was entitled to present this defense. She was entitled to argue that her participation in hiring and paying Celona, and thereafter pressing the Hospital's legislative agenda with him, did not deprive Rhode Island citizens of any honest services due under state law.

Almost certainly, the jury did not adopt the most extreme of the government's accusations against Driscoll—the claim that the consulting agreement was a mechanism for a bribe—as it acquitted her of the conspiracy charge which embodied this theory. Instead, the jury likely found that Driscoll aided in enlisting Celona despite his "conflict of interest." Without an instruction covering when the Ethics Code holds an interest to be "in substantial conflict with the proper discharge of his . . . duties in the public interest and of his . . . responsibilities as prescribed by the laws," it had no choice but to fall back on the "independent judgment"/"disinterested service" standard framed by the trial court.

In this circumstance, the government would not have proved a deprivation of honest services, the core element of 18 U.S.C. §§1341,1346.

"[W]hen a jury has been presented with several bases for conviction, one of which is legally erroneous, and it is impossible to tell which ground the jury convicted upon, the conviction cannot stand." *Sawyer I, supra* at 730-731(citation omitted). The court committed prejudicial error when it refused to instruct the jury that Rhode Island law expressly permitted a legislator to participate in legislation, notwithstanding an interest occasioned by his/her occupation, so long as that interest was no greater than that shared by others in the profession.

## VII. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO INCLUDE ANY SPECIFIC INTENT REQUIRMENT IN THE AIDING AND ABETTING CHARGE

### A. Introduction

Aiding and abetting requires proof of specific intent. The accessory must share both the criminal intent of the principal and the principal's knowledge of the underlying criminal act.

The trial court omitted both of these elements in the jury charge. Instead, it delivered a standard instruction on general intent: the aider and abettor must have "intended to assist" in the mail fraud scheme in the sense that she did not act accidentally. This instruction was not just wide of a bull's eye due to inelegant wording, understatement or imprecision. It missed the target completely by

eliminating the most important element of the crime. It authorized the jury to convict when the law said she was not guilty.[62]

**B. The Instructions**

The trial court described the mental state required for an aiding and abetting conviction in a single sentence: "[T]he Government has to prove that the Defendant intended to assist in the commission of the crime or to cause it to be committed." 17:173(*Add.25*). The court also used the word "willfully" twice: A guilty accomplice is one "who aids or abets someone else in committing the crime or who *willfully* causes someone else to commit the crime." 17:173(*Add.25*) (emphasis supplied). And: The government must prove "that the Defendant *willfully* did something to help in or to cause its commission." 17:174(*Add.26*) (emphasis supplied).

An act is done "willfully" according to the charge if "it's done knowingly, voluntarily and with intent to commit the act." 17:168(*Add.20*). The court went on: "The purpose of requiring that an act be done knowingly and willfully is to prevent a person from being convicted for engaging in an act that the person did not understand or did not intend to commit." *Id.* An act is "willful", in other words, if it is done intentionally and not by accident.

---

62 This Court's review of the legal elements is *de novo, Woodward, supra* at 68-69, mediated through the plain error standard, given the absence of objection below.

By contrast, jurors were told that, in order to find the principal guilty of mail fraud, they must conclude that defendant "acted knowingly, willfully *and* with the specific intent to defraud." *Id.* (emphasis supplied). According to the court: "Specific intent means more than the general intent to commit a particular act. To establish specific intent, the Government must prove that the Defendant knowingly did something that the law forbids and acted with the intent to violate the law." 17:169(*Add.21*). Thus, the "specific intent" required to convict a mail fraud principal required an explicit intention to violate the law. That intent is explicitly distinguished from the intent of an aider and abettor: someone who acts "willfully," *i.e.*, non-accidentally.

If the jury heeded these definitions, it could have come to only one conclusion about the mental state required for aiding and abetting the crime of mail fraud: Aiding and abetting does not require proof of the same "specific intent to defraud" that is required to convict a principal of mail fraud; aiding and abetting requires proof only that defendant offered assistance intentionally and not by accident.

## C. The Law

This instruction flouts settled jurisprudence. Aiding and abetting is a "specific intent crime." *United States v. Ortero-Mendez,* 273 F.3d 46,52 (1st Cir. 2001). The government must always prove that the aider and abettor "*shared the*

*criminal intent of the principal.'"* *United States v. Loder,* 23 F.3d 586,591 (1st Cir. 1994)(emphasis original), quoting *United States v. Serrano,* 870 F.2d 1,6 (1st Cir. 1989)(citations omitted). *Accord, United States v. Matos-Quinones,* 456 F.3d 14,20 (1st Cir. 2006).

Indeed, illicit intent is the crime's cardinal feature. "'By far the most important element [of aiding and abetting] is the sharing of the criminal intent of the principal.'" *United States v. Francomano,* 554 F.2d 483,486 (1st Cir. 1977), quoting *United States v. Snyder v. United States,* 448 F.2d 716,718-719 (8th Cir. 1971). Specific intent is aiding and abetting's most "vital element." *United States v. Tarr,* 589 F.2d 55,59 (1st Cir. 1978).

The mental-state element has a "knowledge" prong as well. In the words of *United States v. Taylor,* 54 F.3d 967,975 (1st Cir. 1995), : "Criminal intent is an important element of aiding and abetting ... Proof of this element *demands a showing* that the defendant *consciously shared the principal's knowledge* of the underlying criminal act, and *intended to help* the principal." (emphasis supplied; citations omitted). *See First Circuit Pattern Instructions* §4.02, p.52 (1998)(government must prove that defendant "participated in [the crime] as he/she would in something he/she wished to bring about. This means that the government must prove that the [defendant] consciously shared the other person's

knowledge of the underlying criminal act *and* intended to help him/her")(emphasis supplied).

**D. Plain Error**

The instruction here was not even close to the mark. "Of course, it is reversible error for a trial judge to fail to instruct the jury on every element of the offense necessary for conviction." *Woodward, supra* at 72 n.18 (citations omitted). It was reversible error to omit the specific intent requirement for aiding and abetting here. *E.g., United States v. Barclay,* 560 F.2d 812 (7$^{th}$Cir. 1977)(reversing where instructions stated that defendant must aid and abet "knowingly", but omitted requirement that defendant act with the same specific intent as the principal); *United States v. Gallishaw,* 428 F.2d 760 (2$^{nd}$Cir. 1970)(reversing conspiracy on same ground). Both *Barclay* and *Gallishaw* were cited by this Court with approval in *Loder, supra* at 591 en route to holding that "the specific intent requirement of the crime of aiding and abetting requires that the defendant consciously share the principal's knowledge of the underlying criminal act."[63]

[63] This Court has noted that it can be a "challenge" to instruct on the "vital element" of mental state in aiding and abetting cases. *Matos-Quinones, supra* at 18 n.4. The challenge does not, however, concern when and whether a knowledge instruction must be given. A shared-knowledge instruction is always required. *Taylor, supra; Loder, supra.* The challenge concerns, rather, the extent of the knowledge the government must prove. In *Loder, supra* at 590-591, for example, this Court held that, because aiding and abetting is a "specific intent crime," the "degree of knowledge" proven must be more than a "'general suspicion that an



P. 12

There can be no reasonable dispute in light of this Court's precedents that the error was both "clear" and "obvious" and therefore "plain." *United States v. Romano,* 137 F.3d 677,682 (1st Cir. 1998), quoting *United States v. Bradstreet,* 135 F.3d 46,50 (1st Cir. 1998)(internal quotation marks and citations omitted). This instruction authorized the jury to convict, erroneously, if it found that Driscoll assisted fraudulent activity without herself intending to defraud. It could convict, in other words, even if Driscoll was not guilty of the charged crime.

There is at a minimum a "reasonable probability that but for the error, the outcome would have been different." *United States v. Colon-Nales,* 464 F.3d 21,28 (1st Cir. 2006). The fact that Driscoll was acquitted of conspiracy and convicted of mail fraud is highly indicative. The indictment framed the two offenses almost word-for-word identically. *App.53*,¶¶14,96. The court's instructions on both conspiracy and mail fraud stressed the specific intent requirement that was missing in the aiding and abetting charge. *E.g.*, 17:169 (*Add.21*); 17:178-179(*Add.30-31*). If jurors concluded that Driscoll participated with other people in "devising" a fraudulent scheme for purposes of the mail fraud conviction, it is hard to see how they could simultaneously have concluded that she did not enter a conspiracy to the same end with those same people. It is far more

---

unlawful act may occur.'" (quoting *United States v. Labat,* 905 F.2d 18,23 (2nd Cir. 1990)).

likely that jurors concluded they were obliged to enter a mail fraud conviction under the aiding and abetting instruction on a bare finding that she assisted, but did not join in, the fraudulent scheme. That would be a miscarriage of justice.

Because the jury returned a single verdict on Count 2, charging both mail fraud and aiding and abetting mail fraud, it is not possible at this juncture to determine on which of these two prongs the jury hung its guilty verdict. Plain error on one of these prongs therefore requires reversal of the conviction. *Sawyer I, supra* at 730-731.

Plain error becomes reversible error when it involves conviction of a potentially innocent defendant. *E.g., United States v. Romano,* 137 F.3d 677,682 (1st Cir. 1998). Driscoll respectfully asks that her conviction be reversed in the interests of justice.

## VIII. THE DISTRICT COURT ERRED IN ITS INSTRUCTIONS DEFINING OFFICIAL DUTIES

Defendant incorporates Part I of Robert Urciuoli's brief pursuant to F.R.A.P. 28. She preserved this claim as set forth at p. 31 *supra.*

As noted at pp. 20-21 *supra,* Celona's rescue run activity was far and away his most significant non-outreach activity prior to the filing of the Ethics Advisory Request. Driscoll was the recipient of a number of faxes on the rescue run issue. *Id.* As the indictment's allegation of deceit was premised exclusively on the

Advisory Request's failure to include all of Celona's activities, the jury may well have returned its verdict on the rescue run evidence which the jury assessed under a legally erroneous standard.

## IX. CONCLUSION

For reasons stated in this brief, and the reasons that may appear on further litigation of this case, Frances Driscoll asks this Court to grant her appeal, to reverse her conviction, and to remand this case to the District Court for a new trial.

Respectfully submitted,
FRANCES P. DRISCOLL
By her attorney,

JOHN A. MACFADYEN (1st Cir. #13514)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
(401) 751-5090

On the brief:
B. Jean Rosiello, Esq.